ACCEPTED
07-15-00327-CV
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
11/20/2015 4:55:24 PM
Vivian Long, Clerk

**No. 07-15-00327-CV**

**IN THE COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS AT AMARILLO**

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
11/20/2015 4:55:24 PM
VIVIAN LONG
CLERK

**HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS,**

**Appellants/Cross-Appellees,**

**v.**

**JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust,**

**Appellee/Cross-Appellant.**

**On Appeal from the 46th Judicial District Court Wilbarger County, Texas, Trial Court Cause No. 24,955 Honorable Dan Mike Bird, Presiding**

**BRIEF OF CROSS-APPELLANT**

Lee F. Christie
State Bar No. 042317100
lfchristie@popehardwicke.com
Michael L. Atchley
State Bar No. 01397600
matchley@popehardwicke.com
**POPE, HARDWICKE, CHRISTIE, SCHELL, KELLY & RAY, L.L.P.**
500 W. 7th Street, Suite 600
Fort Worth, Texas 76102
817.332.3245—Telephone
817.877.4781—Telecopier

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

**Cross-Appellant/Appellee/Plaintiff:**

John Mikkelsen, acting solely in his capacity
as Trustee of the John Mikkelsen Trust

**Counsel for Cross-Appellant/Appellee/Plaintiff:**

Lee F. Christie
State Bar No. 042317100
lfchristie@popehardwicke.com
Michael L. Atchley
State Bar No. 01397600
matchley@popehardwicke.com
**POPE, HARDWICKE, CHRISTIE,
SCHELL, KELLY & RAY, L.L.P.**
500 W. 7th Street, Suite 600
Fort Worth, Texas 76102
817.332.3245 — Telephone
817.877.4781 — Telecopier
*Trial and Appellate Counsel*

# IDENTITY OF PARTIES AND COUNSEL (cont.)

## Appellants/Cross-Appellees/Defendants:

Herring Bancorp, Inc.
C.C. Burgess
C. Campbell Burgess

## Counsel for Appellants/Cross-Appellees/Defendants:

Thomas S. Leatherbury
State Bar No. 12095275
tleatherbury@velaw.com
Manuel G. Berrelez
State Bar No. 24057760
mberrelez@velaw.com
Stephen S. Gilstrap
State Bar No. 24078563
sgilstrap@velaw.com
**VINSON & ELKINS, LLP**
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201
214.220.7700—Telephone
214.999.7792—Telecopier
*Appellate Counsel*

Cornell D. Curtis
State Bar No. 24007069
vernonlaw@sbcglobal.net
**CORNELL D. CURTIS, P.C.**
1716 Main Street
Vernon, Texas 76834
940.552.9100—Telephone
940.552.2655—Telecopier
*Trial and Appellate Counsel*

Tim Newsom
State Bar No. 00784677
tim@lovell-law.net
John H. Lovell
State Bar No. 12609300
john@lovell-law.net
**LOVELL, LOVELL, NEWSOM & ISERN, L.L.P.**
112 West 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
806.373.1515—Telephone
806.379.7176—Telecopier
*Trial Counsel*

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ..........................................................i

INDEX OF AUTHORITIES........................................................................ v

STATEMENT OF THE CASE...................................................................vii

STATEMENT REGARDING ORAL ARGUMENT.........................................viii

TABLE OF ABBREVIATIONS ................................................................. ix

ISSUES PRESENTED ..............................................................................x

STATEMENT OF FACTS.........................................................................1

SUMMARY OF THE ARGUMENT...................................................................19

ARGUMENT AND AUTHORITIES .................................................................20

      ISSUE 1:    The trial court excluded Mikkelsen's evidence
                of Appellants' noncompliance with regulatory
                requirements and failure to inform the Internal
                Revenue Service and regulators that the
                supposed Subchapter "S" conversion was
                compromised as two classes of stock continue
                to exist. Was this error? ........................................................20

      ISSUE 2:    The trial court denied Mikkelsen's Motion
                to Compel the discovery of net worth information.
                Was this error?.......................................................................24

CONCLUSION .........................................................................................26

PRAYER...................................................................................................27

SIGNATURE OF COUNSEL ......................................................................28

CERTIFICATE OF COMPLIANCE ...........................................................29

CERTIFICATE OF SERVICE .....................................................................29

INDEX TO APPENDIX TO BRIEF OF CROSS-APPELLANT .......................30

# INDEX OF AUTHORITIES

**Cases**                                                                               **Page**

*Alamo Nat'l Bank v. Kraus*,
616 S.W.2d 908 (Tex. 1981) ............................................................. 22, 26

*BMW of N. Am. v. Gore*,
517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ........................... 22

*Ford Motor Co. v. Castillo*,
279 S.W.3d 656 (Tex. 2009) ...................................................................... 25

*Gharda USA, Inc. v. Control Solutions, Inc.*,
464 S.W.3d 338 (Tex. 2015) ...................................................................... 21

*In re Arpin America Moving Systems, LLC*,
416 S.W.3d 927 (Tex. App.—Dallas 2013, orig. proceeding) ............... 25

*In re Jacobs*, 300 S.W.3d 35
(Tex. App.—Houston [14th Dist.] 2009, orig. proceeding) .................. 25

*Lunsford v. Morris*,
746 S.W.2d 471 (Tex. 1988) ...................................................................... 25

*McElroy v. Fitts*,
876 S.W.2d 190 (Tex. App.—El Paso 1994, writ dism'd) ...................... 27

*State v. Central Expressway Sign Assocs.*,
302 S.W.3d 866 (Tex. 2009) ...................................................................... 21

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ........................... 22

*Tex. Mut. Ins. Co. Navarez*,
312 S.W.3d 94 (Tex. App.—Dallas 2010, pet. denied) .......................... 25

*Tony Gullo Motors I, L.P. v. Chapa*,
    212 S.W.3d 299 (Tex. 2006)........................................................ 22

*Vernon v. Perrien*,
    390 S.W.3d 47 (Tex. App.—El Paso 2012, pet. denied)......................... 23

## Rules and Statutes

Tex. Civ. Prac. & Rem. Code § 41.011 ............................................. 22

Tex. R. App. P. 9.4 ...................................................................... 29

Tex. R. App. P. 39 .......................................................................viii

# STATEMENT OF THE CASE

| | |
|---|---|
| **Nature of the Case:** | This is an appeal following a jury trial. Plaintiff/Cross-Appellant Mikkelsen filed suit contending that Appellants' invalid stock redemption constituted a breach of Herring's Articles of Incorporation and therefore a breach of contract. Mikkelsen also brought claims for declaratory judgment, enforcement of inspection rights, breach of fiduciary duty, civil conspiracy, and unlawful oppression of a minority shareholder. [1 CR 5-17; 2 CR 153-161] [App. 45-57; 58-66] |
| **Trial Court:** | The 46th Judicial District Court, Wilbarger County, Texas, Cause No. 24,955; the Honorable Dan Mike Bird, presiding. |
| **Trial Court's Disposition:** | The trial court entered a Final Judgment on June 16, 2015 incorporating a prior partial summary judgment as well as the jury's verdict [2 CR 334; App. 1]. The trial court denied Appellants' Motion for Judgment Notwithstanding the Verdict and Motion for New Trial on August 19, 2015. [2 CR 409-410]. |

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rule of Appellate Procedure 39, Cross-Appellant Mikkelsen requests oral argument. This Court's decision will be significantly aided by oral argument because the appeal involves a somewhat complex set of facts and procedural history.

# TABLE OF ABBREVIATIONS

Mikkelsen: Appellee/Cross-Appellant/Plaintiff John Mikkelsen

Herring:    Appellant/Cross-Appellee/Defendant Herring Bancorp, Inc.

CR:         Clerk's Record

RR:         Reporter's Record

App:        Appendix

# ISSUES PRESENTED

ISSUE 1:    The trial court excluded Mikkelsen's evidence of Appellants' noncompliance with regulatory requirements and failure to inform the Internal Revenue Service and regulators that the supposed Subchapter "S" conversion was compromised as two classes of stock continue to exist. Was this error?

ISSUE 2:    The trial court denied Mikkelsen's Motion to Compel the discovery of net worth information. Was this error?

## STATEMENT OF FACTS

This case involves the purported redemption of shares of Herring's preferred stock. Herring is a bank holding company that owns Herring Bank. Mikkelsen was previously Chairman of the Board of Directors for Herring and the Bank, but he was ousted from these roles in the 1990s when the Burgess family took control of both. Mikkelsen later inherited some shares of Herring preferred stock from his mother and was later assigned preferred shares by his brother Mallory Mikkelsen.

When the Burgess family decided to convert Herring to a Subchapter "S" corporation — meaning that it could no longer have preferred stock — they concocted a scheme to permit all of the preferred shareholders except Mikkelsen (that is, the Burgess family and their friends) to trade their preferred stock for common stock. Mikkelsen alone was commanded to sell his preferred shares back to Herring for par value. Mikkelsen's suit centers on his contention that this unequal treatment of the preferred shares (permitting the exchange of some but then "redeeming" Mikkelsen's) violated the company's Articles of Incorporation and was void.

Mikkelsen, as Trustee of the John Mikkelsen Trust, owns 300 shares of preferred stock in Herring.[1] His chief complaint in this case is that Herring violated its Articles of Incorporation because it permitted all of Herring's preferred stock except his to be exchanged for common stock, and that his shares were singled out for "redemption," meaning that he was commanded to sell them back to the company for par value. Mikkelsen filed this suit in the trial court, making claims for (1) breach of contract, for violating the Articles of Incorporation, (2) a declaratory judgment that the redemption was void and that Mikkelsen continues to be a preferred shareholder, (3) a declaratory judgment that Mikkelsen has the right to inspect the company's books and records, and (4) breach of fiduciary duty, oppression of a minority shareholder, and conspiracy, as Mikkelsen contends that the redemption scheme was the work of the Burgess family aimed at singling him out and divesting him of any interest in Herring.

Mikkelsen's involvement with Herring Bank began in 1969, when he was elected to its Board of Directors.[2] Mikkelsen's

---

[1] 8 RR 47-48.
[2] 8 RR 21.

grandfather-in-law was involved with the Bank when it was chartered in 1903.[3] Mikkelsen became Vice-Chairman of the Board in 1978, and was elected Chairman of the Board in 1982.[4] Herring Bancorp — the holding company that is a party to this case — was formed in 1984.[5] Herring Bancorp owns Herring Bank.[6] Mikkelsen served as Chairman of the Board of the Bank from 1982 until 1997, and served as Chairman of the Board of Herring Bancorp from the time it was formed in 1984 until 1992.[7]

Appellant C.C. Burgess bought stock in Herring Bank in about 1972, and was elected to the Board of Directors in about 1973.[8] C.C. Burgess continues to serve on Herring Bancorp's Board of Directors as its Chairman.[9] He is also Chairman of the Board of Directors of the Bank.[10]

---

[3] 8 RR 18-19.
[4] 8 RR 22.
[5] 8 RR 23.
[6] 9 RR 16.
[7] 8 RR 27-28.
[8] 8 RR 27.
[9] *Id.*; 9 RR 16
[10] 9 RR 16-17.

Campbell Burgess is the son of C.C. Burgess.[11] He has served as Chief Executive Officer and Vice-Chairman of Herring Bancorp.[12] He has also served as Vice-Chairman of the Bank.[13]

C.C. Burgess gained an executive capacity with Herring in the 1990s, when the Burgess family acquired additional stock in the company and took control of it.[14] From that time forward, the Burgess family, or trusts created for their benefit, have owned and controlled a majority of Herring's stock, and they have been in control of the Bank and the holding company for all of that time.[15] Members of the Burgess family now comprise the entire Herring Board of Directors, except for one seat, which is held by a long-time friend of Campbell Burgess.[16]

When the Burgess family took control of the Bank in 1992, they elected themselves to enough positions to take over the Board of Directors, and they decided to oust Mikkelsen from his leadership

---

[11] 9 RR 95-96.
[12] 9 RR 17.
[13] *Id*.
[14] 9 RR 18.
[15] 9 RR 18, 21.
[16] 9 RR 21, 75-76.

role.[17] One of the other shareholders, along with the local County Attorney, brought a *quo warranto* proceeding, contending in essence that the Burgesses had not been properly elected to their positions.[18] That litigation was resolved in June or July 1992, by an agreement under which, among other things, Mikkelsen and his family sold essentially all of their shares in the holding company (all except for 180 shares, which were sold back to the company in 1998), and Mikkelsen was provided a five-year contract to stay on as Chairman and Chief Executive Officer until December 31, 1997.[19] After this, Mikkelsen was out of the Bank and the Burgesses were in complete control.[20]

The only Mikkelsen to retain any interest in the company after that time was Mikkelsen's mother, who had 300 shares of Herring's preferred stock (i.e., stock that has a specific par value and earns a certain percentage dividend, but has no voting rights).[21] There were about 17,000 total shares of Herring preferred stock outstanding.[22]

---

[17] 8 RR 36-37; 9 RR 20-21.
[18] 8 RR 34-35.
[19] 8 RR 35-36.
[20] 8 RR 36-37.
[21] 8 RR 37.
[22] *Id*.

Mikkelsen's mother died in 2005, at which time Mikkelsen (as Trustee of the John Mikkelsen Trust) inherited 150 of the preferred shares and his brother Mallory inherited the other 150 shares.[23] Mallory later assigned his 150 shares to Mikkelsen (as Trustee of the John Mikkelsen Trust).[24]

The Burgesses decided in 2006 to convert Herring from a Subchapter "C" corporation to a Subchapter "S" corporation.[25] This was allegedly desired mainly to take advantage of the fact that Subchapter "S" corporations are not taxed at the corporate level as Subchapter "C" corporations are. Rather, Subchapter "S" corporations are taxed more like partnerships; dividends are paid to the shareholders, who pay taxes on that income, but the company itself is not generally subject to income taxation.[26] Mikkelsen initially expressed to C.C. Burgess that he was not opposed to the conversion.[27]

---

[23] 8 RR 46-47.
[24] 8 RR 48-49.
[25] 8 RR 55-56, 59; 10 RR 88-89.
[26] 8 RR 56.
[27] 8 RR 59-60.

To convert a corporation from Subchapter "C" to Subchapter "S," the company needs the consent of all shareholders,[28] must maintain no more than one class of stock,[29] and must have no more than 100 shareholders.[30] As the company had preferred shares outstanding, Herring would have to redeem those shares or convert them to common stock.[31]

Herring's preferred stock had been issued under specific authority in the company's Articles of Incorporation. The Articles also set forth a specific, required procedure for redeeming the shares:

> 5. Redemption.
>
> a. <u>Preferred Stock</u>. The Corporation, at the option of the Board of Directors, may at any time redeem the whole, or from time to time redeem any part, of the Preferred Stock outstanding by paying in cash therefor the sum of $95 per share, plus all dividends declared but unpaid thereon . . . .
>
> ***
>
> <u>Should only a part of the outstanding Preferred Stock be redeemed, the redemption will be effected by lot or pro rata, as prescribed by the Board of Directors</u>.[32]

---

[28] 10 RR 110-111.

[29] 8 RR 61; 9 RR 25.

[30] 9 RR 29-30.

[31] 8 RR 61.

[32] 12 RR PX-2 (App. 84) (emphasis added).

The Articles of Incorporation are clear on this: if the company wishes to redeem any preferred shares, it must either (1) redeem all of them, (2) redeem some by lot [drawing], or (3) redeem some of them by redeeming pro rata from each shareholder.[33]

Instead of following the Articles, the Burgesses decided on a different scheme that resulted in bracketing and forcing out only the Mikkelsen shares. C.C. Burgess and one other Board member labeled themselves a two-person "committee" that concocted "criteria" for permitting a preferred shareholder to "convert" their shares for common stock in the company rather than to have the shares redeemed.

In essence, the Burgess "committee" decided that a preferred shareholder would be entitled to convert preferred shares to common stock if (1) the preferred shareholder had a banking relationship with Herring Bank, and (2) upon conversion, the shareholder would hold at least 50 shares of common stock; any other preferred shares (i.e.,

---

[33] 8 RR 93.

Mikkelsen's) would be redeemed.[34] There is no authority in the Articles of Incorporation for such a set of "criteria" to determine which preferred shares to redeem, and there is no authority in the Articles for an "exchange" or "conversion" of preferred shares.

At the time this conversion scheme was created, there were 11 preferred shareholders, who together held a collective 17,147 preferred shares.[35] Those shareholders were (1) C.C. Burgess – 7882 shares ; (2) Janie Slemp Burgess (C.C. Burgess's wife[36]) – 576 shares; (3) Margo Colquitt Burgess (C.C. Burgess's former daughter-in-law[37]) – 1053 shares; (4) Harriet Burgess Myers (C.C. Burgess's sister[38]) – 660 shares; (5) Monarch Trust Co. (a trust company owned by the Burgess family[39]) – 96 shares; (6) Kelly & Susan Couch Living Trust (Susan Couch was a board member[40]) – 2940 shares; (7) Sharon Haney Browning (cousin of board member Couch[41]) – 1470 shares; (8) Susan

---

[34] 8 RR 192; 9 RR 96-97.
[35] 9 RR 100-104; 12 RR PX-25 (App. 93).
[36] 8 RR 31; 9 RR 100.
[37] 9 RR 101.
[38] 9 RR 101.
[39] 9 RR 100.
[40] 9 RR 101.
[41] 9 RR 100-101.

Spiller Culbertson (relative of board member Couch[42]) – 1470 shares; (9) Vernon Parts, Inc. (a company owned by Jim Pennington[43]) – 1000 shares; (10) Mikkelsen – 150 shares; (11) Mallory Mikkelsen – 150 shares.[44]

As the preferred shares had a set par value of $95 per share, Herring would have had to pay over $1,600,000.00 to redeem all 17,147 preferred shares ($95 x 17,147).[45] The company obviously wished to avoid such an expenditure, which is undoubtedly part of the reason the Burgesses concocted the conversion scheme.

To convert the preferred shares to common stock, the company calculated an exchange value based on the par value of the preferred shares ($95 per share) and the book value of the common stock.[46] The book value of the common stock at that time was $698.10,[47] meaning that the conversion rate was about 7.34 preferred shares for one share of common stock (698.10 / 95).[48]

---

[42] 9 RR 101.
[43] 9 RR 203.
[44] 12 RR PX-25 (App. 93).
[45] 9 RR 61.
[46] 9 RR 30-31.
[47] 10 RR 153.
[48] *Id.*; 13 RR DX- 12 (App. 94).

The conversion rate resulted in a calculation that the preferred shareholders, if they converted to common stock, would receive these numbers of common shares: (1) C.C. Burgess - 1072 shares; (2) Janie Slemp Burgess – 78 shares; (3) Margo Colquitt Burgess – 143 shares; (4) Harriet Burgess Myers – 89 shares; (5) Monarch Trust Co. – 13 shares; (6) Kelly & Susan Couch Living Trust – 400 shares; (7) Sharon Haney Browning – 200 shares; (8) Susan Spiller Culbertson– 200 shares; (9) Vernon Parts, Inc. – 136 shares; (10) Mikkelsen – 20 shares; (11) Mallory Mikkelsen – 20 shares.[49]

C.C. Burgess's "criteria" for permitting conversion — specifically, the criterion denying conversion for anyone who would not have at least 50 shares of common stock — cut out only the Mikkelsen shares. Monarch Trust Co. (the Burgess family company) already had other shares of common stock, so it would have over 400 total shares after conversion.[50] Corporations cannot own stock in a Subchapter "S" corporation, but the company assisted Monarch, and Vernon Parts,

---

[49] 10 RR 153; 13 RR DX- 12 (App. 94).
[50] 9 RR 53.

Inc., to change the ownership of their shares so that they could then be converted to common stock.[51]

The Burgesses offered no similar assistance to Mikkelsen. Rather, the 50-share criterion cut only the Mikkelsens out of the chance to convert to common stock (as they would have had about 40 shares instead of the concocted 50-share requirement). There was no legitimate reason for the 50-share requirement; C.C. Burgess testified that it was just a number he and the other member of his two-person "committee" invented.[52] Though Board committees were required by the company's Bylaws to keep minutes, this "committee" kept no minutes.[53]

Obviously, the Burgesses wanted to rid themselves of Mikkelsen. He was the person they had already forced out of the Bank once, and they did not want him involved any longer. Even though he had expressed general initial agreement with the conversion to Subchapter "S" status, they were concerned that he might ultimately

---

[51] 9 RR 203.
[52] 9 RR 57.
[53] 9 RR 49-50.

oppose the idea, thus depriving the Burgesses of the unanimity required for conversion.[54]

The only stated reason the Burgesses had for implementing any criteria is that they wanted to limit the number of stockholders so that they would not ultimately run afoul of the maximum of 100 shareholders.[55] But the company would have had far fewer than 100 shareholders, and with the generational exception (under which lineal relatives generally do not count against the 100-shareholder limit), the company was nowhere close to the maximum number.[56] There is no evidence supporting the notion that ridding the company of Mikkelsen and only Mikkelsen would translate to any significant difference vis-à-vis the 100-shareholder maximum.

C.C. Burgess initially told Mikkelsen that <u>all</u> preferred shares would be redeemed and/or exchanged into common stock.[57] However, on September 22, 2006, Burgess sent Mikkelsen a letter informing him that "[s]ince the conversion factor [for preferred and non-voting common shares] will result in you and Mallory having

---

[54] 10 RR 110.
[55] 9 RR 27.
[56] 9 RR 30; 8 RR 77-78.
[57] 8 RR 61.

only 19 shares of common stock each, we will be sending you and Mallory a letter expressing the Bank's intent to call your preferred stock."[58] As this letter reflects, Mikkelsen and his brother were being singled out for "special" treatment in the form of deprivation of their preferred shares.

Although the other preferred shareholders were given the opportunity to convert their shares to common stock,[59] the Mikkelsens were sent a "Notice of Redemption" informing them that their shares would be redeemed:

> This letter is to notify you that the board of directors (the "Board") of Herring Bancorp, Inc. (the "Company") has called for the redemption (the "Redemption") of your outstanding shares of Preferred Stock (the "Preferred Stock") of the Company on November 20, 2006.
>
> ***
>
> As a result of this process, the Board appointed a committee to recommend the criteria for determining which Preferred Stock shareholders would be offered to exchange their shares for the Company's common stock (the "Common Stock"), the nonvoting Common Stock-Series A (the "Common Stock-Series A"), or to have their shares redeemed. The Board's criteria for making this

---

[58] 8 RR 69; 12 RR PX- 9.
[59] 12 RR PX-18.

determination included whether the Preferred Stock shareholder had a banking relationship with Herring Bank (the "Bank"), and whether they would own at least 50 shares of Common Stock upon the conversion. If these criteria were met, the Board offered the Preferred Stock shareholders the option to exchange their shares for the Common Stock. If the Preferred Stock shareholder did not meet these criteria, the Board determined the Preferred Stock shareholders would be redeemed.

***

From our conversations with you and the Board's determination regarding our classes of stock, your Preferred Stock will be redeemed.[60]

Clearly, Defendants' own "Notice of Redemption" draws a distinction among the preferred shareholders and admits that only some of the preferred shares were being redeemed for cash. The Notice of Redemption also makes it clear that the procedure for determining which of the preferred shares would be redeemed for cash did not involve a drawing by lot or pro rata as mandated by the Articles; instead, all but the Mikkelsen shares were "exchanged" for common stock.

Mikkelsen did not surrender the 300 shares as demanded, but instead pleaded with Burgess and Herring's attorneys to permit him to

---

[60] 12 RR PX-13 (App. 90); 8 RR 80-81.

convert the preferred shares to common stock, and reminded them that the partial redemption violated the Articles of Incorporation.[61] Mikkelsen's requests were ignored, so he filed the underlying lawsuit in 2008.[62]

*Procedural History*

In the court below, Mikkelsen asserted claims for (1) breach of contract, (2) a declaration that the redemption was void and that he continues to hold 300 shares of Herring's preferred stock, (3) a declaration that he has the right to inspect the company's books and records, and (4) breach of fiduciary duty, unlawful oppression of a minority shareholder, and conspiracy.[63]

Well before the case went to jury trial, the trial court granted a partial summary judgment in favor of Mikkelsen on his breach of contract claim and declaratory judgment claims.[64] Specifically, the trial court found and concluded as a matter of law that (1) the purported redemption of Mikkelsen's preferred shares was undertaken in violation of the company's Articles of Incorporation and

---

[61] 8 RR 76; 8 RR 116-127.
[62] 8 RR 127.
[63] 1 CR 5-17 (App. 45-57); 2 CR 153-161 (App. 58-66).
[64] 1 CR 306-307 (App. 4-5).

is void, and (2) Mikkelsen is, and continues to be, the holder of 300 shares of Herring's preferred stock, and has all the rights appurtenant thereto, including the right to inspect the company's books and records.[65]

During the trial, the trial court did not permit Mikkelsen to introduce evidence of regulatory difficulties concerning the Burgesses and the Office of the Comptroller of the Currency and the FDIC.[66] Specifically, by way of an offer of proof, Mikkelsen offered evidence that an order such as the trial court's order granting Mikkelsen's Motion for Partial Summary Judgment invokes a duty on the part of the Bank's management to disclose the order to the IRS and regulators.[67] There was no such disclosure, and no disclosure on Herring's FDIC call reports.[68] Additionally, Mikkelsen offered evidence of Herring's failure to comply with requirements of the Office of the Comptroller of the Currency (the regulatory authority governing national banks), that the bank surrendered its OCC charter

---

[65] *Id.*

[66] 6 RR 10-14; 8 RR 142-144.

[67] 8 RR 220-221

[68] 8 RR 221-246; 12 RR PX-45, 46, 47, 52, 53 (App. 95-115), 54 (App. 116-141); 13 RR DX-31, 41-46.

and became a state bank, and that the FDIC essentially ordered Campbell Burgess to cease his leadership role with the Bank.[69] The trial court refused to admit this evidence, even though Mikkelsen urged that the evidence was critical in showing a pattern of improper conduct.

The trial court also prevented Mikkelsen from introducing evidence as to the net worth of the Appellants, and in fact precluded Mikkelsen from being able to conduct discovery of the Appellants' net worth.[70]

At the conclusion of the trial, the jury found that Mikkelsen was entitled to recover attorney's fees in the amount of $127,442.00 through trial, with additional amounts for appeals; found that C.C. Burgess engaged in oppressive conduct toward Mikkelsen; found that Campbell Burgess engaged in oppressive conduct toward Mikkelsen; found that Mikkelsen was entitled to recover damages in the amount of $23,314.80 for lost dividend income; found that C.C. Burgess did not act with malice; found that Campbell Burgess did not act with malice;

---

[69] 8 RR 237-238; 12 RR PX-53-54 (App. 105-115; 116-141); 10 RR 216-232.
[70] 1st Supp CR 86-93 (App. 37-43; 44).

did not find any exemplary damages; found that C.C. Burgess breached fiduciary duties owed to Mikkelsen; found that Campbell Burgess did not breach fiduciary duties owed to Mikkelsen; and found no conspiracy.[71]

The trial court entered a Final Judgment incorporating the jury's verdict and the prior order on Mikkelsen's Motion for Partial Summary Judgment.[72]

## SUMMARY OF THE ARGUMENT

Although Mikkelsen was largely successful in the trial court, he was prevented from introducing evidence that was central to his effort to obtain exemplary damages. The trial court erred by excluding evidence of Appellants' pattern of wrongdoing, which was crucial to showing malice and other factors weighing on whether to award exemplary damages and in what amount. The trial court also erred by denying Mikkelsen's Motion to Compel discovery of Appellants' net worth, which precluded Mikkelsen from developing and introducing

---

[71] 2 CR 228-258 (App. 6-36)
[72] 2 CR 334 (App. 1-3).

the evidence of net worth that is also essential to his claim for exemplary damages.

## ARGUMENT AND AUTHORITIES

**ISSUE 1:** **The trial court excluded Mikkelsen's evidence of Appellants' noncompliance with regulatory requirements and failure to inform the Internal Revenue Service and regulators that the supposed Subchapter "S" conversion was compromised as two classes of stock continue to exist. Was this error?**

At trial, Mikkelsen offered evidence relating to regulatory problems encountered by Appellants, as well as Appellants' failure to report to regulators that the summary judgment order had been entered. As the summary judgment order found that Mikkelsen continued to own preferred shares in Herring, Herring had more than one class of shareholders and its Subchapter "S" conversion was void or at least in jeopardy. It is a critical omission for Appellants not to bring this information to the attention of the IRS and the appropriate regulators. Mikkelsen needed to present evidence of these matters to show a continuing course of dishonest behavior. This evidence would have assisted the jury in determining whether malice was present and in determining whether to award exemplary damages. Lacking this

critical evidence, the jury found in favor of Appellants on both of these issues.

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). Reversal is appropriate if the error is harmful; that is, if it probably caused the rendition of an improper judgment. *State v. Central Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). This Court should consider the entire record in determining whether the evidentiary ruling was harmful. *Id.* Mikkelsen need not show that "but for" the exclusion of the evidence a different judgment would have resulted. Rather, the error was harmful if the excluded evidence was crucial to a key issue. *Id.*

Here, the excluded evidence was crucial to the jury's ability to analyze whether to award exemplary damages and in what amount. In making this determination, a jury is to consider (1) the nature of the wrong, (2) the character of the conduct, (3) the degree of the wrongdoer's culpability, (4) the situation and sensibilities of the parties concerned, (5) the extent to which the conduct offends a public sense of justice and propriety, and (6) the defendant's net worth.

*Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981); Tex. Civ. Prac. & Rem. Code § 41.011.

The trial court instructed the jury to consider the *Kraus* factors in this case,[73] but the jury was lacking crucial evidence pertaining to the character of the conduct, the degree of culpability, the situation and sensibilities of the parties, and a public sense of justice and propriety. A factor in determining an award of exemplary damages is whether the harm involved repeated acts or isolated incidents. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 318 (Tex. 2006), citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). A recidivist is generally more reprehensible, and may be punished more severely, than a one-time offender. *Id.* at 309 n. 48, citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 577, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Mikkelsen was denied an opportunity to demonstrate the Appellants' recidivism to the jury.

Although the *Kraus* factors generally relate to the amount of exemplary damages, they are important here as to liability because the "malice" that would justify an award of exemplary damages may be

---

[73] 2 CR 249-250 (App. 27-28).

shown by direct or circumstantial evidence. See *Vernon v. Perrien*, 390 S.W.3d 47, 62 (Tex. App.—El Paso 2012, pet. denied).

Mikkelsen attempted to introduce evidence that the FDIC essentially ordered the removal of Campbell Burgess from the Bank because, among other things, he "engaged or participated in unsafe or unsound banking practices, committed or engaged in acts, omissions, or practices which constitute breaches of his fiduciary duty to the Bank, and/or violated law or regulation; that the Bank suffered financial loss and [Campbell Burgess] received financial gain or other benefit as a result of such practices . . . and that such practices . . . demonstrate [Campbell Burgess's] personal dishonesty or willful or continuing disregard for the safety or soundness of the Bank."[74]

Mikkelsen also attempted to introduce evidence of an agreement between the Bank and the Office of the Comptroller of the Currency under which the Bank was required to undertake a series of actions to remedy deficiencies in the Bank's operations and that, instead of

---

[74] 12 RR PX-54 (App. 116); 8 RR 239-243, 245-246; 10 RR 217-218; 222; 225-232.

complying, the Bank forfeited its decades-old national charter and became a state bank.[75]

Mikkelsen also attempted to introduce evidence of the Appellants' failure to notify the Internal Revenue Service and the FDIC of the potential existence of two classes of stock, after the trial court had ordered that Mikkelsen continued to own preferred shares.[76]

If this crucial evidence had been admitted, the jury probably would have concluded that C.C. Burgess and Campbell Burgess acted with malice, and that their recidivism, their degree of culpability, and a public sense of justice and propriety justified an award of exemplary damages. The trial court erred in refusing to admit this evidence, and the error was harmful in that it probably resulted in an improper judgment on the issue of exemplary damages.

**ISSUE 2:** **The trial court denied Mikkelsen's Motion to Compel the discovery of net worth information. Was this error?**

Mikkelsen was also prevented from introducing evidence of the Appellants' net worth and, in fact, was not permitted to conduct

---

[75] 12 RR PX-53 (App. 95); 8 RR 235-239, 245-246; 10 RR 217-218; 222; 225-232.
[76] 8 RR 220-228; 232-235; 10 RR 216-232.

discovery on the issue. The trial court denied Mikkelsen's Motion to Compel discovery of the Appellants' net worth.[77]

A trial court's discovery order is reviewed for abuse of discretion. *Tex. Mut. Ins. Co. v. Navarez*, 312 S.W.3d 94, 103 (Tex. App.—Dallas 2010, pet. denied). A trial court abuses its discretion when it denies discovery going to the heart of a party's case or when the denial compromises a party's ability to present a viable defense. *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 663 (Tex. 2009).

A defendant's net worth is relevant in a suit involving exemplary damages. *Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex. 1988). Under the law applicable to this case, a plaintiff who is seeking to recover exemplary damages is entitled to discovery of the defendants' net worth, and is not required to make a prima facie showing of likely recovery before conducting such discovery. *In re Arpin America Moving Systems, LLC*, 416 S.W.3d 927, 929 (Tex. App.—Dallas 2013, orig. proceeding); *In re Jacobs*, 300 S.W.3d 35, 40-41 (Tex. App.—Houston [14th Dist.] 2009, orig. proceeding).

---

[77] 1st Supp. CR 86-93 (App. 37-43; 44)

Here, the Appellants' net worth is crucial evidence that Mikkelsen needed in order to present his case for exemplary damages. Mikkelsen's pleadings request an award of exemplary damages.[78] The jury was instructed to consider net worth as one of the *Kraus* factors,[79] but heard no evidence on the subject because the trial court did not permit Mikkelsen to develop it. The order denying Mikkelsen's Motion to Compel discovery of net worth information was an abuse of discretion that prevented Mikkelsen from developing crucial evidence going to the heart of his case for exemplary damages. This denial probably resulted in an improper judgment, and it should be reversed and a new trial ordered on the issue of exemplary damages.

## CONCLUSION

While Mikkelsen succeeded on most of his claims, the trial court erred by denying him the opportunity to demonstrate Appellants' dishonest recidivism and net worth. This error prevented Mikkelsen from presenting evidence that was crucial to his claim for exemplary damages. If the evidence had been admitted, the jury probably would

---

[78] 2 CR 160 (App. 65).
[79] 2 CR 249-250 (App. 27-28).

have awarded Mikkelsen exemplary damages. The trial court's judgment should be reversed to the extent it fails to award exemplary damages to Mikkelsen, the trial court's order denying Mikkelsen's motion to compel discovery of net-worth information should be reversed, Mikkelsen should be permitted to conduct net-worth discovery, and the Court should order a new trial on the issue of malice and exemplary damages to the extent permitted, or at a minimum grant Mikkelsen this relief if the case is otherwise remanded to the trial court.[80]

## **PRAYER**

Mikkelsen respectfully requests the Court to reverse the Final Judgment to the extent it fails to award exemplary damages to Mikkelsen, to render judgment that Mikkelsen is entitled to recover exemplary damages or to order a new trial on this issue, to order a new trial on the issue of the amount of exemplary damages to be awarded, to reverse the trial court's Order denying Mikkelsen's

---

[80] There is authority for remanding a case for a new trial on the issue of exemplary damages. See *McElroy v. Fitts*, 876 S.W.2d 190, 199 (Tex. App.—El Paso 1994, writ dism'd). However, should the Court determine such relief to be inappropriate, Mikkelsen alternatively seeks remand on these issues if the case is otherwise remanded.

Motion to Compel discovery of net-worth information, to instruct the trial court to order the discovery of such information, and to grant Mikkelsen all other relief he is entitled to receive. Alternatively, Mikkelsen seeks this relief in the event the case is otherwise remanded to the trial court.

Respectfully submitted,

__/s/ Michael L. Atchley_____
Lee F. Christie
State Bar No. 042317100
hray@popehardwicke.com
Michael L. Atchley
State Bar No. 01397600
matchley@popehardwicke.com
**Pope, Hardwicke, Christie, Schell, Kelly & Ray, L.L.P.**
500 W. 7th Street, Suite 600
Fort Worth, Texas 76102
817.332.3245—Telephone
817.877.4781—Telecopier

**ATTORNEYS FOR CROSS-APPELLANT**

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Texas Rule of Appellate Procedure 9.4(i)(2)(B) because it contains 5,358 words, excluding the parts of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

2.     This brief complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because this brief has been prepared in a proportionally spaced typeface using "Microsoft Word 2010" in 14-point "Book Antiqua" style font (12-point for footnotes).

/s/ Michael L. Atchley
Michael L. Atchley

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document is being forwarded to all counsel of record via electronic filing on November 20, 2015, as follows:

Thomas S. Leatherbury
State Bar No. 12095275
tleatherbury@velaw.com
Manuel G. Berrelez
State Bar No. 24057760
mberrelez@velaw.com
Stephen S. Gilstrap
State Bar No. 24078563
sgilstrap@velaw.com
**VINSON & ELKINS, LLP**
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201

Cornell D. Curtis
State Bar No. 24007069
vernonlaw@sbcglobal.net
**CORNELL D. CURTIS, P.C.**
1716 Main Street
Vernon, Texas 76834

/s/ Michael L. Atchley
Michael L. Atchley

No. 07-15-00327-CV

IN THE COURT OF APPEALS FOR THE
SEVENTH DISTRICT OF TEXAS AT AMARILLO

HERRING BANCORP, INC.; C.C. BURGESS;
and C. CAMPBELL BURGESS,

Appellants/Cross-Appellees,

v.

JOHN MIKKELSEN, acting solely in his capacity as Trustee
of the John Mikkelsen Trust,

Appellee/Cross-Appellant.

On Appeal from the 46th Judicial District Court
Wilbarger County, Texas, Trial Court Cause No. 24,955
Honorable Dan Mike Bird, Presiding

INDEX TO APPENDIX TO BRIEF OF CROSS-APPELLANT

Document                                                                 Pages

Final Judgment (2 CR 335-336)............................................................. 1-3

Order on Motion for Partial Summary Judgment (2 CR 306-307)..... 4-5

Jury Charge (2 CR 228-258) ................................................................. 6-36

Plaintiff's Motion to Compel (1st Supp. CR 86-92)........................... 37-43

Order Denying Plaintiff's Motion to Compel (1st Supp. CR 93) ........ 44

Document                                                                    Pages

Plaintiff's Original Petition (1 CR 5-17) .............................................. 45-57

Plaintiff's First Amended Original Petition (2 CR 153-161) ............ 58-66

Herring Articles of Incorporation (12 RR PX-2) ................................ 67-89

Notice of Redemption (12 RR PX-13) .................................................... 90-92

List of Preferred Shareholders (12 RR PX-25) ...........................................93

Shareholder List Showing Conversion Rate (13 RR DX-12) ..................94

Herring Agreement with the OCC (12 RR PX-53) ........................... 95-115

FDIC Order Regarding Campbell Burgess (12 RR PX-54) ........... 116-141

FILED

The _16_ day of _June_ 20 _15_

_1:30_ o'clock _P_ M

_Brenda Peterson_

Clerk Dist. Court Wilbarger Co.

By _____
Deputy

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust, | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § § | WILBARGER COUNTY, TEXAS |
| HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS, | § § § § § | |
| Defendants. | § | 46TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

On January 30, 2015, this cause came on to be heard, and John Mikkelsen, acting solely in his capacity as Trustee of the John Mikkelsen Trust, Plaintiff, appeared in person and by attorney of record and announced ready for trial, and Herring Bancorp, Inc., C.C. Burgess, and C. Campbell Burgess, Defendants, appeared in person or by attorney of record and announced ready for trial, and a jury having been previously demanded, a jury consisting of 12 qualified jurors was duly empaneled and the case proceeded to trial.

The Court, by granting Plaintiff's Motion for Partial Summary Judgment on August 4, 2011, granted Plaintiff's breach of contract claim in Count One of Plaintiff's First Amended Original Petition, and the Order granting Plaintiff's Motion, which is copied and attached hereto as Exhibit "A," is incorporated herein. With respect to Count Four of Plaintiff's First Amended Original Petition, which alleged that an October 2006 purported redemption of Plaintiff's preferred shares in Herring Bancorp, Inc. constituted unlawful oppression of a minority shareholder, the Court submitted said issue to the jury, and the jury returned its verdict in accordance with the instructions of the Court. The charge of the Court and the verdict of the jury are copied and

FINAL JUDGMENT                                                                                        PAGE 1

Appendix p. 1

attached hereto as Exhibit "B" and incorporated for all purposes by reference. Because the Court found for Plaintiff and it appears to the Court that the verdict of the jury was for the Plaintiff and against Defendant Herring Bancorp, Inc., C.C. Burgess, and C. Campbell Burgess, the Court finds that judgment should be rendered as herein provided. It is, therefore,

ORDERED, ADJUDGED, and DECREED that Plaintiff John Mikkelsen have and recover from this Court a declaratory judgment whereby this Court declares, pursuant to the Texas Declaratory Judgments Act and the jury's verdict, that the purported October 2006 and November 2013 redemptions of the preferred shares of Plaintiff John Mikkelsen were void and of no force or effect, and did not deprive Plaintiff of his status as a preferred shareholder of Herring Bancorp, Inc. Accordingly, Plaintiff at all times had and has the right to inspect the books and records of Herring Bancorp, Inc. The Court further finds that Defendant Herring Bancorp, Inc. breached its Articles of Incorporation and that Defendants C.C. Burgess and C. Campbell Burgess wrongfully engaged in oppressive conduct towards Plaintiff, as found by the jury. In connection therewith, the Court further finds, and it is ORDERED, ADJUDGED, and DECREED that the Plaintiff remains a preferred shareholder of said Herring Bancorp, Inc., is entitled to have and recover of and from Defendant Herring Bancorp, Inc., C.C. Burgess, and C. Campbell Burgess, jointly and severally, judgment in the amount of $23,112.00, representing preferred dividends on Plaintiff's preferred shares in Herring Bancorp, Inc. from and after October 31, 2006, through December 31, 2014, plus prejudgment interest thereon through the date of judgment rendered herein in the amount of $ 5,227.25. It is further

ORDERED, ADJUDGED, and DECREED that Plaintiff John Mikkelsen should have and recover of and from the Defendant Herring Bancorp, Inc. judgment for his reasonable and necessary attorneys' fees, as awarded by the jury, in the amount of $127,442.00 for preparation

Appendix p. 2

and trial of this cause, and the additional sum of $25,000.00 for an appeal to the Court of Appeals, $10,000.00 for representation at the petition for review stage in the Supreme Court of Texas, $10,000.00 for representation at the merit briefing stage in the Supreme Court of Texas, and $10,000.00 for representation through oral argument and completion of proceedings in the Supreme Court of Texas. It is further

ORDERED, ADJUDGED, and DECREED that all costs of court should be and hereby are taxed jointly and severally against Defendants Herring Bancorp, Inc., C.C. Burgess, and C. Campbell Burgess. It is further

ORDERED, ADJUDGED, and DECREED that the contract award of $23,112.00 shall bear interest from the date this Judgment is signed at the rate of ten percent (10%) per annum until paid. It is further

ORDERED, ADJUDGED, and DECREED that the other monetary awards shall bear interest from the date this Judgment is signed at the rate of five percent (5%) per annum until paid. It is further

ORDERED, ADJUDGED, and DECREED that all relief not expressly herein granted is denied, and this is intended to be a final, appealable judgment.

SIGNED this ___16___ day of ___June___, 2015.

_____
DAN MIKE BIRD, DISTRICT JUDGE

FILED

The 4 day of Aug 2011

At 9:00 o'clock A M: o'clock

Brenda Peterson

Clerk Dist. Court Wilbarger Co.

By _____ Deputy

CAUSE NO. 24,955

JOHN MIKKELSEN,
acting solely in his capacity as Trustee
of the John Mikkelsen Trust,

Plaintiff,

v.

HERRING BANCORP, INC.;
C.C. BURGESS; and
C. CAMPBELL BURGESS,

Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

IN THE DISTRICT COURT

WILBARGER COUNTY, TEXAS

46TH JUDICIAL DISTRICT

## ORDER

Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") and Defendants' Cross-Motion for Summary Judgment ("Defendants' Motion") came on for hearing on April 18, 2011. The Court finds Plaintiff's Motion was timely filed and that notice of Plaintiff's Motion and the hearing thereon was duly and properly given. The Court also finds that Defendants' Motion was timely filed and served by agreement of the parties, and hereby grants leave to file and serve the Motion on less than 21-days' notice prior to the hearing. The Court also finds that Plaintiff's Response to Defendants' Motion was timely filed and served by agreement of the parties, and hereby grants Plaintiff leave to file and serve the Response and the evidence attached thereto, including discovery products, within seven days of the hearing. After considering Plaintiff's Motion and the Response thereto, and after considering Defendants' Motion and the Response thereto, and after considering the admissible summary judgment evidence and the arguments of counsel, the Court finds that Plaintiff's Motion should be granted and Defendants' Motion should be denied.

ORDER

PAGE 1

Appendix p. 4

IT IS THEREFORE ORDERED that Defendants' Cross-Motion for Summary Judgment is denied in its entirety.

IT IS FURTHER ORDERED that Defendants' Special Exceptions and Plea in Abatement are overruled and denied.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment is granted in all respects.

The Court further finds as a matter of law that (1) the purported redemption of Plaintiff's 300 shares of preferred stock of Herring Bancorp, Inc. (the "Company") was undertaken in violation of the Company's Articles of Incorporation and is void and (2) that Plaintiff is, and continues to be, the holder of 300 shares of the Company's preferred stock, and has all the rights appurtenant thereto, including the right to inspect the Company's books and records.

SIGNED on the ____ day of _____, 2011.

_____
Judge Presiding

Approved as to form:

_____
Lee F. Christie, Counsel for Plaintiff

_____
James W. Bowen, Counsel for Defendants

ORDER                                                    PAGE 2

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, Acting Solely in his Capacity as Trustee of the John Mikkelsen Trust, | § § § § | IN THE 46TH DISTRICT COURT |
| Plaintiff/Counter Defendant, | § § | |
| v. | § § § | IN AND FOR |
| HERRING BANCORP., INC., C.C. BURGESS and C. CAMPBELL BURGESS, | § § § § | |
| Defendants/Counter-Plaintiffs. | § | WILBARGER COUNTY, TEXAS |

**CHARGE TO THE JURY**

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

**I.**

Do not let bias, prejudice or sympathy play any part in your deliberations.

**II.**

In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the Court; that is, what you have seen and heard in this courtroom, together with the law as given you by the Court.

Appendix p. 6

In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

## III.

Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

## IV.

You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

## V.

You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figure and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

## VI.

You may render your verdict upon the vote of ten or more members of the jury. The same ten or more of you must agree upon all of the answers made and to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority or any other vote of less than ten jurors. If the verdict and all of the answers therein are reached by unanimous agreement, the presiding juror shall sign the verdict for the entire jury. If any juror disagrees as to any answer made by the verdict,

Appendix p. 7

those jurors who agree to all findings shall each sign the verdict.

## VII.

These instructions are given to you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

## VIII.

The presiding juror or any other who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

## IX.

When words are used in this charge in a sense which varies from the commonly understood meaning, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

## X.

Answer by checking "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." If the question directs you to give an answer other than "Yes" or "No," you must still base your answers on a preponderance of the evidence with respect to each matter inquired about in the question. Preponderance of the evidence means the greater weight and degree of credible testimony or evidence introduced before you and admitted in evidence in this case.

## XI.

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud together with the accompanying instructions and then you will deliberate upon your answers to the questions asked in the verdict form. It is the duty of the presiding juror to:

(1)     Preside during your deliberations.

(2)     See that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge.

(3)     Write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the Judge.

(4)     Conduct voting on each question.

(5)     Write your answers to the questions in the spaces provided.

(6)     Certify to your verdict in the space provided for the presiding juror's signature, or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

## XII.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, or your home, or elsewhere, please inform the Judge of this fact.

## XIII.

When you have answered all the questions you are required to answer under the instructions of the Judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury

Appendix p. 9

room that you have reached a verdict, and then you will return into Court with your verdict.

SIGNED this _30_ day of January, 2015.

HONORABLE DAN MIKE BIRD
46th District Court Judge

Filed 1/30/15
at 9:40 AM
by DMB Judge

Returned 1/30/15
at 5:00 PM
by DMB Judge

Appendix p. 10

## DEFINITIONS AND INSTRUCTIONS

You are instructed that when words are used in the Questions in a sense which varies from the meaning commonly understood, you will be given in this Charge a proper legal definition which you are bound to accept in the place of any other definition or meaning. In answering the Questions you shall give the following terms the following meanings:

1.      The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true. A fact may be established by direct evidence or by circumstantial evidence, or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

2.      A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

3.      "Mikkelsen" means Plaintiff John Mikkelsen, acting solely in his capacity as Trustee of the John Mikkelsen Trust and his agents, attorneys, and representatives acting in the course and scope of their agency or employment.

---

CHARGE TO THE JURY                                              PAGE 6 OF 30

234234234234234

4. "Herring Bancorp" means Herring Bancorp, Inc., and its agents, attorneys, employees, officers, directors, and representatives acting in the course and scope of their agency or employment.

5. "C.C. Burgess" means C.C. Burgess and his agents, attorneys, and representatives acting in the course and scope of their agency or employment.

6. "Campbell Burgess" means C. Campbell Burgess and his agents, attorneys, and representatives acting in the course and scope of their agency or employment.

7. The "Articles of Incorporation" means and refers to the Articles of Incorporation of Herring (Plaintiff's Exhibit "2").

## INSTRUCTION REGARDING BREACH OF ARTICLES OF INCORPORATION

You are instructed that the Court has previously determined, as a matter of law, that Defendant Herring failed to comply with the Articles of Incorporation of Herring Bancorp when it purported to involuntarily redeem Mikkelsen's preferred shares in 2006. However, this failure to comply with the Articles of Incorporation, standing alone, is not sufficient to constitute minority oppression or breach of fiduciary duty.

235235235235235

## QUESTION NO 1:

What is a reasonable fee for the necessary services of Mikkelsen's attorney in connection with the failure of Herring Bancorp to comply with the Articles of Incorporation?

In answering this Question, you are to consider the attorney's fees and expenses incurred and reasonably anticipated to be incurred by Mikkelsen in enforcing his rights in this action and any appeal thereof. In determining the amount of attorney's fees and expenses, you are to consider the following:

- the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly;

- the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

- the fee customarily charged in the locality for similar legal services;

- the amount involved and the results obtained;

- the time limitations imposed by the client or the circumstances;

- the nature and length of the professional relationship with the client;

- the experience, reputation, and ability of the lawyer or lawyers performing the services; and

- whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

a.  For preparation in the trial court.

ANSWER: $127,442.00

b.  For representation through appeal to the Court of Appeals.

ANSWER: 25,000.00

c.  For representation at the petition for review stage in the Supreme Court of Texas.

ANSWER: 10,000.00

d.  For representation at the merits briefing stage in the Supreme Court of Texas.

ANSWER: 15,000.00

e.  For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

ANSWER: 10,000.00

237237237237237

## QUESTION NO. 2:

Do you find that C. C. Burgess engaged in oppressive conduct toward Mikkelsen?

"Oppressive conduct" means burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

It also means unfair treatment of minority shareholders by the directors or those in control the corporation.

Answer "yes" or "no."

Answer: ____yes____

---

CHARGE TO THE JURY                                        PAGE 10 OF 30

Appendix p. 15

238238238238238

## QUESTION NO. 3:

Do you find that Campbell Burgess engaged in oppressive conduct toward Mikkelsen?

"Oppressive conduct" means burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

It also means unfair treatment of minority shareholders by the directors or those in control of the corporation.

Answer "yes" or "no."

Answer: ___Yes___

*If you answered "Yes" to # 2 or 3 answer #4, otherwise do not answer #4.*

<u>QUESTION NO. 4</u>:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mikkelsen for his damages, if any, that proximately resulted from such oppressive conduct, if any, you have found?

Consider the following elements of damages, if any, and none other: The lost dividend income on Mikkelsen's preferred shares from November 21, 2006 until January 26, 2015.

Answer in dollars and cents.

Answer: $ 23, 314.80

240240240240240

## QUESTION NO. 5:

Answer the following question only if you unanimously answered "yes" to Question No. 2. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by C.C. Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: ___ *No* ___

---

241241241241241

## QUESTION NO. 6:

Answer the following question only if you unanimously answered "yes" to Question No. 3. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Campbell Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: _No_

242242242242242

## QUESTION NO. 7:

Answer the following question only if you unanimously answered "yes" to Question No. 5.

You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against C.C. Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 2?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of C.C. Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of C.C. Burgess.

Answer in dollars and cents, if any.

Answer: $_____

243243243243243

## QUESTION NO. 8:

Answer the following question only if you unanimously answered "yes" to Question No. 6. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against Campbell Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 3?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of Campbell Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of Campbell Burgess.

Answer in dollars and cents, if any.

Answer: $_____

244244244244244244

## JURY QUESTION NO. 9:

Do you find that C. C. Burgess used his personal control of Herring Bancshares to breach fiduciary duties owed to Mikkelsen?

In connection with the foregoing question, you are instructed that a majority shareholder of a corporation owes fiduciary duties to a minority shareholder and to show compliance with those duties must show he acted fairly and equitably, in the utmost good faith with the most scrupulous honesty, fully and fairly disclosing all important information to a minority shareholder such as Mikkelsen.

Answer "yes" or "no."

Answer: ___yes___

---

245245245245245245

<u>QUESTION NO. 10</u>:

Do you find that Campbell Burgess used his personal control of Herring Bancshares to breach fiduciary duties owed to Mikkelsen?

In connection with the foregoing question, you are instructed that a majority shareholder of a corporation owes fiduciary duties to a minority shareholder and to show compliance with those duties must show he acted fairly and equitably, in the utmost good faith with the most scrupulous honesty, fully and fairly disclosing all important information to a minority shareholder such as Mikkelsen.

Answer "yes" or "no."

Answer: ____*No*____

CHARGE TO THE JURY

246246246246246

*If you answered "Yes" to #9 or 10 answer #11, otherwise do not answer #11*

## QUESTION NO. 11:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mikkelsen for his damages, if any, that proximately resulted from such breaches of fiduciary duties, if any you have found?

Consider the following elements of damages, if any, and none other: The lost dividend income on Mikkelsen's preferred shares from November 21, 2006 until January 26, 2015.

Answer in dollars and cents.

Answer: $ *0.00*

247247247247247247

## QUESTION NO. 12:

Answer the following question only if you unanimously answered "yes" to Question No. ~~10~~ 9. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by C.C. Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: __No__

---

248248248248248

## QUESTION NO. 13:

Answer the following question only if you unanimously answered "yes" to Question No. 10. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Campbell Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: _____

---

CHARGE TO THE JURY                                                     PAGE 21 OF 30

249249249249249249

## QUESTION NO. 14:

Answer the following question only if you unanimously answered "yes" to Question No. 12.

You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against C. C. Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 9?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of C. C. Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of C. C. Burgess.

Answer in dollars and cents, if any.

Answer: $_____

Appendix p. 27

249

## QUESTION NO. 15:

Answer the following question only if you unanimously answered "yes" to Question No. 13.

You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against Campbell Burgess

and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to

Question 10?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a.   The nature of the wrong.
b.   The character of the conduct involved.
c.   The degree of culpability of Campbell Burgess.
d.   The situation and sensibilities of the parties concerned.
e.   The extent to which such conduct offends a public sense of justice and propriety.
f.   The net worth of Campbell Burgess.

Answer in dollars and cents, if any.

Answer: $_____

251251251251251

## QUESTION NO. 16:

Answer the following Question only if you have answered "yes" to Questions 2 or 9.

Was C. C. Burgess part of a conspiracy to wrongfully deprive Mikkelsen of his preferred shares in Herring Bancorp?

To be part of a conspiracy, C. C. Burgess and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to Mikkelsen. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Answer "yes" or "no."

Answer: _____No_____

252252252252252252

## QUESTION NO. 17:

Answer the following Question only if you had answered "yes" to Questions 3 or 10.

Was Campbell Burgess part of a conspiracy to wrongfully deprive Mikkelsen of his preferred shares in Herring Bancorp?

To be part of a conspiracy, Campbell Burgess and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to Mikkelsen. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Answer "yes" or "no."

Answer: _____ No _____

---

CHARGE TO THE JURY

*If you answered "yes" to #16 or #17 answer #18, otherwise do not answer #18.*

QUESTION NO. 18:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mikkelsen for his damages, if any, that were proximately caused by such conspiracy?

Consider the following elements of damages, if any, and none other: The lost dividend income on Mikkelsen's preferred shares from November 21, 2006 until January 26, 2015.

Answer in dollars and cents.

Answer: $_____

CHARGE TO THE JURY                                                    PAGE 26 OF 30

Appendix p. 31

254254254254254

## QUESTION NO. 19:

Answer the following question only if you unanimously answered "yes" to Question No. 16. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by C.C. Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: _____

255255255255255255

## QUESTION NO. 20:

Answer the following question only if you unanimously answered "yes" to Question No. 17. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Campbell Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: _____

256256256256256

## QUESTION NO. 21:

Answer the following question only if you unanimously answered "yes" to Question No. 19.

You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against C. C. Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 16?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a.    The nature of the wrong.
b.    The character of the conduct involved.
c.    The degree of culpability of C. C. Burgess.
d.    The situation and sensibilities of the parties concerned.
e.    The extent to which such conduct offends a public sense of justice and propriety.
f.    The net worth of C. C. Burgess.

Answer in dollars and cents, if any.

Answer: $_____

257257257257257

## QUESTION NO. 22:

Answer the following question only if you unanimously answered "yes" to Question No. 20.

You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against Campbell Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 17?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a.   The nature of the wrong.
b.   The character of the conduct involved.
c.   The degree of culpability of Campbell Burgess.
d.   The situation and sensibilities of the parties concerned.
e.   The extent to which such conduct offends a public sense of justice and propriety.
f.   The net worth of Campbell Burgess.

Answer in dollars and cents, if any.

Answer: $_____

---

CHARGE TO THE JURY                                              PAGE 30 OF 30

Appendix p. 35

258258258258258

## JUROR CERTIFICATE

We, the jury, havef answered the above and foregoing questions as herein indicated, and

herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)

_Patsy Bachman_
PRESIDING JUROR

(To be signed by those rendering the verdict if not unanimous.)

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

Appendix p. 36

FILED

The 23 day of Oct 20 14
At 10:10 o'clock A M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By_____
Deputy

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust, | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | WILBARGER COUNTY, TEXAS |
| HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS, | § § § § | |
| Defendants. | § § | 46TH JUDICIAL DISTRICT |

## PLAINTIFF'S MOTION TO COMPEL

TO THE HONORABLE DAN MIKE BIRD, DISTRICT JUDGE:

COMES NOW John Mikkelsen, acting solely in his capacity as Trustee of the John Mikkelsen Trust, Plaintiff, and respectfully files this Motion to Compel, and for such would show:

### I.

### Overview

Plaintiff reluctantly files this Motion to require the production of highly relevant documents regarding Defendants' net worth, as expressly authorized by Texas law.

### II.

### Net Worth Documents

On May 21, 2014, Plaintiff served his Third Request for Production of Documents to Defendants, to which Defendants responded on June 20, 2014. The requests (and Defendants' identical boilerplate objections) were the following:

---

PLAINTIFF'S MOTION TO COMPEL

Page 1

## REQUEST FOR PRODUCTION NO. 1:

All financial statements provided by C. C. Burgess to any person within the past five (5) years.

**OBJECTION:** Defendants object to this request to the extent that the documents sought are neither relevant nor material to any issue to be decided by the trier of fact nor are the documents sought reasonably calculated to lead to the discovery of admissible evidence. TEX. R. CIV. P. 192.3(a). Defendants further object to the extent that the documents sought are proprietary in nature and confidential and are not otherwise subject to disclosure and/or discovery. In addition, Defendants object to the extent that unless and until Plaintiff obtains a fact finding from the trier of fact which would entitle Plaintiff to offer and/or introduce evidence of such matters. Defendants state that any obligation on the part of Defendants to respond to and/or produce documents in connection with this request prior to such a fact finding from the trier of fact is premature, unnecessary and an unreasonable invasion of Defendants' proprietary and/or privacy rights. Defendants are entitled to and hereby move for a Protective Order so as to eliminate and/or minimize unnecessary harassment and/or invasion of Defendants' property rights with respect to the confidential financial information sought by this request and to the extent that the Court Orders production of such private, proprietary and/or confidential documents, that such documents be submitted for in camera inspection by the Court and further Orders circumscribing delivery, use, reproduction and/or dissemination of such documents by Plaintiff.

## REQUEST FOR PRODUCTION NO. 2:

All financial statements provided by C. Campbell Burgess to any person within the past five (5) years.

**OBJECTION:** Defendants object to this request to the extent that the documents sought are neither relevant nor material to any issue to be decided by the trier of fact nor are the documents sought reasonably calculated to lead to the discovery of admissible evidence. TEX. R. CIV. P. 192.3(a). Defendants further object to the extent that the documents sought are proprietary in nature and confidential and are not otherwise subject to disclosure and/or discovery. In addition, Defendants object to the extent that unless and until Plaintiff obtains a fact finding from the trier of fact which would entitle Plaintiff to offer and/or introduce evidence of such matters. Defendants state that any obligation on the part of Defendants to respond to and/or produce documents in connection with this request prior to such a fact finding from the trier of fact is premature, unnecessary and an unreasonable invasion of Defendants' proprietary and/or privacy rights. Defendants are entitled to and hereby move for a Protective Order so as to eliminate and/or minimize unnecessary harassment and/or invasion of Defendants' property rights with respect to the confidential financial information sought by this request and to the extent that the Court Orders production of such private, proprietary and/or confidential

documents, that such documents be submitted for in camera inspection by the Court and further Orders circumscribing delivery, use, reproduction and/or dissemination of such documents by Plaintiff.

**REQUEST FOR PRODUCTION NO. 3:**

If you object to Request for Production No. 1 or claim such documents do not exist, any other documents which would reflect the net worth of C. C. Burgess at all times from 2006 to the present date.

**OBJECTION:** Defendants object to this request to the extent that the documents sought are neither relevant nor material to any issue to be decided by the trier of fact nor are the documents sought reasonably calculated to lead to the discovery of admissible evidence. TEX. R. CIV. P. 192.3(a). Defendants further object to the extent that the documents sought are proprietary in nature and confidential and are not otherwise subject to disclosure and/or discovery. In addition, Defendants object to the extent that unless and until Plaintiff obtains a fact finding from the trier of fact which would entitle Plaintiff to offer and/or introduce evidence of such matters. Defendants state that any obligation on the part of Defendants to respond to and/or produce documents in connection with this request prior to such a fact finding from the trier of fact is premature, unnecessary and an unreasonable invasion of Defendants' proprietary and/or privacy rights. Defendants are entitled to and hereby move for a Protective Order so as to eliminate and/or minimize unnecessary harassment and/or invasion of Defendants' property rights with respect to the confidential financial information sought by this request and to the extent that the Court Orders production of such private, proprietary and/or confidential documents, that such documents be submitted for in camera inspection by the Court and further Orders circumscribing delivery, use, reproduction and/or dissemination of such documents by Plaintiff.

**REQUEST FOR PRODUCTION NO. 4:**

If you object to Request for Production No. 1 or claim such documents do not exist, any other documents which would reflect the net worth of C. Campbell Burgess at all times from 2006 to the present date.

**OBJECTION:** Defendants object to this request to the extent that the documents sought are neither relevant nor material to any issue to be decided by the trier of fact nor are the documents sought reasonably calculated to lead to the discovery of admissible evidence. TEX. R. CIV. P. 192.3(a). Defendants further object to the extent that the documents sought are proprietary in nature and confidential and are not otherwise subject to disclosure and/or discovery. In addition, Defendants object to the extent that unless and until Plaintiff obtains a fact finding from the trier of fact which would entitle Plaintiff to offer and/or introduce evidence of such matters. Defendants state that any obligation on the part of Defendants to respond to and/or produce documents in connection with this request prior to such a fact finding from

the trier of fact is premature, unnecessary and an unreasonable invasion of Defendants' proprietary and/or privacy rights. Defendants are entitled to and hereby move for a Protective Order so as to eliminate and/or minimize unnecessary harassment and/or invasion of Defendants' property rights with respect to the confidential financial information sought by this request and to the extent that the Court Orders production of such private, proprietary and/or confidential documents, that such documents be submitted for in camera inspection by the Court and further Orders circumscribing delivery, use, reproduction and/or dissemination of such documents by Plaintiff.

## REQUEST FOR PRODUCTION NO. 5:

If you object to Requests for Production No. 1 and No. 2 or claim such documents do not exist, please produce federal income tax returns for C. C. Burgess for the years 2006 to the present.

**OBJECTION:** Defendants object to this request to the extent that the documents sought are neither relevant nor material to any issue to be decided by the trier of fact nor are the documents sought reasonably calculated to lead to the discovery of admissible evidence. TEX. R. CIV. P. 192.3(a). Defendants further object to the extent that the documents sought are proprietary in nature and confidential and are not otherwise subject to disclosure and/or discovery. In addition, Defendants object to the extent that unless and until Plaintiff obtains a fact finding from the trier of fact which would entitle Plaintiff to offer and/or introduce evidence of such matters. Defendants state that any obligation on the part of Defendants to respond to and/or produce documents in connection with this request prior to such a fact finding from the trier of fact is premature, unnecessary and an unreasonable invasion of Defendants' proprietary and/or privacy rights. Defendants are entitled to and hereby move for a Protective Order so as to eliminate and/or minimize unnecessary harassment and/or invasion of Defendants' property rights with respect to the confidential financial information sought by this request and to the extent that the Court Orders production of such private, proprietary and/or confidential documents, that such documents be submitted for in camera inspection by the Court and further Orders circumscribing delivery, use, reproduction and/or dissemination of such documents by Plaintiff.

## REQUEST FOR PRODUCTION NO. 6:

If you object to Requests for Production No. 1 and No. 2 or claim such documents do not exist, please produce federal income tax returns for C. Campbell Burgess for the years 2006 to the present.

**OBJECTION:** Defendants object to this request to the extent that the documents sought are neither relevant nor material to any issue to be decided by the trier of fact nor are the documents sought reasonably calculated to lead to the discovery of admissible evidence. TEX. R. CIV. P. 192.3(a). Defendants further object to the

extent that the documents sought are proprietary in nature and confidential and are not otherwise subject to disclosure and/or discovery. In addition, Defendants object to the extent that unless and until Plaintiff obtains a fact finding from the trier of fact which would entitle Plaintiff to offer and/or introduce evidence of such matters. Defendants state that any obligation on the part of Defendants to respond to and/or produce documents in connection with this request prior to such a fact finding from the trier of fact is premature, unnecessary and an unreasonable invasion of Defendants' proprietary and/or privacy rights. Defendants are entitled to and hereby move for a Protective Order so as to eliminate and/or minimize unnecessary harassment and/or invasion of Defendants' property rights with respect to the confidential financial information sought by this request and to the extent that the Court Orders production of such private, proprietary and/or confidential documents, that such documents be submitted for in camera inspection by the Court and further Orders circumscribing delivery, use. reproduction and/or dissemination of such documents by Plaintiff.

## REQUEST FOR PRODUCTION NO. 7:

Documents reflecting any transfer of assets by you at any time from 2006 to the present for other than equivalent value, including assets transferred to fund any trusts or similar arrangement, together with a copy of the trust instrument or other agreement evidencing any such transfer.

**OBJECTION:** Defendants object to this request to the extent that the documents sought are neither relevant nor material to any issue to be decided by the trier of fact nor are the documents sought reasonably calculated to lead to the discovery of admissible evidence. TEX. R. CIV. P. 192.3(a). Defendants further object to the extent that the documents sought are proprietary in nature and confidential and are not otherwise subject to disclosure and/or discovery. In addition, Defendants object to the extent that unless and until Plaintiff obtains a fact finding from the trier of fact which would entitle Plaintiff to offer and/or introduce evidence of such matters. Defendants state that any obligation on the part of Defendants to respond to and/or produce documents in connection with this request prior to such a fact finding from the trier of fact is premature, unnecessary and an unreasonable invasion of Defendants' proprietary and/or privacy rights. Defendants are entitled to and hereby move for a Protective Order so as to eliminate and/or minimize unnecessary harassment and/or invasion of Defendants' property rights with respect to the confidential financial information sought by this request and to the extent that the Court Orders production of such private, proprietary and/or confidential documents, that such documents be submitted for in camera inspection by the Court and further Orders circumscribing delivery, use, reproduction and/or dissemination of such documents by Plaintiff.

As reflected by the foregoing Requests and responses, Defendants repeat the same objection to each request. The documents requested in Requests for Production No. 1 through 7

are in the custody and control of Defendants, who have refused to produce them on grounds that the items are not relevant or "subject to disclosure and/or discovery." However, Texas law clearly makes these items discoverable.

"Net worth is relevant and discoverable when punitive damages may be awarded." *In re Islamorada Fish Co. Texas, L.L.C.*, 319 S.W.3d 908, 912 (Tex. App.—Dallas 2010, no pet.) *citing Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex. 1988), *disapproved of on other grounds by Walker*, 827 S.W.2d at 842; *see also In re Arpin Am. Moving Sys., LLC*, 416 S.W.3d 927, 929 (Tex. App.— Dallas 2013, no pet.) (Net worth discovery permissible when real parties in interest seek exemplary damages); *see also In re Jacobs*, 300 S.W.3d 35, 40 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see also Miller v. O'Neill*, 775 S.W.2d 56, 58 (Tex. App.—Houston [1st Dist.] 1989). Plaintiff's Original Petition seeks punitive and exemplary damages for breach of fiduciary duties, oppression, and civil conspiracy. *See* Plaintiff's Original Petition, p. 8. The requested items are clearly relevant to the issue of exemplary damages and withholding production is improper.

Contrary to Defendants' contention that Plaintiff must first obtain "a fact finding from the trier of fact which would entitle Plaintiff to offer and/or introduce evidence" of Defendants' net worth, Texas courts have consistently held that a party does not have to show the viability of an exemplary damages claim before being entitled to conduct discovery regarding net worth. *See Lunsford*, 746 S.W.2d at 473; *see also Al Parker Buick Co. v. Touchy*, 788 S.W.2d 129, 131 (Tex. App.—Houston [1st Dist.] 1990, orig. proceeding). Thus, Defendants' objections that the requests at issue are premature and unnecessary are unfounded.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that the above and foregoing Motion be set for hearing, that upon hearing all of Defendants' objections as aforesaid be overruled, that Defendants be ordered to fully respond to Plaintiff's discovery requests, that

Appendix p. 42

Plaintiff be awarded his reasonable and necessary attorney's fees incurred in filing this Motion, and for general relief.

Respectfully submitted,

POPE, HARDWICKE, CHRISTIE, SCHELL, KELLY & RAY, L.L.P.

By: _____

Lee F. Christie
State Bar No. 04237100
lfchristie@popehardwicke.com

Michael L. Atchley
State Bar No. 01397600
matchley@popehardwicke.com

500 W. 7th Street, Suite 600
Fort Worth, Texas 76102
Telephone No. (817) 332-3245
Facsimile No. (817) 877-4781

ATTORNEYS FOR PLAINTIFF
JOHN MIKKELSEN

## CERTIFICATE OF SERVICE

I certify that a copy of this document is being served on the following counsel of record, as indicated below, on October 22, 2014:

Mr. Cornell Curtis
CORNELL D. CURTIS, P.C.
1716 Main Street
Vernon, TX 76384
*(Via Facsimile)*

Mr. Tim Newsom
LOVELL, LOVELL, NEWSOM & ISERN, L.L.P.
112 West 8th Avenue, Suite 1000
Amarillo, TX 79101
*(Via Facsimile and E-Mail)*

_____
Lee F. Christie

P:\Mikkelsen\Pleadings\Motion to Compel 10-2014 Net Worth.docx

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust, | § § § § | IN THE 46TH DISTRICT COURT |
| Plaintiff/Counter-Defendant, | § § | |
| v. | § § | IN AND FOR |
| HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS, | § § § § | |
| Defendants/Counter-Plaintiffs. | § § | WILBARGER COUNTY, TEXAS |

## ORDER DENYING PLAINTIFF'S MOTION TO COMPEL

On the 12th day of November, 2014, came on for hearing Plaintiff's Motion to Compel filed herein on October 23, 2014. The Court, having duly considered the Motion, the response of Defendants, and the arguments of counsel, finds that the Plaintiff's Motion should be DENIED.

IT IS SO ORDERED.

SIGNED on the _20_ day of January, 2015.

_____
HONORABLE DAN MIKE BIRD
46th District Court Judge

**FILED**
The _20_ day of _Jan_ 2015
At _12:40_ o'clock_P_ M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By_____
Deputy

P:\Mikkelsen\Pleadings\Order Denying Pf's Motion to Compel.doc

**ORDER**                                                                                    **SOLO PAGE**

Appendix p. 44

55

Cause No. 24,955

FILED

2008 AUG 20 A 10: 23

BRENDA PETERSON
CLERK DIST COURT WILBARGER CO.

BY_____

| | | |
|---|---|---|
| **JOHN MIKKELSEN, acting solely in** | § | **IN THE DISTRICT COURT** |
| **his capacity as Trustee of the** | § | |
| **John Mikkelsen Trust,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **WILBARGER COUNTY, TEXAS** |
| | § | |
| **HERRING BANCORP, INC.;** | § | |
| **C.C. BURGESS; and** | § | |
| **C. CAMPBELL BURGESS,** | § | |
| | § | |
| **Defendants.** | § | **46TH JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL PETITION

John Mikkelsen, acting solely in his capacity as Trustee of the John Mikkelsen Trust ("Plaintiff" or "Mikkelsen"), complains of Herring Bancorp, Inc., C.C. Burgess and C. Campbell Burgess, and for cause of action shows as follows:

### I.

### DISCOVERY CONTROL PLAN

1. Plaintiff intends to conduct discovery under a Level 3 Discovery Control Plan, as provided by Rule 190.3 of the Texas Rules of Civil Procedure.

### II.

### PARTIES

2. Plaintiff John Mikkelsen is a resident of Wilbarger County, Texas.

3. Defendant Herring Bancorp, Inc. is a Texas corporation with its principal place of business in Texas. It may be served with process by serving its registered agent, Sandra K. Webb, at 2201 Civic Circle, Amarillo, Texas 79109.

---

**PLAINTIFF'S ORIGINAL PETITION** **PAGE 1**

Appendix p. 45

4. Defendant C.C. Burgess is an individual Texas resident. He may be served with process at his usual place of business, 2201 Civic Circle, Amarillo, Texas 79109, or wherever else he may be found.

5. Defendant C. Campbell Burgess is an individual Texas resident. He may be served with process at his usual place of business, 2201 Civic Circle, Amarillo, Texas 79109, or wherever else he may be found.

## III.
### VENUE AND JURISDICTION

6. The Court has personal jurisdiction of all parties because they are all Texas residents.

7. The Court has subject-matter jurisdiction of this case because the amount in controversy exceeds the Court's minimum jurisdictional limit and because it is an action by a trustee concerning a trust.

8. Venue is proper in Wilbarger County because all or a substantial part of the events giving rise to Plaintiff's claims occurred in this county. Specifically, Defendants took the actions described below against Plaintiff in Wilbarger County; the Will through which the stock at issue in this case was acquired was probated in Wilbarger County; and the stock certificates at issue in this case are located in Wilbarger County. Further, because this is an action by a Trustee who resides or has resided in Wilbarger County within the four-year period preceding the date this action is filed, and because the situs of administration of the Trust is maintained in Wilbarger County, venue is mandatory in this County under Chapter 115 of the Texas Property Code.

## IV.

### BACKGROUND FACTS

9.      This lawsuit arises from a course of action undertaken by, or at the direction of, Herring Bancorp, Inc. ("Herring"), C.C. Burgess and C. Campbell Burgess (collectively, "Burgess"). C.C. Burgess is Herrring's Chairman and C. Campbell Burgess has been its chief executive officer. Herring is the holding company for Herring Bank (the "Bank"), which has several branches in Amarillo and Vernon, Texas.

10.     Mikkelsen and his wife's family have been associated with Herring Bank since its inception in 1903. Mikkelsen himself was associated with the Bank for more than 30 years, and served as Chairman of the Board for 13 years, from 1985 to 1998. He succeeded his father-in-law, M.K. Berry, who was Chairman from 1939 to 1985 and was President of the Bank from about 1937 until about 1974. M.K. Berry's father was W.D. Berry, who was one of the Bank's founding shareholders in 1903 and who served as Chairman of the Board from about 1921 until about 1939.

11.     Among his many ties to the Bank, Mikkelsen owns 300 shares of Herring Bancorp's preferred stock, including 150 shares acquired through his mother's Will and 150 shares assigned to him by his brother, Mallory Mikkelsen.

12.     Burgess and members of his family have undertaken a course of conduct intended to eliminate the Mikkelsen family from further involvement in Herring or the Bank, and in doing so have violated (among other things) Herring's Articles of Incorporation.

Appendix p. 47

13. As part of the Burgesses' plan, they decided to try to force Mikkelsen to surrender his preferred stock through an elaborate reorganization whereby Herring was supposedly converted from a C Corporation to an S Corporation and whereby certain, selected shares of preferred stock (i.e., Mikkelsen's shares) were purportedly redeemed. C.C. Burgess tried to justify the selective redemption by claiming that, since the company was converting to an S Corporation, it was only permitted to have one class of stock and no more than 100 shareholders. Therefore, according to C.C. Burgess, many of the preferred shareholders were permitted to have their preferred shares redeemed and exchanged for common stock, but the company elected not to give Mikkelsen that option and instead decided instead to redeem his shares for cash.

14. C.C. Burgess (purportedly on behalf of Herring) sent Mikkelsen a "Notice of Redemption" on or about October 31, 2006 (a copy of which is attached as Exhibit "A"), which states in pertinent part:

> This letter is intended to notify you that the board of directors (the "Board") of Herring Bancorp, Inc. (the "Company") has called for the redemption (the "Redemption") of your outstanding shares of Preferred Stock (the "Preferred Stock") of the Company on November 20, 2006.
>
> ***
>
> As a result of this process, the Board appointed a committee to recommend the criteria for determining which Preferred Stock shareholders would be offered to exchange their shares for the Company's common stock (the "Common Stock"), the nonvoting Common Stock-Series A (the "Common Stock-Series A"), or to have their shares redeemed. The Board's criteria for making this determination included whether the Preferred Stock shareholder had a banking relationship with Herring Bank (the "Bank"), and whether they would own at least 50 shares of Common Stock upon the conversion. If these criteria were met, the Board offered the Preferred Stock

Appendix p. 48

shareholders the option to exchange their shares for the Common Stock. If the Preferred Stock shareholders did not meet these criteria, the Board determined the Preferred Stock shareholders would be redeemed.

***

From our conversations with you and the Board's determination regarding our classes of stock, your Preferred Stock will be redeemed.

15. Thus, Defendants' own Notice of Redemption draws a distinction among the preferred shareholders and admits that only some of the preferred shares were being redeemed for cash. Defendants also admit in the Notice of Redemption that the procedure for determining which of the preferred shares to redeem for cash did not involve a drawing by lot or any pro rata redemption.

16. The redemption process Defendants undertook, as explained in their own Notice of Redemption, violates the procedure required by Herring's Articles of Incorporation:

5. Redemption.

a. Preferred Stock. The Corporation, at the option of the Board of Directors, may at any time redeem the whole, or from time to time redeem any part, of the Preferred Stock outstanding by paying cash therefor the sum of $95 per share, plus all dividends declared but unpaid thereon . . . .

***

Should only a part of the outstanding Preferred Stock be redeemed, the redemption will be effected by lot or pro rata, as prescribed by the Board of Directors.

17. Since only some shares of the company's preferred stock were redeemed, and since the purported redemption was not effected by lot or pro rata, the procedure

Appendix p. 49

violated the plain language of Herring's Articles of Incorporation, a copy of the relevant portions of which is attached hereto as Exhibit "B."

18.     Because of the invalidity of the redemption procedure, Mikkelsen declined the Defendants' offer of redemption. Defendants did not have the authority to redeem shares in violation of the company's Articles, and the purported redemption is therefore void.

19.     Notwithstanding the fact that the purported redemption is void, Mikkelsen has not received dividends on his preferred shares, has been denied access to the company's books and records, and has generally been treated as if he is no longer a shareholder.

## V.

### CAUSES OF ACTION
### COUNT ONE
### BREACH OF CONTRACT

20.     The Articles of Incorporation of Herring constitute a contract between Herring and its shareholders. As a preferred shareholder of Herring at all relevant times, Plaintiff is entitled to the benefits of that contract. The acts and omissions of Defendants as described hereinabove constitute a breach of that contract, entitling Plaintiff to recover all of his damage and loss proximately resulting therefrom.

21.     Plaintiff further seeks recovery of his reasonable and necessary attorney's fees for breach of contract pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

Appendix p. 50

## COUNT TWO
## INSPECTION RIGHTS

22. Mikkelsen further sues Defendants for their wrongful violation of his statutory rights of inspection under TEX. BUS. CORP. ACT Art. 2.44(C), which provides a corporate shareholder with a statutory right to inspect and make extracts from corporate records. Mikkelsen seeks an appropriate order, including, if necessary, a writ of mandamus, compelling Defendants to provide access to and copies of Herring's corporate records.

## COUNT THREE
## BREACH OF FIDUCIARY DUTY, CIVIL CONSPIRACY, AND UNLAWFUL OPPRESSION OF MINORITY SHAREHOLDER

23. Mikkelsen further sues Defendants for the fraudulent and disloyal acts they have directed toward him. Defendants violated the plain terms of Herring's Articles of Incorporation, breached their fiduciary duties, and misrepresented facts by attempting to selectively redeem Mikkelsen's preferred shares in a manner not authorized by the company's Articles of Incorporation, without notice to all the preferred shareholders, and without notice that the company's board of directors and its secret committee were engaged in an insider transaction. Defendants breached their fiduciary duties when they voted on and conducted the purported redemption through secret meetings with hidden procedures.

24. Defendants also made material false representations to Mikkelsen concerning the attempted selective redemption, the motives and procedures of the secret

Appendix p. 51

committee that authorized and conducted the purported redemption, and the self-dealing and differing treatment within the class of preferred shareholders.

25.     The foregoing course of action was part of a general pattern of oppression of Mikkelsen as a minority shareholder, and clearly the product of a civil conspiracy between and among Herring and Burgess to accomplish an illegal result, the deprivation or impairment of Mikkelsen's vested property rights, and the violation of Herring's Articles of Incorporation.  Plaintiff has been damaged by this conduct, and hereby sues to recover those damages.

26.     Mikkelsen's damages include, at a minimum, the dividends due to him as a preferred shareholder since October 31, 2006, his attorney's fees and expenses required to be incurred as a result of Defendants' improper conduct; and capital gains taxes if the alleged redemptions are required to be reported as such.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Mikkelsen respectfully requests the Court to cite Defendants to appear and answer and, on final trial, award Mikkelsen relief against Defendants, jointly and severally, as follows:

(1)     An appropriate order compelling Defendants to immediately provide Plaintiff with the right to inspect all requested records of Herring;

(2)     Actual damages;

(3)     Punitive and exemplary damages for breach of fiduciary duties, oppression, and civil conspiracy as pled above;

(4)     Attorney's fees and court costs;

(5)     Prejudgment interest and post-judgment interest at the highest lawful rates;

Appendix p. 52

(6)   All writs and processes necessary to effectuate the relief requested; and Attorney's fees and costs of court; and

(7)   All other relief Plaintiff Mikkelsen is entitled to receive.

Respectfully submitted,

POPE, HARDWICKE, CHRISTIE, SCHELL, KELLY & RAY, L.L.P.

By: _____

Lee F. Christie
State Bar No. 04231700

Michael L. Atchley
State Bar No. 01397600

306 West 7th Street, Suite 901
Fort Worth, Texas 76102-4995
(817) 332-3245 (Telephone)
(817) 877-4781 (Facsimile)

Attorneys for Plaintiff

1414



# HERRING BANCORP, INC.

C. C. Burgess
*Chairman of the Board*

## Notice of Redemption

2201 Civic Circle, Suite 1001
Amarillo, TX 79109
P. O. Box 9900
Amarillo, TX 79105-5900

(806) 373-3921 Phone
(806) 372-8230 Fax
ccburgess@herringbank.com

October 31, 2006

Dear Preferred Stock Shareholder:

This letter is to notify you that the board of directors (the "Board") of Herring Bancorp, Inc. (the "Company") has called for the redemption (the "Redemption") of your outstanding shares of Preferred Stock (the "Preferred Stock") of the Company on November 20, 2006.

As you know on July 26, 2006, our Board approved taking the necessary acts for the Company to become an "S corporation" under the Internal Revenue Code of 1986, as amended. In order to become eligible to make the Subchapter S election, the Company is only allowed to have one class of outstanding capital stock, and voting rights between shares of stock are disregarded for determining whether a company has more than one class of stock. At the current time, the Company has a number of outstanding classes of stock, which include your Preferred Stock shares, as well as Class A Nonvoting Common Stock, Class A-Series 2 Nonvoting Common Stock, and Class B Nonvoting Common Stock (collectively, the "Nonvoting Shares"). Therefore, we must currently consolidate our Nonvoting Shares into one class. The Class A Nonvoting Common Stock and the Class B Nonvoting Common Stock will be allowed to exchange their shares for Common Stock-Series A, and the Class A-Series 2 Nonvoting Common Stock will be converted into a subordinated debenture. As a result of this process, the Board appointed a committee to recommend the criteria for determining which Preferred Stock shareholders would be offered to exchange their shares for the Company's common stock (the "Common Stock"), the nonvoting Common Stock-Series A (the "Common Stock-Series A") or to have their shares redeemed. The Board's criteria for making this determination included whether the Preferred Stock shareholder had a banking relationship with Herring Bank (the "Bank"), and whether they would own at least 50 shares of Common Stock upon the conversion. If these criteria were met, the Board offered the Preferred Stock shareholders the option to exchange their shares for the Common Stock. If the Preferred Stock shareholder did not meet these criteria, the Board determined the Preferred Stock shareholders would be redeemed. Additionally, if the Preferred Stock shareholder did not have a banking relationship with the Bank, we would offer them the option of either exchanging their shares for the nonvoting Common Stock-Series A or having their shares redeemed. From our

EXHIBIT "A" PAGE 1 OF 3

Appendix p. 54

1515

conversations with you and the Board's determinations regarding our classes of stock, your Preferred Stock will be redeemed.

The Redemption will take place after 5:00 p.m. on November 20, 2006 (the "Redemption Date"). The price to be paid for each share of Preferred Stock will be $95.00 per share, plus an amount equal to all dividends accrued and unpaid thereon, whether or not declared, pro rata to the date fixed for the redemption (the "Redemptive Price"). As a result of the Redemption, the Company will pay you $95.00, in cash, for the shares of Preferred Stock you hold that will be redeemed.

Prior to or at the open of business after 5:00 p.m. on November 20, 2006, the Company will deposit with Herring Bank, Amarillo, Texas (hereinafter the "Transfer Agent"), as a trust fund, an amount necessary to pay the aggregate Redemptive Price, together with irrevocable instructions and authority to the Transfer Agent to pay, on or after the Redemption Date, the Redemptive Price to the holders of the Preferred Stock upon the Transfer Agent's receipt of the duly surrendered certificates representing their Preferred Stock. As a result of the Company's deposit of funds with the Transfer Agent, you will cease to be a holder of shares of Preferred Stock as of the Redemption Date and will only be entitled to the receipt of the Redemptive Price.

In order to receive the Redemptive Price, you should deliver to the Transfer Agent the following: (i) a duly executed Letter of Transmittal, a copy of which is enclosed herewith, and (ii) the stock certificate(s) representing your shares of Preferred Stock. The address of the Transfer Agent is Herring Bank, P.O. Box 9900, Amarillo, Texas 79105. The telephone number of the Transfer Agent is (806) 355-0153.

Please follow carefully the Instructions to the Letter of Transmittal when completing it. Assuming the Transfer Agent receives the applicable documents from you prior to the Redemption Date (and assuming there is no problem with these documents), the Transfer Agent will hold them in escrow for you until the Redemption Date, at which time you will receive payment for your shares. The Company will pay the Redemptive Price by check of same day funds. Please refer to the Letter of Transmittal provided herewith for further instructions on how to surrender certificates and receive delivery of the Redemptive Price.

You may obtain additional copies of the Letter of Transmittal from the Company. Also, if any of your Preferred Stock certificates have been lost, stolen or misplaced, or if any of your shares are pledged or encumbered, you will need to make additional arrangements in order to receive the Redemptive Price for your shares. Please contact the Transfer Agent for further details.

EXHIBIT "A" PAGE 2 OF 3

Assuming that the Transfer Agent has received these documents from you on or before 5:00 p.m. on November 20, 2006 (and that there are no problems with your documents), you will be able to receive payment for your shares on the Redemption Date. You may pick up your check on the Redemption Date at Herring Bank, 2201 Civic Circle, Amarillo, Texas during regular business hours. If you will not be available to pick up your check in person at that time, please contact the Transfer Agent so that you can arrange an alternate method of delivery of the Redemptive Price for your Preferred Stock. If you do not pick up your check on the Redemption Date or contact the Transfer Agent to make other arrangements, the Transfer Agent will mail your check to you at the close of business on the Redemption Date. If your documents are not in order so that your check is not available on the Redemption Date, your check will be mailed to you as soon as possible after your documents are received and approved.

Please remember that the Redemption of your Preferred Stock may be a taxable transaction for federal income tax purposes. There also may be state, local or foreign income or other tax consequences to the Redemption. You should consult your own tax advisor to determine the precise tax consequences of this transaction.

If you should have any questions in connection with any aspect of this letter, please feel free to call C.C. Burgess at (806) 373-3921.

Very truly yours,

HERRING BANCORP, INC.

C.C. Burgess
Chairman of the Board

EXHIBIT "A" PAGE 3 OF 3

set forth above are not completely carried through to the new company will not be considered a liquidation for the purposes of the liquidation preferences set forth above.

5.    **Redemption:**

a.    <u>Preferred Stock</u>.    The Corporation, at the option of the Board of Directors, may at any time redeem the whole, or from time to time redeem any part, of the Preferred Stock outstanding by paying in cash therefor the sum of $95 per share, plus all dividends declared but unpaid thereon as provided in this Article Four to and including the date of redemption, hereinafter referred to as the "redemptive price," and by giving to each Preferred Stock shareholder of record at that Preferred Stock shareholder's last known address, as shown on the records of the Corporation, at least 20, but not more than 50, days' prior notice personally or in writing, by mail, postage prepaid, stating the class or series or part of the class or series of shares to be redeemed and the date and plan of redemption, the redemptive price, and the place where the shareholder can obtain payment of the redemptive price on surrender of their respective share certificates, hereinafter called the "redemption notice." Should only a part of the outstanding Preferred Stock be redeemed, the redemption will be effected by lot or pro rata, as prescribed by the Board of Directors. On or after the date fixed for redemption, each holder of shares called for redemption will surrender his or her certificate for the shares to the Corporation at the place designated in the redemption notice and will thereupon be entitled to receive payment of the redemptive price. Should less than all the shares represented by any surrendered certificate be redeemed, a new certificate for the unredeemed shares will be issued. If the redemption notice is duly given and if sufficient funds are available on the date fixed for redemption, then, whether or not the certificates evidencing the shares to be redeemed are surrendered, all rights with respect to the shares will terminate on the date fixed for redemption, except for the right of the holders to receive the redemption price, without interest, on surrender of their certificate

If, on or prior to any date fixed for redemption of Preferred Stock as herein provided, the Corporation deposits with any bank or trust company in Texas or any bank or trust company in the United States duly appointing and acting as transfer agent for the Corporation as a trust fund, a sum sufficient to redeem, on the date fixed for redemption thereof, the shares called for redemption, with irrevocable instructions and authority to the bank or trust company to publish the notice of redemption thereof, or to complete the publication if theretofore commenced, and to pay, on and after the date fixed for redemption or prior thereto, the redemptive price of the shares to their respective holders on surrender of their share certificates, then from and after the date of the deposit, even though that date may be prior to the date fixed for redemption, the shares so called will be deemed to be redeemed; and dividends on those shares will cease to accrue after the date fixed for redemption The deposit will be deemed to constitute full payment of the shares to their holders; and from and after the date of the deposit, the shares will be deemed to be no longer outstanding; and the holders thereof will cease to be shareholders with respect to the shares and will have no rights with respect thereto, except the right to receive from the bank or trust company payment of the redemptive price of the shares, without interest, on surrender of their certificates

12264023.WPS

EXHIBIT "B" PAGE 1 OF 1

15315315315315 3153

**FILED**

The 16 day of Jan 2015
At 3:00 o'clock P M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By_____ Deputy

Cause No. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust, | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| V. | § § | WILBARGER COUNTY, TEXAS |
| HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS, | § § § § § | |
| Defendants. | § § | 46TH JUDICIAL DISTRICT |

### PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

John Mikkelsen, acting solely in his capacity as Trustee of the John Mikkelsen Trust ("Plaintiff" or "Mikkelsen"), complains of Herring Bancorp, Inc., C.C. Burgess and C. Campbell Burgess, and for cause of action shows as follows:

### I.

### DISCOVERY CONTROL PLAN

1. Plaintiff intends to conduct discovery under a Level 3 Discovery Control Plan, as provided by Rule 190.3 of the Texas Rules of Civil Procedure.

### II.

### PARTIES

2. Plaintiff John Mikkelsen is a resident of Wilbarger County, Texas.

3. Defendant Herring Bancorp, Inc. is a Texas corporation with its principal place of business in Texas and has appeared and answered herein.

4. Defendant C.C. Burgess is an individual Texas resident and has appeared and answered herein.

---

PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

5.     Defendant C. Campbell Burgess is an individual Texas resident and has appeared and answered herein.

## III.
### VENUE AND JURISDICTION

6.     The Court has personal jurisdiction of all parties because they are all Texas residents.

7.     The Court has subject-matter jurisdiction of this case because the amount in controversy exceeds the Court's minimum jurisdictional limit and because it is an action by a trustee concerning a trust.

8.     Venue is proper in Wilbarger County because all or a substantial part of the events giving rise to Plaintiff's claims occurred in this county. Specifically, Defendants took the actions described below against Plaintiff in Wilbarger County; the Will through which the stock at issue in this case was acquired was probated in Wilbarger County; and the stock certificates at issue in this case are located in Wilbarger County. Further, because this is an action by a Trustee who resides or has resided in Wilbarger County within the four-year period preceding the date this action was filed, and because the situs of administration of the Trust is maintained in Wilbarger County, venue is mandatory in this County under Chapter 115 of the Texas Property Code.

## IV.
### BACKGROUND FACTS

9.     This lawsuit arises from a course of action undertaken by, or at the direction of, Herring Bancorp, Inc. ("Herring"), C.C. Burgess and C. Campbell Burgess (collectively, "Burgess"). C.C. Burgess is Herrring's Chairman and C. Campbell Burgess has been its chief executive officer. Herring is the holding company for Herring Bank (the "Bank"), which has several branches in Amarillo and Vernon, Texas.

10. Mikkelsen and his wife's family have been associated with Herring Bank since its inception in 1903. Mikkelsen himself was associated with the Bank for more than 30 years, and served as Chairman of the Board for 13 years, from 1985 to 1998. He succeeded his father-in-law, M.K. Berry, who was Chairman from 1939 to 1985 and was President of the Bank from about 1937 until about 1974. M.K. Berry's father was W.D. Berry, who was one of the Bank's founding shareholders in 1903 and who served as Chairman of the Board from about 1921 until about 1939.

11. Among his many ties to the Bank, Mikkelsen owns 300 shares of Herring Bancorp's preferred stock, including 150 shares acquired through his mother's Will and 150 shares assigned to him by his brother, Mallory Mikkelsen.

12. Burgess and members of his family have undertaken a course of conduct intended to eliminate the Mikkelsen family from further involvement in Herring or the Bank, and in doing so have violated (among other things) Herring's Articles of Incorporation.

13. As part of the Burgesses' plan, they decided to try to force Mikkelsen to surrender his preferred stock through an elaborate reorganization whereby Herring was supposedly converted from a C Corporation to an S Corporation and whereby certain, selected shareholders of preferred stock (i.e., Mikkelsen's shares) were purportedly redeemed. C.C. Burgess tried to justify the selective redemption by claiming that, since the company was converting to an S Corporation, it was only permitted to have one class of stock and no more than 100 shareholders. Therefore, according to C.C. Burgess, many of the preferred shareholders were permitted to have their preferred shares redeemed and exchanged for common stock, but the company elected not to give Mikkelsen that option and instead decided instead to redeem his shares for cash.

14. C.C. Burgess (purportedly on behalf of Herring) sent Mikkelsen a "Notice of Redemption" on or about October 31, 2006 (a copy of which is attached as Exhibit "A"), which states in pertinent part:

> This letter is to notify you that the board of directors (the "Board") of Herring Bancorp, Inc. (the "Company") has called for the redemption (the "Redemption") of your outstanding shares of Preferred Stock (the "Preferred Stock") of the Company on November 20, 2006.
>
> \*\*\*
>
> As a result of this process, the Board appointed a committee to recommend the criteria for determining which Preferred Stock shareholders would be offered to exchange their shares for the Company's common stock (the "Common Stock"), the nonvoting Common Stock-Series A (the "Common Stock-Series A"), or to have their shares redeemed. The Board's criteria for making this determination included whether the Preferred Stock shareholder had a banking relationship with Herring Bank (the "Bank"), and whether they would own at least 50 shares of Common Stock upon the conversion. If these criteria were met, the Board offered the Preferred Stock shareholders the option to exchange their shares for the Common Stock. If the Preferred Stock shareholder did not meet these criteria, the Board determined the Preferred Stock shareholders would be redeemed.
>
> \*\*\*
>
> From our conversations with you and the Board's determination regarding our classes of stock, your Preferred Stock will be redeemed.

15. Thus, Defendants' own Notice of Redemption draws a distinction among the preferred shareholders and admits that only some of the preferred shareholders were being redeemed for cash. Defendants also admit in the Notice of Redemption that the procedure for determining which of the preferred shares to redeem for cash did not involve a drawing by lot or any pro rata redemption, and did not involve the redemption of shares but instead of shareholders.

16. The redemption process Defendants undertook, as explained in their own Notice of Redemption, violates the procedure required by Herring's Articles of Incorporation:

---

5. Redemption.

a. _Preferred Stock_. The Corporation, at the option of the Board of Directors, may at any time redeem the whole, or from time to time redeem any part, of the Preferred Stock outstanding by paying cash therefor the sum of $95 per share, plus all dividends declared but unpaid thereon . . . .

\*\*\*

Should only a part of the outstanding Preferred Stock be redeemed, the redemption will be effected by lot or pro rata, as prescribed by the Board of Directors.

17. Since only some shares of the company's preferred stock were redeemed, and since the purported redemption was not effected by lot or pro rata, the procedure violated the plain language of Herring's Articles of Incorporation, a copy of the relevant portions of which is attached hereto as Exhibit "B."

18. Because of the invalidity of the redemption procedure, Mikkelsen declined the Defendants' offer of redemption, informed Defendants that they were breaching the contractual Articles of Incorporation and demanded they comply. Defendants refused, even though Defendants did not have the authority to redeem shares in violation of the company's Articles, and the purported redemption is therefore void.

19. Notwithstanding the fact that the purported redemption is void, Mikkelsen has not received dividends on his preferred shares, has been denied access to the company's books and records, and has generally been treated as if he is no longer a shareholder.

## V.

### CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT

20. The Articles of Incorporation of Herring constitute a contract between Herring and its shareholders. As a preferred shareholder of Herring at all relevant times, Plaintiff is

entitled to the benefits of that contract. The acts and omissions of Defendants as described hereinabove constitute a breach of that contract, entitling Plaintiff to recover all of his damage and loss proximately resulting therefrom.

21.     Plaintiff further seeks recovery of his reasonable and necessary attorney's fees for breach of contract pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

22.     All conditions precedent to the recovery of damages and attorney's fees have occurred or been performed.

## COURT TWO
### DECLARATORY JUDGMENT

23.     Pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code, Plaintiff requests that the Court construe the Articles of Incorporation of Herring and declare that the November 2006 purported redemption of Plaintiff's preferred shares was void, that the subsequent purported November 2013 redemption of Plaintiff's preferred shares was also void, and that Plaintiff remains a preferred shareholder of Herring.

24.     Mikkelsen requests an award of his reasonable and necessary attorney's fees under Chapter 37 of the Texas Civil Practice & Remedies Code as part of any final judgment rendered herein.

## COUNT THREE
### INSPECTION RIGHTS

25.     Mikkelsen further sues Defendants for their wrongful violation of his statutory rights of inspection under TEX. BUS. CORP. ACT Art. 2.44(C), which provides a corporate shareholder with a statutory right to inspect and make extracts from corporate records. Mikkelsen seeks an appropriate order, including, if necessary, a writ of mandamus, compelling Defendants to provide access to and copies of Herring's corporate records.

## COUNT FOUR
## BREACH OF FIDUCIARY DUTY, CIVIL CONSPIRACY,
## AND UNLAWFUL OPPRESSION OF MINORITY SHAREHOLDER

26.     Mikkelsen further sues Defendants for the fraudulent and disloyal acts they have directed toward him. Defendants violated the plain terms of Herring's Articles of Incorporation, breached their fiduciary duties, and misrepresented facts by attempting to selectively redeem Mikkelsen's preferred shares in a manner not authorized by the company's Articles of Incorporation, without notice to all the preferred shareholders, and without notice that the company's board of directors and its secret committee were engaged in an insider transaction. Defendants breached their fiduciary duties when they voted on and conducted the purported redemption through secret meetings with hidden procedures.

27.     Defendants also made material false representations to Mikkelsen concerning the attempted selective redemption, the motives and procedures of the secret committee that authorized and conducted the purported redemption, and the self-dealing and differing treatment within the class of preferred shareholders.

28.     The foregoing course of action was part of a general pattern of oppression of Mikkelsen as a minority shareholder, and clearly the product of a civil conspiracy between and among Herring and the Burgesses to accomplish an illegal result, the deprivation or impairment of Mikkelsen's vested property rights, and the violation of Herring's Articles of Incorporation. Plaintiff has been damaged by this conduct, and hereby sues to recover those damages.

29.     Mikkelsen's damages include, at a minimum, the dividends due to him as a preferred shareholder since October 31, 2006, his attorney's fees and expenses required to be incurred as a result of Defendants' improper conduct; and capital gains taxes if the alleged redemptions are required to be reported as such.

160160160160160

<u>**PRAYER**</u>

WHEREFORE, PREMISES CONSIDERED, Mikkelsen respectfully requests the Court

to cite Defendants to appear and answer and, on final trial, award Mikkelsen relief against

Defendants, jointly and severally, as follows:

(1)     An appropriate order compelling Defendants to immediately provide Plaintiff with the right to inspect all requested records of Herring;

(2)     Declaratory relief as prayed for herein;

(3)     Actual damages;

(4)     Punitive and exemplary damages for breach of fiduciary duties, oppression, and civil conspiracy as pled above;

(5)     Attorney's fees and court costs;

(6)     Prejudgment interest and post-judgment interest at the highest lawful rates;

(7)     All writs and processes necessary to effectuate the relief requested; and Attorney's fees and costs of court; and

(8)     All other relief Plaintiff Mikkelsen is entitled to receive.

Respectfully submitted,

POPE, HARDWICKE, CHRISTIE, SCHELL,
KELLY & RAY, L.L.P.

By: _____

Lee F. Christie
State Bar No. 042317100

Michael L. Atchley
State Bar No. 01397600

500 West 7th Street, Suite 600
Fort Worth, Texas 76102
(817) 332-3245 (Telephone)
(817) 877-4781 (Facsimile)

Attorneys for Plaintiff

---

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing Plaintiff's Objections and Responses to Defendants' Second Request for Production has been sent to the following attorneys of record for Defendants via certified mail, return receipt requested, on the 15th day of January, 2015:

Tim Newsom, Esq.
Lovell, Lovell, Newsom & Isern, L.L.P.
Eagle Centre Building
112 West 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314

Cornell Curtis, Esq.
Cornell D. Curtis, P.C.
1716 Main Street
Vernon, Texas 76384

_Lee F. Christie_

Lee F. Christie

P:\Mikkelsen\Pleadings\First Amended Original Petition.doc

---

FILED
' ' ' of the
' ' of Texas

DEC 19 1983

Clerk E
Corporations Section

## ARTICLES OF INCORPORATION
## OF
## HERRING BANCORP, INC.

I, the undersigned natural person of the age of eighteen (18) years or more, acting as an incorporator of a corporation (hereinafter called the "Corporation") under the Texas Business Corporation Act, do hereby adopt the following Articles of Incorporation for the Corporation:

### ARTICLE ONE: NAME

The name of the Corporation is Herring Bancorp, Inc.

### ARTICLE TWO: DURATION

The Corporation's period of duration is perpetual.

### ARTICLE THREE: PURPOSE

The purpose or purposes for which the Corporation is organized are:

(a)     To act as a bank holding company;

(b)     To transact any and all lawful business for which corporations may be incorporated under the Texas Business Corporation Act;

(c)     To do each and every thing necessary, suitable, or proper for the accomplishment of any of the purposes or for the attainment of any one or more of the objects herein enumerated or which at any time appear conducive to or expedient for the protection or benefit of the Corporation.

The foregoing clauses shall be construed as powers as well as objects and purposes, and the matter expressed in each clause shall, unless herein otherwise expressly provided, be in nowise limited by reference to or inference from the terms of any other clause, but shall be regarded as independent objects, purposes and powers, and shall not be construed to limit or restrict in any manner the meaning of the general terms or the general powers of the Corporation.

### ARTICLE FOUR: STOCK

The Corporation is authorized to issue two classes of shares to be designated respectively "preferred" and "common." The total number of shares which the Corporation is authorized to issue is 125,000 shares. The number of

PLAINTIFF'S
EXHIBIT
2

Appendix p. 67

HERR 000075

preferred shares authorized is 25,000 shares, and the par value of each such share is $95.00. The number of common shares authorized is 100,000 shares, and the par value of each such share is $20.00.

(a)    The holders of the preferred shares shall be entitled to receive dividends, out of any funds legally available therefor, at the rate of ten percent (10.0%) per annum of the par value thereof, and no more, payable in cash semi-annually, or at such intervals as the Board of Directors may from time to time determine. Such dividends shall accrue from the date of issuance of the respective preferred shares and shall be deemed to accrue from day to day whether or not earned or declared.

Such dividends shall be payable before any dividends shall be paid, declared, or set apart for the common shares, and shall be cumulative so that if for any dividend period such dividends on the outstanding preferred shares at the rate of ten percent (10.0%) per annum of the par value thereof are not paid or declared and set apart therefor, the deficiency shall be fully paid or declared and set apart for payment, without interest, before any distribution, by dividend or otherwise, shall be paid on, declared, or set apart for the common shares.

(b)    On any voluntary or involuntary liquidation of the Corporation, the holders of the preferred shares shall receive an amount equal to the par value of such shares plus any dividends declared and unpaid thereon, and no more, before any amount shall be paid to the holders of the common shares. If the assets of the Corporation should be insufficient to permit payment to the preferred shareholders of their full preferential amounts as herein provided, then such assets shall be distributed ratably among the outstanding preferred shares. Subject to such preferential rights, the holders of the common shares shall receive, ratably, all remaining assets of the Corporation. A consolidation or merger of the Corporation with or into any other corporation or a sale of all or substantially all of the assets of the Corporation shall not be deemed a liquidation, dissolution, or winding up of the Corporation within the meaning of this paragraph.

(c)    The Corporation, at the option of the Board of Directors, may at any time redeem the whole, or from time to time redeem any part, of the preferred shares outstanding by paying in cash therefor the sum of $95.00 per share, plus all dividends declared but unpaid thereon as provided in this Article Four to and including the date of redemption, hereinafter referred to as the "redemptive price," and by giving to each preferred shareholder of record at his last known address, as shown on the records of the Corporation, at least twenty (20), but not more than fifty (50), days' prior notice personally or in writing, by mail, postage prepaid, stating the class or series or part of the class or series of shares to be redeemed and

2

HERR 000076

the date and plan of redemption, the redemptive price, and the place where the shareholders may obtain payment of the redemptive price on surrender of their respective share certificates, hereinafter called the "redemption notice." Should only a part of the outstanding preferred shares be redeemed, such redemption shall be effected by lot, or pro rata, as prescribed by the Board of Directors. On or after the date fixed for redemption, each holder of shares called for redemption shall surrender his certificate for such shares to the Corporation at the place designated in the redemption notice and shall thereupon be entitled to receive payment of the redemptive price. Should less than all the shares represented by any surrendered certificate be redeemed, a new certificate for the unredeemed shares shall be issued. If the redemption notice is duly given and if sufficient funds are available therefor on the date fixed for redemption, then, whether or not the certificates evidencing the shares to be redeemed are surrendered, all rights with respect to such shares shall terminate on the date fixed for redemption, except for the right of the holders to receive the redemption price, without interest, on surrender of their certificate therefor.

(d)     If, on or prior to any date fixed for redemption of preferred shares as herein provided, the Corporation deposits with any bank or trust company in Texas, or any bank or trust company in the United States duly appointing and acting as transfer agent for the Corporation, as a trust fund, a sum sufficient to redeem, on the date fixed for redemption thereof, the shares called for redemption, with irrevocable instructions and authority to the bank or trust company to publish the notice of redemption thereof, or to complete such publication if theretofore commenced, and to pay, on and after the date fixed for redemption or prior thereto, the redemptive price of the shares to their respective holders on surrender of their share certificates, then from and after the date of the deposit, even though such date may be prior to the date fixed for redemption, the shares so called shall be deemed to be redeemed and dividends on those shares shall cease to accrue after the date fixed for redemption. The deposit shall be deemed to constitute full payment of the shares to their holders and from and after the date of the deposit, the shares shall be deemed to be no longer outstanding, and the holders thereof shall cease to be shareholders with respect to such shares and shall have no rights with respect thereto, except the right to receive from the bank or trust company payment of the redemptive price of the shares, without interest, on surrender of their certificates therefor.

(e)     Shares redeemed by the Corporation shall be restored to the status of authorized but unissued shares of the Corporation.

(f)     Except where otherwise provided in these Articles of Incorporation or by law, the holders of the common shares shall have the

3

Appendix p. 69

HERR 000077

exclusive voting rights and powers, including the exclusive right to notice of shareholders' meetings.

## ARTICLE FIVE: PREEMPTIVE RIGHTS DENIED

No holder of any shares of common stock or preferred stock shall have any preemptive or preferential right to receive, purchase, or subscribe to (a) any unissued or treasury shares of any class of stock (whether now or hereafter authorized) of the Corporation, (b) any obligations, evidences of indebtedness, or other securities of the Corporation convertible into or exchangeable for, or carrying or accompanied by any rights to receive, purchase, or subscribe to, any such unissued or treasury shares, (c) any right of subscription to or right to receive, or any warrant or option for the purchase of, any of the foregoing securities, or (d) any other securities that may be issued or sold by the Corporation.

## ARTICLE SIX: COMMENCING BUSINESS

The Corporation will not commence business until it has received consideration for the issuance of its shares amounting to One Thousand Dollars ($1,000.00) in value and consisting of money, labor done, or property actually received.

## ARTICLE SEVEN: CUMULATIVE VOTING

Cumulative voting for the election of directors is prohibited.

## ARTICLE EIGHT: VOTING

Except where otherwise provided in these Articles of Incorporation or the bylaws of the Corporation, the holders of the common stock shall have the exclusive voting rights and powers, including the exclusive right to notice of shareholders' meetings.

## ARTICLE NINE: ADOPTION OF BYLAWS

The Board of Directors of the Corporation shall adopt the initial bylaws of the Corporation and may thereafter alter, amend, or repeal the bylaws of the Corporation or may adopt new bylaws, subject to the shareholders' concurrent right to alter, amend, or repeal the bylaws or to adopt new bylaws. The shareholders may provide that any or all bylaws altered, amended, repealed, or adopted by the shareholders shall not be altered, amended, reenacted, or repealed by the Board of Directors of the Corporation.

4

HERR 000078

## ARTICLE TEN: INTERESTED PARTIES

A contract or transaction between the Corporation and any other Person (as used herein the term "Person" means an individual, firm, trust, partnership, joint venture, association, corporation, political subdivision or instrumentality, or other entity) shall not be affected or invalidated by the fact that (a) any director, officer, or security holder of the Corporation is also a party to, or has a direct or indirect interest in, such contract or transaction; or (b) any director, officer, or security holder of the Corporation is in any way connected with such other Person or with any of its officers or directors.

Every person who may become a director of the Corporation is hereby relieved from any liability that might otherwise exist from contracting with the Corporation for the benefit of himself or of any Person in which he has any interest, whether or not the interested director's presence at a meeting or his vote or votes were necessary to obligate the Corporation in such transaction, if such interest shall have been disclosed to, or known to, the Corporation's directors or shareholders who shall have approved such transaction.

## ARTICLE ELEVEN: INDEMNIFICATION

**Section A.** The Corporation shall indemnify any person who was or is a party or is threatened with being made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (all such actions, suits, and proceedings and accompanying modifiers being comprehended by the term "Proceeding") (excluding actions by, or in the right of, the Corporation), by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another Person. Such indemnification may be made only against those expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding if (i) he is successful on the merits or otherwise; or (ii) he acted in the transaction which is the subject of the Proceeding in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Corporation, and, with respect to any criminal Proceeding, he had no reasonable cause to believe his conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of _nolo contendere_ or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interest of the Corporation, nor, with respect to any criminal Proceeding, that he had reasonable cause to believe that his conduct was unlawful.

**Section B.** The Corporation shall indemnify any person who was or is a party or is threatened with being made a party to a Proceeding by or in the right of the Corporation by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another Person. Such indemnification may be made against expenses (including attorneys' fees) actually and reasonably

5

Appendix p. 71

HERR 000079

incurred by such person in connection with the defense or settlement of such Proceeding if (i) he is successful on the merits or otherwise; or (ii) he acted in the transaction which is the subject of the Proceeding in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Corporation. However, no indemnification may be made in respect of any claim, issue, or matter in relation to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of his duty to the Corporation. Notwithstanding the foregoing exception, indemnification may be made to the extent that the court in which such Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnification for such expenses as the court of appropriate jurisdiction shall deem proper.

Section C. Any indemnification under Section A or Section B of this Article (other than one ordered by a court) may be made by the Corporation only upon a determination that indemnification of such person is proper in the circumstances because he has met the applicable standard of conduct set forth in such Section. Such determination shall be made by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such Proceeding; or, if such a quorum is not obtainable (or, even if obtainable, if a quorum of disinterested directors so directs), by independent legal counsel in a written opinion, or by the shareholders of the Corporation; or through such procedures as shall be authorized in the bylaws of the Corporation.

Section D. Expenses incurred in defending a civil or criminal Proceeding may be paid by the Corporation in advance of the final disposition of such Proceeding as authorized by the Board of Directors or other appropriate body or party in the manner provided in Section C of this Article only when the Corporation has received an undertaking by or on behalf of the person who is to receive such payment to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Corporation as authorized in this Article.

Section E. In determining whether the standard of conduct set forth in Section A or Section B has been met, it may be determined that a person has met the standard as to some matters but not as to others, and the amount of indemnification may be accordingly prorated.

Section F. The indemnification provided by Sections A through E shall not be exclusive of any other rights to which a person may be entitled by law, bylaw, agreement, vote of shareholders, or otherwise.

Section G. The indemnification provided by Sections A through E shall inure to the heirs, executors, and administrators of any person entitled to indemnification under this Article.

Section H. The Corporation may purchase and maintain insurance on any person who is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, or agent of

6

Appendix p. 72

HERR 000080

another Person against any liability incurred by him in any such position, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under Sections A through E.

## ARTICLE TWELVE: REPURCHASE OF STOCK

The Corporation is authorized to purchase, directly or indirectly, its own shares to the extent of the aggregate of the unrestricted capital surplus and unrestricted reduction surplus available therefor, without submitting such purchase to a vote of the shareholders of the Corporation.

## ARTICLE THIRTEEN: AUTHORITY TO BORROW

The Board of Directors is expressly authorized, without the consent of the stockholders, except so far as such consent is herein or by law provided, to issue and sell or otherwise dispose of, for any purpose, the Corporation's bonds, debentures, notes or other securities or obligations, upon such terms and for such consideration as the Board of Directors shall deem advisable and to authorize and cause to be executed mortgages, pledges, charges and liens upon all or part of the real and personal property rights, interest and franchise of the Corporation, including contract rights, whether at the time owned or thereafter acquired.

## ARTICLE FOURTEEN: INITIAL OFFICE AND AGENT

The address of the initial registered office of the Corporation is 1900 Pease Street, Vernon, Texas, and the name of its initial registered agent at such address is H. W. Dozier.

## ARTICLE FIFTEEN: INITIAL DIRECTORS

The number of directors constituting the initial Board of Directors of the Corporation is five and the names and addresses of the persons who are to serve as directors until the first annual meeting of shareholders, or until their respective successors are elected and qualified, are:

| NAME | ADDRESS |
|------|---------|
| Robert Belew | 2603 Mansard Street<br>Vernon, Texas 76384 |
| C. C. Burgess | Suite 1000<br>Amarillo National Bank Bldg.<br>Amarillo, Texas 79101 |
| H. W. Dozier | 1102 Hillcrest Drive<br>Vernon, Texas 76384 |

7

HERR 000081

| NAME | ADDRESS |
|---|---|
| Curtis D. Johnson | 2230 Hilltop<br>Vernon, Texas 76384 |
| John Mikkelsen | 2801 Gordon Street<br>Vernon, Texas 76384 |

## ARTICLE SIXTEEN: INCORPORATOR

The name and address of the incorporator is:

| NAME | ADDRESS |
|---|---|
| Tonia T. Kittelson | 4700 InterFirst Two<br>Dallas, Texas 75270 |

IN WITNESS WHEREOF, I have executed this document as of the *16th* day of *December*, 1983.

_____Tonia T. Kittelson_____
Tonia T. Kittelson

STATE OF TEXAS     §
                         §
COUNTY OF DALLAS   §

I, *Jenay K Goebel*, a Notary Public, hereby certify that on this *16th* day of *December* 1983, personally appeared before me Tonia T. Kittelson, who, being first duly sworn by me, declared that he is the person who signed the foregoing document as incorporator and that the statements contained therein are true.

JENAY K GOEBEL, Notary Public
In and for the State of Texas
My commission expires Feb 19, 1986

*Jenay K Goebel*
Notary Public in and for Texas

8

HERR 000082

0 0 0 9 9 6 0 1 3 5 1

## ARTICLES OF AMENDMENT
## TO ARTICLES OF INCORPORATION
## OF HERRING BANCORP, INC.

Pursuant to the provisions of Article 4.04 of the Texas Business Corporation Act, the undersigned corporation adopts the following Article of Amendment to its Articles of Incorporation:

### ARTICLE ONE

The name of the corporation is Herring Bancorp, Inc.

FILED
In the Office of the
Secretary of State of Texas
NOV 09 1988
Corporations Section

### ARTICLE TWO

The following amendment to the Articles of Incorporation was adopted by the shareholders of the corporation on January 19, 1988: To Limit Director's Liability To Shareholders.

The amendment is an addition to the original Article of Incorporation and the full text of the provision added reads as follows:

ARTICLE SEVENTEEN: DIRECTOR'S LIABILITY TO SHAREHOLDERS

To the fullest extend not prohibited by law, a director of this corporation shall not be liable to the corporation or its shareholders for monetary damages for an act or omission in the director's capacity as a director, except that this article does not eliminate or limit the liability of a director for:

1. a breach of a director's duty of loyalty to the corporation or its shareholders or members;

2. an act or omission not in good faith or that involves intentional misconduct or a knowing violation of the law;

3. a transaction from which a director received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the director's office;

4. an act or omission for which the liability of a director is expressly provided for by statute; or

5. act related to an unlawful stock repurchase or payment of a dividend.

### ARTICLE THREE

The number of shares of the corporation outstanding at the time of the adoption was 39,074; and the number of shares entitled to vote on the amendment was 39,074.

00098601362

## ARTICLE FOUR

The number of shares that voted for the amendment was 32,115; and the number of the shares that voted against the amendment as 0.

Dated:  November 7, 1988.

ATTEST:

_Frances Pierce_
FRANCES PIERCE, Secretary

HERRING BANCORP, INC.

BY: _John Mikkelsen_
JOHN MIKKELSEN,
Chairman of the Board

**ARTICLES OF AMENDMENT
TO ARTICLES OF INCORPORATION
OF
HERRING BANCORP, INC.**

**FILED**
In the Office of the
Secretary of State of Texas

**MAY 06 1998**

Corporations Section

Pursuant to the provisions of Article 4 04 of the Texas Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation

### ARTICLE ONE

The name of the corporation is Herring Bancorp, Inc

### ARTICLE TWO

The following amendment to the Articles of Incorporation was adopted by the shareholders of the corporation on February 17, 1998 Article Four -Stock

The amendment is an amendment to the original Articles of Incorporation Article Four and the full text of the amendment reads as follows

ARTICLE FOUR See Exhibit "A" attached hereto and incorporated herein as if copied verbatim

### ARTICLE THREE

The following amendment to the Articles of Incorporation was adopted by the shareholders of the corporation on February 17, 1998 Article Eight Voting

The amendment is an amendment to the original Articles of Incorporation Article Eight and the full text of the amendment reads as follows

ARTICLE EIGHT See Exhibit "A" attached hereto and incorporated herein as if copied verbatim

### ARTICLE FOUR

The following amendment to the Articles of Incorporation was adopted by the shareholders of the corporation on February 17, 1998 Article Fourteen Registered Agent

The amendment is an amendment to the original Articles of Incorporation Article Fourteen and the full text of the amendment reads as follows

ARTICLE FOURTEEN See Exhibit "A" attached hereto and incorporated herein as if copied verbatim

## ARTICLE FIVE

The following amendment to the Articles of Incorporation was adopted by the shareholders of the corporation on February 17, 1998 Article Eighteen Stock restrictions

The amendment is an addition to the original Articles of Incorporation and the full text of the provision added reads as follows

ARTICLE EIGHTEEN See Exhibit "A" attached hereto and incorporated herein as if copied verbatim

## ARTICLE SIX

The number of shares of the corporation outstanding at the time of the adoption was 32,781, and the number of shares entitled to vote on the amendment was 32,781

## ARTICLE SEVEN

The number of shares that voted for the amendment was 31,266, and the number of the shares that voted against the amendment was 0

Dated April 23, 1998

ATTEST

DONNA STRIBLING, Secretary

HERRING BANCORP, INC

BY
CURTIS D JOHNSON
President



# HERRING BANCORP, INC.
# CORPORATE RESOLUTION

I, DONNA STRIBLING, Secretary of HERRING BANCORP, INC, do hereby certify that I am keeper of the records and the minutes of the proceedings of the shareholders of said Corporation, and that on the 17th day of February, 1998, there was held a meeting of the shareholders of said Corporation, which was duly called and held in accordance with law and the bylaws of the Corporation, and at which a quorum of the shareholders was present, at said meeting the following action was duly and legally taken

**RESOLVED** that the shareholders of Herring Bancorp, Inc do hereby authorize the amendment the Articles of Incorporation of said corporation, specifically Articles 4, 8, 14 and 18, copies of which are attached hereto and incorporated herein

**RESOLVED** that the shareholders of Herring Bancorp, Inc do hereby authorize the amendment of the Articles of Association of Herring National Bank, copy of which is attached hereto and incorporated herein

Passed and approved at ___3:30___ o'clock _p._ m on February 17, 1998

IN WITNESS WHEREOF, I have hereunto set my hand as Secretary of said Corporation, and have attached hereto the official seal of said Corporation, this 23rd day of ___April___, 1998

_Donna Stribling_
**DONNA STRIBLING**
Secretary

RESOLVED, THAT ARTICLE FOUR OF THE ARTICLES OF INCORPORATION OF HERRING BANCORP, INC. BE AMENDED TO READ AS FOLLOWS:

## ARTICLE FOUR - STOCK

**1. Classes:**

The aggregate number of Shares that the Corporation is authorized to issue is 625,000, divided into four classes. The designation of each class is as follows:

i. Class A Nonvoting Common Stock, consisting of 250,000 Shares, no par value,

ii. Class B Nonvoting Common Stock, consisting of 250,000 Shares, no par value;

iii. Class C Voting Common Stock, consisting of 100,000 Shares, $20 par value;

iv. Preferred Stock, consisting of 25,000 Shares, $95 par value.

The nature and extent of the preferences, rights, privileges, and restrictions granted to or imposed on the holders of the respective classes of stock are as follows:

**2. General:**

a    <u>Class A Nonvoting Common Stock</u>. The holders of the Class A Nonvoting Common Stock will have no voting rights or powers. The Class A Nonvoting Common Stock will be issued from time to time in series  The Board of Directors is authorized to fix or alter the designations, preferences, rights (other than voting rights) and qualifications, and limitations or restrictions of the Class A Nonvoting Common Stock. This includes, without limitation of the generality of the previous sentence, dividend rights, dividend rates, and liquidation preferences of any wholly unissued series.

b.    <u>Class B Nonvoting Common Stock</u>. The holders of the Class B Nonvoting Common Stock will have no voting rights or powers. The Class B Nonvoting Common Stock will be issued from time to time in series. Each series issued by the Board of Directors will relate to a "Profit Center" of the Corporation or a subsidiary of the Corporation, as determined from time to time by the Corporation's Board of Directors. In each series, the only persons who will be eligible to purchase the shares of such series will be employees, directors and advisory directors of the "Profit Center" to which the series relate. The Board of Directors is authorized to fix or alter the designations, preferences, rights (other than voting rights) and qualifications, and limitations or restrictions of the Class B Nonvoting Common Stock. This includes, without

12264023.wp5

limitation of the generality of the previous sentence, dividend rights, dividend rates, and liquidation preferences of any wholly unissued series.

At the end of each fiscal year, the Corporation's Board of Directors may, at its option and in its sole discretion, declare a Performance Award (as defined below) for one or more series of Class B Nonvoting Common Stock on the basis of the performance of the "Profit Center" to which such series relates. If declared, the Performance Award shall be determined by the Corporation's Board of Directors using the applicable Performance Measures (as defined below) and the Corporation's and its subsidiaries' internal financial records and information. If the Board of Directors declares a Performance Award for a series of Class B Nonvoting Common Stock, the Performance Award shall be divided ratably among the outstanding shares in such series. From time to time, the Corporation's Board of Directors shall establish the Performance Measures to be applied in order to determine the Performance Award of the shares of Class B Nonvoting Common Stock. The Performance Measures may include, but shall not be limited to, the return of assets or the return on equity of the "Profit Center." The Performance Measures may be applied on an absolute basis or relative industry indices. The Performance Measures shall be applied consistently for each series of Class B Nonvoting Common Stock. If during the course of a fiscal year there should occur significant changes in conditions which the Board of Directors did not foresee in establishing the Performance Measures for such fiscal year and which, in the Board of Directors sole judgment, have or are expected to have a substantial effect on the performance of the Corporation or of a subsidiary, the Board of Directors may revise the Performance Measures.

The Corporation shall set up an appropriate record, referred to as the "Class B Stock Ledger", and from time to time enter in the ledger the name of each holder of Class B Nonvoting Common Stock, the number of shares held by him or her, the price paid for such shares, the Performance Awards declared for such shares, and the accrued Appreciated Value of the shares.

For purposes of these Articles, the following terms shall have the following meanings "Performance Award" means the award declared by the Corporation's Board of Directors for one or more series of Class B Nonvoting Common Stock expressed in dollars at the conclusion of a fiscal year, determined in accordance with this section; "Performance Measures" means the performance measures established by the Corporation's Board of Directors from time to time in its sole discretion in accordance with this section; and "Appreciated Value" means the accrued value per share of each series of Class B Nonvoting Common Stock which equals the aggregate amount of the Performance Awards declared for such share.

Subject to the immediately following sentence, when a holder of Class B Nonvoting Common Stock is no longer an employee, director or advisory director of the Corporation or one of its subsidiaries (through death, disability, resignation, termination, removal or otherwise), then the Corporation shall, on the next redemption date of Class B Nonvoting Common Stock declared by the Corporation's Board of Directors pursuant to paragraph 5.b. of this Article, redeem the holder's shares of Class B Nonvoting Common Stock by paying in cash therefor the sum of (a) the price paid for such shares by the holder, plus (b) the then existing Appreciated

12264023.WP5

Value of such shares as shown on the Class B Stock ledger. If a holder of Class B Nonvoting Common Stock is either terminated or removed as an employee, director or advisory director of the Corporation or one of its subsidiaries "For Cause", then the Corporation shall, on the next redemption date of Class B Nonvoting Common Stock declared by the Corporation's Board of Directors pursuant to paragraph 5.b. of this Article, redeem the holder's Class B Nonvoting Common Stock by paying in cash therefor the sum of the purchase price paid for such shares, and all Appreciated Value of such shares shall be forfeited. For the purposes of this section, the term "For Cause" means (a) failure or refusal to comply with all rules and regulations promulgated by the Corporation concerning the conduct of employees or advisory directors and the performance of his or her duties; (b) habitual neglect of his or her duties; (c) personal or professional misconduct where the Corporation's Board of Directors determines that the continued presence or employment of the employee or advisory director is personally or professionally obnoxious or detrimental to the Corporation; (d) the conviction or plea of guilty or nolo contendere to a felony or misdemeanor involving fraud, embezzlement, theft, or dishonesty or other criminal conduct; (e) willfully disobeying a lawful directive of the Corporation or its Board of Directors, whether through commission or omission, or (f) engaging in any fraudulent conduct as determined by the Board of Directors

c        Class C Voting Common Stock. Except as otherwise provided by law, the holders of the Class C Voting Common Stock will have the exclusive voting rights and powers, including the exclusive right to notice of shareholders' meetings.

## 3.    Dividends:

a.        Class A Nonvoting Common Stock. The Corporation may, but is not obligated to, declare dividends on the Class A Nonvoting Common Stock from time to time. The Corporation may pay dividends to holders of Class A Nonvoting Common Stock in excess of dividends paid or without paying dividends to holders of the Class C Voting Common Stock or the Class B Nonvoting Common Stock.

b        Class B Nonvoting Common Stock. The Corporation may, but is not obligated to, declare dividends on the Class B Nonvoting Common Stock from time to time. The dividends of each series will be based upon the Performance Measures of the Profit Center to which the series relates. The Corporation may pay dividends to holders of Class B Nonvoting Common Stock in excess of dividends paid or without paying dividends to holders of the Class C Voting Common Stock or Class A Nonvoting Common Stock. Notwithstanding any provision in these Articles or the Corporation's bylaws to the contrary, no dividends will accrue or be payable to any shareholder of Class B Nonvoting Common Stock who has been terminated or removed "For Cause", as such term is defined in paragraph 2.b. of this Article.

c.        Class C Voting Common Stock. The Corporation may, but is not obligated to, declare dividends on the Class C Voting Common Stock from time to time. The Corporation may pay dividends to holders of Class C Voting Common Stock in excess of dividends paid or without paying dividends to holders of the Class A Nonvoting Common Stock or the Class B Nonvoting Common Stock.

d.     Preferred Stock.     The holders of the Preferred Stock will be entitled to receive dividends, out of any funds legally available therefor, at the rate of ten percent per annum of the par value thereof, and no more, payable in cash semi-annually, or at such intervals as the Board of Directors may from time to time determine. The dividends will accrue from the date of issuance of the respective Preferred Stock and will be deemed to accrue from day to day whether or not earned or declared.

The dividends will be payable before any dividends will be paid, declared, or set apart for the Common Stock and will be cumulative so that if for any dividend period the dividends on the outstanding Preferred Stock at the rate of ten percent per annum of the par value thereof are not paid or declared and set apart therefor, the deficiency will be fully paid or declared and set apart for payment, without interest, before any distribution, by dividend or otherwise, will be paid on, declared or set apart for the Common Stock.

## 4.     Liquidation

a     Preferred Stock.     On any voluntary or involuntary liquidation, dissolution, or winding up of the affairs of the Corporation, the holders of the Preferred Stock will receive an amount equal to the par value of the shares plus any dividends declared and unpaid thereon, and no more, before any amount is paid to the holders of the Common Stock. If the assets of the Corporation are insufficient to permit payment to the Preferred Stock shareholders of their full preferential amounts as herein provided, then the assets will be distributed ratably among the outstanding Preferred Stock

b.     Class B Nonvoting Common Stock     Subject to the rights of the Preferred Stock shareholders, in the event of any voluntary or involuntary liquidation, dissolution, or winding up of the affairs of the Corporation, each holder of the Class B Nonvoting Common Stock will be paid the sum of (a) the price paid for the shares held by the shareholder, plus (b) the then existing Appreciated Value of the shares held by the shareholder as shown on the Class B Stock Ledger; provided however, if any holder of Class B Nonvoting Common Stock has been terminated or removed "For Cause" (as such term is defined in paragraph 2 b. of this Article), then in the event of any voluntary or involuntary liquidation, dissolution, or winding up of the affairs of the Corporation, such shareholder will be paid an amount equal to the aggregate price paid for the shares of Class B Nonvoting Common Stock held by such shareholder; and all Appreciated Value of such shares shall be forfeited.

c.     Class A Nonvoting Common Stock and Class C Voting Common Stock—Subject to the rights of the Preferred Stock shareholders and the Class B Nonvoting Common Stock shareholders, the remaining assets and funds of the Corporation will be distributed equally among the holders of the Class A Nonvoting Common Stock and the Class C Voting Common Stock, pro rata, according to the number of shares held

A merger, consolidation, and sale, lease, or conveyance of assets will not be considered a liquidation and dissolution of the Corporation for the purposes of the liquidation provisions set forth above, except that any reorganization in which the Shares having a liquidation preference

12264023.WPS

set forth above are not completely carried through to the new company will not be considered a liquidation for the purposes of the liquidation preferences set forth above.

## 5. Redemption:

a. _Preferred Stock_. The Corporation, at the option of the Board of Directors, may at any time redeem the whole, or from time to time redeem any part, of the Preferred Stock outstanding by paying in cash therefor the sum of $95 per share, plus all dividends declared but unpaid thereon as provided in this Article Four to and including the date of redemption, hereinafter referred to as the "redemptive price," and by giving to each Preferred Stock shareholder of record at that Preferred Stock shareholder's last known address, as shown on the records of the Corporation, at least 20, but not more than 50, days' prior notice personally or in writing, by mail, postage prepaid, stating the class or series or part of the class or series of shares to be redeemed and the date and plan of redemption, the redemptive price, and the place where the shareholder can obtain payment of the redemptive price on surrender of their respective share certificates, hereinafter called the "redemption notice." Should only a part of the outstanding Preferred Stock be redeemed, the redemption will be effected by lot or pro rata, as prescribed by the Board of Directors. On or after the date fixed for redemption, each holder of shares called for redemption will surrender his or her certificate for the shares to the Corporation at the place designated in the redemption notice and will thereupon be entitled to receive payment of the redemptive price. Should less than all the shares represented by any surrendered certificate be redeemed, a new certificate for the unredeemed shares will be issued. If the redemption notice is duly given and if sufficient funds are available on the date fixed for redemption, then, whether or not the certificates evidencing the shares to be redeemed are surrendered, all rights with respect to the shares will terminate on the date fixed for redemption, except for the right of the holders to receive the redemption price, without interest, on surrender of their certificate

If, on or prior to any date fixed for redemption of Preferred Stock as herein provided, the Corporation deposits with any bank or trust company in Texas or any bank or trust company in the United States duly appointing and acting as transfer agent for the Corporation as a trust fund, a sum sufficient to redeem, on the date fixed for redemption thereof, the shares called for redemption, with irrevocable instructions and authority to the bank or trust company to publish the notice of redemption thereof, or to complete the publication if theretofore commenced, and to pay, on and after the date fixed for redemption or prior thereto, the redemptive price of the shares to their respective holders on surrender of their share certificates, then from and after the date of the deposit, even though that date may be prior to the date fixed for redemption, the shares so called will be deemed to be redeemed; and dividends on those shares will cease to accrue after the date fixed for redemption  The deposit will be deemed to constitute full payment of the shares to their holders; and from and after the date of the deposit, the shares will be deemed to be no longer outstanding; and the holders thereof will cease to be shareholders with respect to the shares and will have no rights with respect thereto, except the right to receive from the bank or trust company payment of the redemptive price of the shares, without interest, on surrender of their certificates

12264023.WPS

b.     Class B Nonvoting Common Stock. The Class B Nonvoting Common Stock shall be redeemable at the option of, and at the discretion of the Board of Directors, in whole or in part, at any time on twenty (20) days notice. The redemption price per share shall be equal to the sum of (a) the price paid for such shares by the shareholder, plus (b) the then existing Appreciated Value of such shares as shown on the Class B Stock ledger, provided however, if the holder of the shares to be redeemed was terminated or removed "For Cause" (as such term is defined in paragraph 2.b of this Article), then the redemption price per share shall be equal to the price paid for such shares; and all Appreciated Value of such shares shall be forfeited However, no redemption would render the Corporation insolvent, or would reduce the Corporation's net assets below the aggregate amount payable to the holders of any shares having prior or equal rights to the assets of the Corporation on involuntary dissolution.

The Corporation must give notice of the redemption of any or all shares by call and written or printed notice. The notice of redemption must set forth all of the following:

i       The series of shares or part of any series of shares to be redeemed;

ii.     The date fixed for redemption;

iii     The redemption price;

iv.     The place at which the shareholders may obtain payment of the redemption price on surrender of their share certificates

A copy of the notice of redemption, postage prepaid, must be mailed to each holder of shares to be redeemed, of record as of the date of mailing or as of the record date fixed in accordance with the bylaws, addressed to the holder, at his or her address appearing on the Corporation books or given by him or her to the Corporation for the purpose of notice, or if no such address appears or is given, at the place where the principal office of the Corporation is located, not less than 20 days before the date fixed for redemption.

The redemption payments may be made from any legally available source or fund.

If, on or prior to any date fixed for redemption of Class B Nonvoting Common Stock as herein provided, the Corporation deposits with any bank or trust company in Texas or any bank or trust company in the United States duly appointing and acting as transfer agent for the Corporation as a trust fund, a sum sufficient to redeem, on the date fixed for redemption thereof, the shares called for redemption, with irrevocable instructions and authority to the bank or trust company to publish the notice of redemption thereof, or to complete the publication if theretofore commenced, and to pay, on and after the date fixed for redemption or prior thereto, the redemptive price of the shares to their respective holders on surrender of their share certificates, then from and after the date of the deposit, even though that date may be prior to the date fixed for redemption, the shares so called will be deemed to be redeemed; and dividends on those shares will cease to accrue after the date fixed for redemption. The deposit will be deemed to constitute full payment of the shares to their holders; and from and after the date of

the deposit, the shares will be deemed to be no longer outstanding; and the holders thereof will cease to be shareholders with respect to the shares and will have no rights with respect thereto, except the right to receive from the bank or trust company payment of the redemptive price of the shares, without interest, on surrender of their certificates.

Shares redeemed by the Corporation will be restored to the status of authorized but unissued shares of the Corporation.

RESOLVED, THAT ARTICLE EIGHT OF THE ARTICLES OF INCORPORATION OF HERRING BANCORP, INC BE AMENDED TO READ AS FOLLOWS

## ARTICLE EIGHT: VOTING

Except where otherwise provided in these Articles of Incorporation or bylaws of the Corporation, the holders of (a) Class C Common Stock issued after February 17, 1998 and/or (b) old Common Stock issued prior to February 17, 1998, shall have the exclusive voting rights and powers, including the exclusive right to notice of shareholders' meetings

RESOLVED, THAT ARTICLE FOURTEEN OF THE ARTICLES OF INCORPORATION OF HERRING BANCORP, INC BE AMENDED TO READ AS FOLLOWS

## ARTICLE FOURTEEN: REGISTERED AGENT

The address of the initial registered office is 1900 Pease Street, Vernon, Texas 76384 and the name of the initial registered agent at such address is Curtis D Johnson

RESOLVED, THAT ARTICLE EIGHTEEN OF THE ARTICLES OF INCORPORATION OF HERRING BANCORP, INC BE AMENDED TO READ AS FOLLOWS

## ARTICLE EIGHTEEN: STOCK RESTRICTIONS

For all treasury stock issued after February 17, 1998, before there can be a valid sale or transfer of these certificates of the common shares of the corporation by any holder thereof, such holder shall first offer said shares to the corporation in the following manner

Such offering shareholder shall deliver a notice to the Corporation in writing (1) by certified mail, return receipt requested, (2) with a copy of the bonafide written, signed offer which is acceptable to the shareholders, signed by both the proposed purchaser and the proposed seller, stating the terms and conditions of the proposed sale (i e the price, terms and conditions of such proposed sale or transfer, the number of shares to be sold or transferred, and his intention to so sell or transfer such shares) to the Secretary of the corporation The Bank shall have 30 days thereafter in which to either accept or reject the offer on behalf of the corporation If the offer is accepted, the corporation shall comply with the terms and conditions of the offer as stated, OR if the corporation and the proposed shareholder agree, tender the full cash sales price, within 10 days of acceptance by both parties Should the corporation fail to purchase the shares at the expiration of the 30 day period, or prior thereto decline to purchase the shares, the shareholder may sell the stock as offered, but if that sale fails to close, the obligations and restrictions continue in full and effect with respect to any subsequent sale



# HERRING BANCORP, INC.

C. C. Burgess
*Chairman of the Board*

## Notice of Redemption

2201 Civic Circle, Suite 1001
Amarillo, TX 79109
P. O. Box 9900
Amarillo, TX 79105-5900

(806) 373-3921 Phone
(806) 372-8230 Fax
ccburgess@herringbank.com

October 31, 2006

Dear Preferred Stock Shareholder:

This letter is to notify you that the board of directors (the "Board") of Herring Bancorp, Inc. (the "Company") has called for the redemption (the "Redemption") of your outstanding shares of Preferred Stock (the "Preferred Stock") of the Company on November 20, 2006.

As you know on July 26, 2006, our Board approved taking the necessary acts for the Company to become an "S corporation" under the Internal Revenue Code of 1986, as amended. In order to become eligible to make the Subchapter S election, the Company is only allowed to have one class of outstanding capital stock, and voting rights between shares of stock are disregarded for determining whether a company has more than one class of stock. At the current time, the Company has a number of outstanding classes of stock, which include your Preferred Stock shares, as well as Class A Nonvoting Common Stock, Class A-Series 2 Nonvoting Common Stock, and Class B Nonvoting Common Stock (collectively, the "Nonvoting Shares"). Therefore, we must currently consolidate our Nonvoting Shares into one class. The Class A Nonvoting Common Stock and the Class B Nonvoting Common Stock will be allowed to exchange their shares for Common Stock-Series A, and the Class A-Series 2 Nonvoting Common Stock will be converted into a subordinated debenture. As a result of this process, the Board appointed a committee to recommend the criteria for determining which Preferred Stock shareholders would be offered to exchange their shares for the Company's common stock (the "Common Stock"), the nonvoting Common Stock-Series A (the "Common Stock-Series A") or to have their shares redeemed. The Board's criteria for making this determination included whether the Preferred Stock shareholder had a banking relationship with Herring Bank (the "Bank"), and whether they would own at least 50 shares of Common Stock upon the conversion. If these criteria were met, the Board offered the Preferred Stock shareholders the option to exchange their shares for the Common Stock. If the Preferred Stock shareholder did not meet these criteria, the Board determined the Preferred Stock shareholders would be redeemed. Additionally, if the Preferred Stock shareholder did not have a banking relationship with the Bank, we would offer them the option of either exchanging their shares for the nonvoting Common Stock-Series A or having their shares redeemed. From our


PLAINTIFF'S EXHIBIT
tabbies
13

Appendix p. 90

conversations with you and the Board's determinations regarding our classes of stock, your Preferred Stock will be redeemed.

The Redemption will take place after 5:00 p.m. on November 20, 2006 (the "Redemption Date"). The price to be paid for each share of Preferred Stock will be $95.00 per share, plus an amount equal to all dividends accrued and unpaid thereon, whether or not declared, pro rata to the date fixed for the redemption (the "Redemptive Price"). As a result of the Redemption, the Company will pay you $95.00, in cash, for the shares of Preferred Stock you hold that will be redeemed.

Prior to or at the open of business after 5:00 p.m. on November 20, 2006, the Company will deposit with Herring Bank, Amarillo, Texas (hereinafter the "Transfer Agent"), as a trust fund, an amount necessary to pay the aggregate Redemptive Price, together with irrevocable instructions and authority to the Transfer Agent to pay, on or after the Redemption Date, the Redemptive Price to the holders of the Preferred Stock upon the Transfer Agent's receipt of the duly surrendered certificates representing their Preferred Stock. As a result of the Company's deposit of funds with the Transfer Agent, you will cease to be a holder of shares of Preferred Stock as of the Redemption Date and will only be entitled to the receipt of the Redemptive Price.

In order to receive the Redemptive Price, you should deliver to the Transfer Agent the following: (i) a duly executed Letter of Transmittal, a copy of which is enclosed herewith, and (ii) the stock certificate(s) representing your shares of Preferred Stock. The address of the Transfer Agent is Herring Bank, P.O. Box 9900, Amarillo, Texas 79105. The telephone number of the Transfer Agent is (806) 355-0153.

Please follow carefully the Instructions to the Letter of Transmittal when completing it. Assuming the Transfer Agent receives the applicable documents from you prior to the Redemption Date (and assuming there is no problem with these documents), the Transfer Agent will hold them in escrow for you until the Redemption Date, at which time you will receive payment for your shares. The Company will pay the Redemptive Price by check of same day funds. Please refer to the Letter of Transmittal provided herewith for further instructions on how to surrender certificates and receive delivery of the Redemptive Price.

You may obtain additional copies of the Letter of Transmittal from the Company. Also, if any of your Preferred Stock certificates have been lost, stolen or misplaced, or if any of your shares are pledged or encumbered, you will need to make additional arrangements in order to receive the Redemptive Price for your shares. Please contact the Transfer Agent for further details.

Assuming that the Transfer Agent has received these documents from you on or before 5:00 p.m. on November 20, 2006 (and that there are no problems with your documents), you will be able to receive payment for your shares on the Redemption Date. You may pick up your check on the Redemption Date at Herring Bank, 2201 Civic Circle, Amarillo, Texas during regular business hours. If you will not be available to pick up your check in person at that time, please contact the Transfer Agent so that you can arrange an alternate method of delivery of the Redemptive Price for your Preferred Stock. If you do not pick up your check on the Redemption Date or contact the Transfer Agent to make other arrangements, the Transfer Agent will mail your check to you at the close of business on the Redemption Date. If your documents are not in order so that your check is not available on the Redemption Date, your check will be mailed to you as soon as possible after your documents are received and approved.

Please remember that the Redemption of your Preferred Stock may be a taxable transaction for federal income tax purposes. There also may be state, local or foreign income or other tax consequences to the Redemption. You should consult your own tax advisor to determine the precise tax consequences of this transaction.

If you should have any questions in connection with any aspect of this letter, please feel free to call C.C. Burgess at (806) 373-3921.

Very truly yours,

HERRING BANCORP, INC.

C.C. Burgess
Chairman of the Board

**HERRING BANCORP, INC.**
**Preferred Stockholders List**
**as of 6/08/06**

| First Name | Last Name | Address | City | State | Zip | SSN | Cert # | # of Shares | % Ownership |
|---|---|---|---|---|---|---|---|---|---|
| **Preferred** | | | | | | | | | |
| ✓ Jane Slemp Burgess, Co-Trustee, HNB Co-Trustee, for Cornelia Johnson Slemp Trust | | Box 50488 | Amarillo | TX | 79159 | | #019 | 576 | 3.301427% |
| ✓ Monarch Trust Co, Trustee, Jessie Johnson Estate Trust #1 | Attn: Terry Wright | Box 50488 | Amarillo | TX | 79159 | | #018 | 96 | 0.550238% |
| ✓ Sharon Haney | Browning | 117 Espero Dr | Natchez | MS | 39120 | | #027 | 1470 | 8.425517% |
| ✓ Margo Colquitt | Burgess | Box 50488 | Amarillo | TX | 79159 | | #016 | 1053 | 6.035422% |
| ✓ C C | Burgess | Box 50488 | Amarillo | TX | 79159 | | 3,#024,#029 | 7882 | 45.176821% |
| ✓ Kelly & Susan | Couch Living Trust | 3917 Texas | Vernon | TX | 76384 | | #031 | 2940 | 16.851035% |
| ✓ Susan Spiller | Culbertson | 1269 East Gilmer Dr | Salt Lake City | UT | 84105 | | #026 | 1470 | 8.425517% |
| ✓ Mallory | Mikkelsen | 3912 Winter Park Lane | Addison | TX | 75001 | | #033 | 150 | 0.859747% |
| ✓ John | Mikkelsen Trust | 2429 Texas St | Vernon | TX | 76384 | | #034 | 150 | 0.859747% |
| ✓ Harriet Burgess | Myers | 770 Meadow Vale Dr | Collierville | TN | 38017 | | #030 | 660 | 3.782885% |
| | Vernon Parts Inc | 1701 Marshall | Vernon | TX | 76384 | | #012 | 1000 | 5.731644% |
| **TOTAL PREFERRED STOCK** | | | | | | | | 17447 | 100.000000% |

HERR 002170

PLAINTIFF'S
EXHIBIT
tabbies'
Zs~

Appendix p. 93

| First Name | Last Name | # of Shares | 9/30/06 Book Value Per Share | 9/30/06 Book Value | 1 Share of Common for: | New Common | New Common Whole Shares | Cash for Fraction @ $698.10 | $ to Common | Per Share |
|---|---|---|---|---|---|---|---|---|---|---|
| **Class A:** | | | | | | | | | | |
| Harleston Withers & Gitano A | Dozier Trust | 104.057 | 36.73 | 3,822.01 | 19.00626191 | 5.475 | 5 | 331.51 | 3,490.50 | |
| Don | Wills IRA | 5,110.000 | 36.73 | 187,690.30 | 19.00626191 | 268.859 | 268 | 599.50 | 187,090.80 | |
| Nelda | Woodard IRA | 165.389 | 36.73 | 6,074.74 | 19.00626191 | 8.702 | 8 | 489.94 | 5,584.80 | |
| Jerry | Woodard IRA | 512.225 | 36.73 | 18,814.02 | 19.00626191 | 26.950 | 26 | 663.42 | 18,150.60 | |
| Carl and Joni | Freeling | 357.715 | 36.73 | 13,138.87 | 19.00626191 | 18.821 | 18 | 573.07 | 12,565.80 | |
| Jack | Sisemore | 337.425 | 36.73 | 12,393.62 | 19.00626101 | 17.753 | 17 | 525.92 | 11,867.70 | |
| Sisemore Trust B | | 337.425 | 36.73 | 12,393.62 | 19.00626191 | 17.753 | 17 | 525.92 | 11,867.70 | |
| Total Class A | | 6,924.236 | 36.73 | 254,327.19 | | 364.313 | 359 | 3,709.28 | 250,617.90 | 698.10 |
| | | | | | | | | | | |
| **Class B:** | | | | | | | | | | |
| Ruth Word | Robinson | 1,107.910 | 64.26 | 71,194.30 | 10.86367880 | 101.983 | 101 | 686.20 | 70,508.10 | 698.10 |
| | | | | | | | | | | |
| **Class A Series 2:** | | | | | | | | | | |
| CAMPBELL BURGESS SEPARATE PROPERTY | | 8,000.000 | 243.44 | 1,947,520.00 | * Convert to a Debenture | | | | | |
| | | | | | | | | | | |
| **Preferred** | | | | | | | | | | |
| Jane Slemp Burgess, Co-Trustee, HNB Co-Trustee, for Comella Johnson Slemp Trust | | 576.000 | 95.00 | 54,720.00 | 7.34842105 | 78.384 | 78 | 268.20 | 54,451.80 | |
| Monarch Trust Co, Trustee, Jessie Johnson Estate Trust #1 | Attn: Terry Wright | 96.000 | 95.00 | 9,120.00 | 7.34842105 | 13.064 | 13 | 44.70 | 9,075.30 | |
| Sharon Haney | Browning | 1,470.000 | 95.00 | 139,650.00 | 7.34842105 | 200.043 | 200 | 30.00 | 139,620.00 | |
| Margo Colquitt | Burgess | 1,053.000 | 95.00 | 100,035.00 | 7.34842105 | 143.296 | 143 | 206.70 | 99,828.30 | |
| C C | Burgess | 7,882.000 | 95.00 | 748,790.00 | 7.34842105 | 1,072.611 | 1,072 | 426.80 | 748,363.20 | |
| Kelly & Susan | Couch Living T | 2,940.000 | 95.00 | 279,300.00 | 7.34842105 | 400.086 | 400 | 60.00 | 279,240.00 | |
| Susan Spiller | Culbertson | 1,470.000 | 95.00 | 139,650.00 | 7.34842105 | 200.043 | 200 | 30.00 | 139,620.00 | |
| Mallory | Mikkelsen | 150.000 | 95.00 | 14,250.00 | 7.34842105 | 20.413 | 20 | 288.00 | 13,962.00 | |
| John | Mikkelsen Tru | 150.000 | 95.00 | 14,250.00 | 7.34842105 | 20.413 | 20 | 288.00 | 13,962.00 | |
| Harriet Burgess | Myers | 660.000 | 95.00 | 62,700.00 | 7.34842105 | 89.815 | 89 | 569.10 | 62,130.90 | |
| | Vernon Parts I | 1,000.000 | 95.00 | 95,000.00 | 7.34842105 | 136.084 | 136 | 58.40 | 94,941.60 | |
| Total Preferred | | 17,447.000 | 95.00 | 1,657,465.00 | | | 2,371 | 2,269.90 | 1,655,195.10 | 698.10 |
| | | | | | | | | | | |
| **Class C:** | | | | | | | | | | |
| All | | 32,635.00 | 698.10 | 22,782,493.50 | 1.00000000 | 32,635.000 | 32,635 | 0.00 | 22,782,493.50 | 698.10 |
| | | | | | | | | | | |
| Total All Classes | | | | 26,712,999.99 | | | 35,466 | 6,665.38 | 24,758,814.60 | 698.10 |
| Rounding | | | | 32.69 | | | | | 32.69 | |
| * Debenture | | | | | | | | | 1,947,520.00 | |
| Per Balance Sheet 9/30/06 | | | | 26,713,032.68 | | | 35,466 | 6,665.38 | 26,706,357.29 | |
| | | | | | | | | | 0.01 | |

DEFENDANT'S EXHIBIT 12

DEPOSITION EXHIBIT 28

HERR 0(

Appendix p. 94

AGREEMENT BY AND BETWEEN
The Herring National Bank
Vernon, TX
and
The Office of the Comptroller of the Currency

The Herring National Bank, Vernon, TX (Bank) and the Comptroller of the Currency of the United States of America (Comptroller) wish to protect the interests of the depositors, other customers, and shareholders of the Bank, and, toward that end, wish the Bank to operate safely and soundly and in accordance with all applicable laws, rules and regulations.

The Comptroller, through her National Bank Examiner, has examined the Bank, and her findings are contained in the Report of Examination, dated 3/31/2004 (ROE).

In consideration of the above premises, it is agreed, between the Bank, by and through its duly elected and acting Board of Directors (Board), and the Comptroller, through her authorized representative, that the Bank shall operate at all times in compliance with the articles of this Agreement.

Article I

JURISDICTION

(1)     This Agreement shall be construed to be a "written agreement entered into with the agency" within the meaning of 12 U.S.C. § 1818(b)(1).

(2)     This Agreement shall be construed to be a "written agreement between such depository institution and such agency" within the meaning of 12 U.S.C. § 1818(e)(1) and 12 U.S.C. § 1818(i)(2).

(3)     This Agreement shall be construed to be a "formal written agreement" within the meaning of 12 C.F.R. § 5.51(c)(6)(ii). See 12 U.S.C. § 1831i.

**PLAINTIFF'S EXHIBIT**
**53**

(4)     This Agreement shall be construed to be a "written agreement" within the meaning of 12 U.S.C. § 1818(u)(1)(A).

(5)     All reports or plans which the Bank or Board has agreed to submit to the Assistant Deputy Comptroller pursuant to this Agreement shall be forwarded to the:

Assistant Deputy Comptroller
Lubbock Field Office
5225 S. Loop 289, Suite 108
Lubbock, TX 79424

## ARTICLE II

## COMPLIANCE COMMITTEE

(1)     Within thirty (30) days, the Board shall appoint a Compliance Committee of at least five (5) directors, of which no more than two (2) shall be employees of the Bank or any of its affiliates (as the term "affiliate" is defined in 12 U.S.C. § 371c(b)(1)), or a family member of any such person.  Upon appointment, the names of the members of the Compliance Committee shall be submitted in writing to the Assistant Deputy Comptroller.  The Compliance Committee shall be responsible for monitoring and coordinating the Bank's adherence to the provisions of this Agreement.

(2)     The Compliance Committee shall meet at least monthly.

(3)     Within thirty (30) days of the appointment of the Committee and quarterly thereafter, the Compliance Committee shall submit a written progress report to the Board setting forth in detail:

(a)     actions taken to comply with each Article of this Agreement, and

(b)     the results of those actions.

(4)     The Board shall forward a copy of the Compliance Committee's report, with any

-2-

additional comments by the Board, to the Assistant Deputy Comptroller.

## ARTICLE III

## MANAGEMENT AND BOARD SUPERVISION STUDY

(1)     Within sixty (60) days the Board shall employ an independent outside management consultant.  Prior to employment of the consultant, the name and the qualifications of the consultant considered for employment shall be submitted to the Assistant Deputy Comptroller, who shall have the power of veto over the employment of the proposed consultant. However, failure to exercise such veto power shall not constitute approval or endorsement of the consultant.

(2)     The requirement to submit information and the prior veto provisions of this Article are based on the authority of 12 U.S.C. § 1818(b) and do not require the Comptroller to complete his/her review and act on any such information or authority within ninety (90) days.

(3)     Within one hundred twenty (120) days, the Consultant shall complete a study of current management and Board supervision presently being provided to the Bank, the Bank's management structure, and its staffing requirements in light of the Bank's present condition.  The findings and recommendations of the Consultant shall be set forth in a written report to the Board.  At a minimum, the report shall contain:

(a)     the identification of present and future management and staffing requirements of each area of the Bank, with particular emphasis given to the lending, audit and operations areas;

(b)     detailed written job descriptions for all executive officers;

(c)     an evaluation of each officer's qualifications and abilities and a

- 3 -

determination of whether each of these individuals possesses the experience and other qualifications required to perform present and anticipated duties of his/her officer position;

(d) recommendations as to whether management or staffing changes should be made, including the need for additions to or deletions from the current management team;

(e) objectives by which management's effectiveness will be measured;

(f) a training program to address identified weaknesses in the skills and abilities of the Bank's staff and management team;

(g) an evaluation of current lines of authority, reporting responsibilities and delegation of duties for all officers, including identification of any overlapping duties or responsibilities;

(h) a recommended organization chart that clearly reflects areas of responsibility and lines of authority for all officers, including the Bank's president and chief executive officer;

(i) an assessment of the Board's strengths and weaknesses along with a director education program designed to strengthen identified weaknesses;

(j) an assessment of whether Board members are receiving adequate information on the operation of the Bank to enable them to fulfill their fiduciary responsibilities and other responsibilities under law;

(k) recommendations to expand the scope, frequency and sufficiency of information provided to the Board by management;

(l) an evaluation of the extent of responsibility of current management and/or

- 4 -

the Board for present weaknesses in the Bank's condition; and

(m)    recommendations to correct or eliminate any other deficiencies in the supervision or organizational structure of the Bank.

(4)    Within one hundred eighty (180) days of completion of this study, the Board shall develop, implement, and thereafter ensure Bank adherence to a written plan, with specific time frames, that will correct any deficiencies that are noted in the study.

(5)    The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the plan developed pursuant to this Article.

(6)    Copies of the Board's written plan and the Consultant's study shall be forwarded to the Assistant Deputy Comptroller. The Assistant Deputy Comptroller shall retain the right to determine the adequacy of the report and its compliance with the terms of this Agreement. In the event the written plan, or any portion thereof, is not implemented, the Board shall immediately advise the Assistant Deputy Comptroller, in writing, of specific reasons for deviating from the plan.

# ARTICLE IV

## STRATEGIC PLAN

(1)    Within one hundred twenty (120) days, the Board shall adopt, implement, and thereafter ensure Bank adherence to a written strategic plan for the Bank covering at least a three-year period. The strategic plan shall establish objectives for the Bank's overall risk profile, earnings performance, growth, balance sheet mix, off-balance sheet activities, liability structure,

capital adequacy, reduction in the volume of nonperforming assets, product line development and market segments that the Bank intends to promote or develop, together with strategies to achieve those objectives and, at a minimum, include:

(a)     a mission statement that forms the framework for the establishment of strategic goals and objectives;

(b)     an assessment of the Bank's present and future operating environment;

(c)     the development of strategic goals and objectives to be accomplished over the short and long term;

(d)     an identification of the Bank's present and future product lines (assets and liabilities) that will be utilized to accomplish the strategic goals and objectives established in (1)(c) of this Article;

(e)     an evaluation of the Bank's internal operations, staffing requirements, board and management information systems and policies and procedures for their adequacy and contribution to the accomplishment of the goals and objectives developed under (1)(c) of this Article;

(f)     a management employment and succession program to promote the retention and continuity of capable management;

(g)     product line development and market segments that the Bank intends to promote or develop;

(h)     an action plan to improve bank earnings and accomplish identified strategic goals and objectives, including individual responsibilities, accountability and specific time frames;

(i)     a financial forecast to include projections for major balance sheet and

income statement accounts and desired financial ratios over the period covered by the strategic plan;

(j)     control systems to mitigate risks associated with planned new products, growth, or any proposed changes in the Bank's operating environment;

(k)     specific plans to establish responsibilities and accountability for the strategic planning process, new products, growth goals, or proposed changes in the Bank's operating environment; and

(l)     systems to monitor the Bank's progress in meeting the plan's goals and objectives.

(2)     Upon adoption, a copy of the plan shall be forwarded to the Assistant Deputy Comptroller for prior determination of no supervisory objection.

(3)     The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the plan developed pursuant to this Article.

## ARTICLE V

### INTERNAL AUDIT

(1)     Within ninety (90) days, the Board shall adopt, implement, and thereafter ensure Bank adherence to an independent, internal audit program sufficient to:

(a)     detect irregularities in the Bank's operations;

(b)     determine the Bank's level of compliance with all applicable laws, rules and regulations;

(c)     evaluate the Bank's adherence to established policies and procedures, with

particular emphasis directed to the Bank's adherence to its loan policies concerning underwriting standards and problem loan identification and classification;

(d)     ensure adequate audit coverage in all areas; and

(e)     establish an annual audit plan using a risk based approach sufficient to achieve these objectives.

(2)     As part of this audit program, the Board shall evaluate the audit reports of any party providing services to the Bank, and shall assess the impact on the Bank of any audit deficiencies cited in such reports.

(3)     The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the program developed pursuant to this Article.

(4)     The Board shall ensure that the audit function is supported by an adequately staffed department or outside firm, with respect to both the experience level and number of the individuals employed.

(5)     The Board shall ensure that the audit program is independent. The persons responsible for implementing the internal audit program described above shall report directly to the Board, that shall have the sole power to direct their activities. All reports prepared by the audit staff shall be filed directly with the Board and not through any intervening party.

(6)     All audit reports shall be in writing. The Board shall ensure that immediate actions are undertaken to remedy deficiencies cited in audit reports, and that auditors maintain a written record describing those actions.

(7)     The audit staff shall have access to any records necessary for the proper conduct

-8-

of its activities. National bank examiners shall have access to all reports and work papers of the audit staff and any other parties working on its behalf.

(8)     Upon adoption, a copy of the internal audit program shall be promptly submitted to the Assistant Deputy Comptroller.

## ARTICLE VI

## CREDIT RISK

(1)     Within ninety (90) days, the Board shall develop, implement, and thereafter ensure Bank adherence to a written program to reduce the high level of credit risk in the Bank. The program shall include, but not be limited to:

(a)     procedures to strengthen credit underwriting, particularly in the real estate portfolio;

(b)     procedures to strengthen management of loan operations and to maintain an adequate, qualified staff in all functional areas;

(c)     procedures for strengthening appraisal processes; and

(d)     an action plan to control real estate and payday loan growth.

(e)     The Board shall submit a copy of the program to the Assistant Deputy Comptroller.

(f)     At least quarterly, the Board shall prepare a written assessment of the bank's credit risk, which shall evaluate the Bank's progress under the aforementioned program. The Board shall submit a copy of this assessment to the Assistant Deputy Comptroller.

(2)     The Board shall ensure that the Bank has processes, personnel, and control

- 9 -

systems to ensure implementation of and adherence to the program developed pursuant to this Article.

## ARTICLE VII

### NEW SENIOR EXECUTIVE OFFICER

(1) Within one hundred twenty (120) days, the Board shall appoint a senior credit officer who shall be vested with sufficient executive authority to fulfill the duties and responsibilities of the position and ensure the safe and sound operation of the Bank.

(2) Prior to the appointment of any individual to the senior credit officer position, the Board shall submit to the Assistant Deputy Comptroller the following information:

(a) a written statement of the Board's reasons for selecting the proposed officer; and

(b) a written description of the proposed officer's duties and responsibilities.

(3) The Assistant Deputy Comptroller shall have the power of veto over the employment of the proposed senior credit officer. However, the failure to exercise such veto power shall not constitute an approval or endorsement of the proposed officer.

(4) The requirement to submit information and the prior veto provisions of this Article are based on the authority of 12 U.S.C. § 1818(b) and do not require the Comptroller to complete her review and act on any such information or authority within ninety (90) days.

## ARTICLE VIII

### LOAN REVIEW CONSULTANT

(1) Within ninety (90) days, the Board shall employ a qualified consultant to perform

- 10 -

an asset quality review of the Bank. The consultant shall be utilized until such time as an ongoing internal asset quality review system is developed by the Board, implemented and demonstrated to be effective. Before terminating the consultant's asset quality review services, the Board shall both certify the effectiveness of the internal asset quality review system, and receive prior approval from the Assistant Deputy Comptroller.

(2)    Prior to hiring a consultant or entering into any contract with a consultant, the Bank shall submit the proposed terms of employment and the qualifications of the consultant to the Assistant Deputy Comptroller who shall have the power of veto. However, the failure to exercise such veto power shall not constitute an approval or endorsement of the proposed consultant.

(3)    The requirement to submit information and the prior veto provisions of this Article are based on the authority of 12 U.S.C. § 1818(b) and do not require the Comptroller to complete his/her review and act on any such information or authority within ninety (90) days.

## ARTICLE IX

## PRODUCTS AND SERVICES - EXISTING OR NEW

(1)    Within ninety (90) days, the Board shall prepare a written analysis of the payday lending program, vault cash program, and ATM sponsorship program which fully assesses the risks and benefits of these lines of business. This analysis shall include an assessment of the Bank's controls, procedures, MIS and management of these operations, and shall tie directly to the Bank's strategic plan.

(2)    Prior to the Bank's involvement in any new products or services the Board shall prepare a written analysis of said product or service. The analysis shall, at a minimum, include

the following:

(a)     an assessment of the risks and benefits of the product or service to the

Bank;

(b)     an explanation of how the product or service is consistent with the Bank's

strategic plan;

(c)     an evaluation of the adequacy of the Bank's organizational structure,

staffing, MIS, internal controls and written policies and procedures to

identify, measure, monitor, and control the risks associated with the

product or service; and

(d)     a profitability analysis, including growth projections and interest rate risk.

(3)     Prior to the Bank's involvement in the new product or service, a copy of the

analysis shall be submitted to the Assistant Deputy Comptroller.


ARTICLE X

RISK MANAGEMENT

(1)     Within ninety (90) days, the Board shall develop, implement, and thereafter

ensure Bank adherence to a written risk management program to include, at a minimum, the

following:

(a)     identification of existing credit, interest rate, liquidity, transaction,

compliance, strategic, reputation, price, and foreign currency translation

risks, and a written analysis of those risks;

(b)     action plans and time frames to reduce risks where exposure is high,

particularly with regard to credit risk, which impacts directly on liquidity,

- 12 -

compliance, strategic, and reputation risks, as more fully discussed in the Report of Examination;

(c)     policies, procedures or standards which limit the degree of risk the Board is willing to incur, consistent with the strategic plan and the Bank's financial condition. This includes analyzing and limiting the risks associated with any new lines of business that the Board undertakes. The procedures shall ensure that strategic direction and risk tolerances are effectively communicated and followed throughout the Bank and should describe the actions to be taken where noncompliance with risk policies is identified;

(d)     systems to measure and control risks within the Bank. Measurement systems should provide timely and accurate risk reports by customer, by department or division, and bank wide as appropriate; and

(e)     procedures to ensure that Bank employees have the necessary skills to supervise effectively the current and the new business risks within the Bank, and procedures to describe the actions to be taken to address deficiencies in staff levels and skills.

(f)     The risk management program shall be consistent with the Bank Supervision Process booklet, EP-Sup, of the <u>Comptroller's Handbook.</u>

(2)     The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the program developed pursuant to this Article.

(3)     Within one hundred twenty (120) days, the Board shall identify and appoint an

- 13 -                                                                Appendix p. 107

individual with demonstrated experience and skills in providing overall risk management to implement the Bank's risk management program. This individual shall report to the Board of Directors of the Bank and shall be independent of other Bank operations. Prior to the appointment of an individual to this position, the Assistant Deputy Comptroller shall have the power of veto over the appointment of this person. However, the failure to exercise such veto power shall not constitute an approval or endorsement of the proposed individual.

(4)     The requirement to submit information and the prior veto provisions of this Article are based on the authority of 12 U.S.C. § 1818(b) and do not require the Comptroller to complete his/her review and act on any such information or authority within ninety (90) days.

## ARTICLE XI

## CAPITAL PLAN AND HIGHER MINIMUMS

(1)     The Bank shall achieve by June 30, 2005 and thereafter maintain the following capital levels (as defined in 12 C.F.R. Part 3):

   (a)     Tier 1 capital at least equal to twelve percent (12%) of risk-weighted assets;

   (b)     Tier 1 capital at least equal to eight and half percent (8.5%) of adjusted total assets.

(2)     The requirement in this Agreement to meet and maintain a specific capital level means that the Bank may not be deemed to be "well capitalized" for purposes of 12 U.S.C. § 1831o and 12 C.F.R. Part 6 pursuant to 12 C.F.R. § 6.4(b)(1)(iv).

(3)     Within ninety (90) days, the Board shall develop, implement, and thereafter

- 14 -

ensure Bank adherence to a three-year capital program. The program shall include:

(a) specific plans for the maintenance of adequate capital that may in no event be less than the requirements of paragraph (1);

(b) projections for growth and capital requirements based upon a detailed analysis of the Bank's assets, liabilities, earnings, fixed assets, and off-balance sheet activities;

(c) projections of the sources and timing of additional capital to meet the Bank's current and future needs;

(d) the primary source(s) from which the Bank will strengthen its capital structure to meet the Bank's needs;

(e) contingency plans that identify alternative methods should the primary source(s) under (d) above not be available; and

(f) a dividend policy that permits the declaration of a dividend only:

(i) when the Bank is in compliance with its approved capital program;

(ii) when the Bank is in compliance with 12 U.S.C. § 56 and 60; and

(iii) with the prior written approval of the Assistant Deputy Comptroller.

(4) Upon completion, the Bank's capital program shall be submitted to the Assistant Deputy Comptroller for prior determination of no supervisory objection. After this determination by the Assistant Deputy Comptroller, the Bank shall implement and adhere to the capital program. The Board shall review and update the Bank's capital program on an annual basis, or more frequently if necessary. Copies of the reviews and updates shall be submitted to the Assistant Deputy Comptroller.

(5)     The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the program developed pursuant to this Article.

## ARTICLE XII

## CORRECT INFORMATION TECHNOLOGY SYSTEM DEFICIENCIES

(1)     The Bank shall immediately take all steps necessary to improve the management of the Bank's Information Technology Systems (ITS) activities and correct each deficiency cited in the Report of Examination or any subsequent Report of Examination.

(2)     Within ninety (90) days, the Bank shall ensure that the data processing manager has the necessary skills and experience to supervise effectively the ITS area.

(3)     Within ninety (90) days, the Bank shall implement effective ITS security and operations procedures as described in the Federal Financial Institutions Examination Council's 1996 Information Systems Examination Handbook, and Banking Circular Number 229, dated May 31, 1988.

(4)     Within ninety (90) days, the Bank shall develop an effective and independent internal ITS audit program.  At a minimum, the ITS audit program shall be performed by an independent and qualified individual, and include fundamental elements of a sound audit program as described in the Federal Financial Institutions Examination Council's 1996 Information Systems Examination Handbook.

(5)     Within ninety (90) days, the Board shall appoint an Information Security Officer familiar with ITS operations.  The Information Security Officer shall be responsible for reviewing and ensuring appropriate data security of the Bank.

(6)     The Board shall provide a quarterly written progress report on each of the requirements of this article to the Assistant Deputy Comptroller.


## ARTICLE XIII

## VIOLATIONS OF LAW

(1)     The Board shall immediately take all necessary steps to ensure that Bank management corrects each violation of law, rule or regulation cited in the ROE and in any subsequent Report of Examination. The quarterly progress reports required by Article XIV of this Agreement shall include the date and manner in which each correction has been effected during that reporting period.

(2)     Within ninety (90) days, the Board shall adopt, implement, and thereafter ensure Bank adherence to specific procedures to prevent future violations as cited in the ROE and shall adopt, implement, and ensure Bank adherence to general procedures addressing compliance management which incorporate internal control systems and education of employees regarding laws, rules and regulations applicable to their areas of responsibility.

(3)     Within ninety (90) days of receipt of any subsequent Report of Examination which cites violations of law, rule, or regulation, the Board shall adopt, implement, and thereafter ensure Bank adherence to specific procedures to prevent future violations as cited in the ROE and shall adopt, implement, and ensure Bank adherence to general procedures addressing compliance management which incorporate internal control systems and education of employees regarding laws, rules and regulations applicable to their areas of responsibility.

(4)     Upon adoption, a copy of these procedures shall be promptly forwarded to the Assistant Deputy Comptroller.

(5)     The Board shall ensure that the Bank has policies, processes, personnel, and control systems to ensure implementation of and adherence to the procedures developed pursuant to this Article.

## ARTICLE XIV

## PROGRESS REPORTING - MONTHLY/QUARTERLY

(1)     The Board shall submit monthly/quarterly progress reports to the Assistant Deputy Comptroller, Lubbock Field Office, 5225 South Loop 289, Suite 108, Lubbock, TX 79423.  These reports shall set forth in detail:

(a)     actions taken since the prior progress report to comply with each Article of the Agreement;

(b)     results of those actions; and

(c)     a description of the actions needed to achieve full compliance with each Article of this Agreement.

(2)     The progress reports should also include any actions initiated by the Board and the Bank pursuant to the criticisms and comments in the Report of Examination or in any future Report of Examination.

(3)     The first progress report shall be submitted for the period ending 12/31/04 and will be due within thirty (30) days of that date.  Thereafter, progress reports will be due within thirty (30) days after the quarter end.

- 18 -

Article XV

CLOSING

(6)     Although the Board has agreed to submit certain programs and reports to the Assistant Deputy Comptroller for review or approval, the Board has the ultimate responsibility for proper and sound management of the Bank.

(7)     It is expressly and clearly understood that if, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him/her by the several laws of the United States of America to undertake any action affecting the Bank, nothing in this Agreement shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(8)     Any time limitations imposed by this Agreement shall begin to run from the effective date of this Agreement.  Such time requirements may be extended in writing by the Assistant Deputy Comptroller for good cause upon written application by the Board.

(9)     The provisions of this Agreement shall be effective upon execution by the parties hereto and its provisions shall continue in full force and effect unless or until such provisions are amended in writing by mutual consent of the parties to the Agreement or excepted, waived, or terminated in writing by the Comptroller.

(10)    This Agreement is intended to be, and shall be construed to be, a supervisory "written agreement entered into with the agency" as contemplated by 12 U.S.C. § 1818(b)(1), and expressly does not form, and may not be construed to form, a contract binding on the OCC or the United States.  Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the OCC may enforce any of the commitments or obligations herein undertaken by the Bank under its supervisory powers, including 12 U.S.C. § 1818(b)(1), and not as a matter of contract law.  The Bank expressly acknowledges that neither the Bank nor

the OCC has any intention to enter into a contract. The Bank also expressly acknowledges that no OCC officer or employee has statutory or other authority to bind the United States, the U.S. Treasury Department, the OCC, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the OCC's exercise of its supervisory responsibilities. The terms of this Agreement, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements or arrangements, or negotiations between the parties, whether oral or written.

IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller, has hereunto set her hand on behalf of the Comptroller.


/s/ *Debra A. Garland*
Debra A. Garland
Assistant Deputy Comptroller
Lubbock Field Office

10/25/04
Date

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.

Susan Couch                                          10-25-04
_____          _____
                                                     Date

Jane Slemp Burgess                                   10/25/04
_____          _____
                                                     Date

Terry J. Spears                                      10-25-2004
_____          _____
                                                     Date

Jim Pennington                                       10-25-04
_____          _____
                                                     Date

C. C. Burgess                                        10-25-04
_____          _____
                                                     Date

Campbell Burgess                                     10-25-04
_____          _____
                                                     Date

_____          _____
                                                     Date

_____          _____
                                                     Date

_____          _____
                                                     Date

- 21 -

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of | NOTICE OF INTENTION TO REMOVE FROM OFFICE AND PROHIBIT FROM FURTHER PARTICIPATION AND NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTY, FINDINGS OF FACT AND CONCLUSIONS OF LAW, ORDER TO PAY, AND NOTICE OF HEARING |
| CORNELIUS CAMPBELL BURGESS, Individually and as an institution-affiliated party of | |
| HERRING BANK AMARILLO, TEXAS | |
| (INSURED STATE NONMEMBER BANK) | |
| | FDIC-14-0307e and FDIC-14-0308k |

The Federal Deposit Insurance Corporation ("FDIC") has determined that Cornelius Campbell Burgess ("Respondent"), individually, as an officer, director, and institution-affiliated party of Herring Bank, Amarillo, Texas ("Bank"), engaged or participated in unsafe or unsound banking practices, committed or engaged in acts, omissions, or practices which constitute breaches of his fiduciary duties to the Bank, and/or violated law or regulation; that the Bank suffered financial loss and Respondent received financial gain or other benefit as a result of such practices, breaches of fiduciary duties and/or violations; and that such practices, breaches of fiduciary duties and/or violations demonstrate Respondent's personal dishonesty or willful or continuing disregard for the safety or soundness of the Bank.

The FDIC has also determined that Respondent's reckless unsafe or unsound practices, breaches of fiduciary duties and/or violations of law or regulation were part of a pattern and practice of misconduct that resulted in pecuniary gain or other benefit to Respondent and/or


PLAINTIFF'S EXHIBIT
54

Appendix p. 116

caused or was likely to cause more than a minimal loss to the Bank.

The FDIC, therefore, institutes this proceeding for the purpose of determining whether an appropriate ORDER OF REMOVAL FROM OFFICE AND PROHIBITION FROM FURTHER PARTICIPATION ("ORDER OF REMOVAL AND PROHIBITION") should be issued against Respondent pursuant to the provisions of 12 U.S.C. § 1818(e), removing Respondent from office and prohibiting him from further participation in the conduct of the affairs of the Bank and any other insured depository institution or organization listed in 12 U.S.C. § 1818(e)(7)(A), without the prior written consent of the FDIC and such other appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D):

Further, the FDIC institutes this proceeding for the assessment of civil money penalties pursuant to the provisions of 12 U.S.C. § 1818(i)(2)(A) and (B) against Respondent.

The FDIC hereby issues this NOTICE OF INTENT TO REMOVE FROM OFFICE AND PROHIBIT FROM FURTHER PARTICIPATION ("NOTICE TO REMOVE AND PROHIBIT") pursuant to the provisions of 12 U.S.C. § 1818(e) and this NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTY, FINDINGS OF FACT AND CONCLUSIONS OF LAW, ORDER TO PAY, AND NOTICE OF HEARING ("NOTICE OF ASSESSMENT") pursuant to 12 U.S.C. § 1818(i) and 12 C.F.R. Part 308 and alleges as follows:

## FINDINGS OF FACT

### *Jurisdiction and Background*

1. At all times pertinent to the charges herein, the Bank was a corporation existing and doing business under the laws of the State of Texas, having its principal place of business in

2

Amarillo, Texas.

2.    At all times pertinent to the charges herein, the Bank has been an insured State nonmember bank, as defined in 12 U.S.C. § 1813(e)(2) and, as such, is subject to the Federal Deposit Insurance Act ("Act"), 12 U.S.C. § 1811 et seq., the Rules and Regulations of the FDIC, 12 C.F.R. Chapter III, and the laws of the State of Texas.

3.    At all times pertinent to the charges herein, Respondent was an institution-affiliated party of the Bank as that term is defined in 12 U.S.C. § 1813(u).

4.    The FDIC has jurisdiction over the Bank, the Respondent, and the subject matter of this proceeding.

5.    The FDIC is the "appropriate Federal banking agency" with respect to the Bank within the meaning of 12 U.S.C. § 1813(q)(2).

6.    The Bank is wholly-owned by Herring Bancorp, Inc., Amarillo Texas ("HBI").

7.    The Burgess family owns or controls approximately 80 percent of the outstanding stock of HBI.

8.    The members of the Bank's Board of Directors ("Board"), which includes Respondent, his father and sister, collectively own 58 percent of HBI's voting stock. Respondent's father, Charles Coney Burgess, was at all times relevant to this action, Chairman of the Board and Chairman of the Board of Directors of HBI.

9.    Respondent is HBI's Vice Chairman and President.

10.   Respondent joined the Bank in 1992.

11.   In 2002, the Bank appointed Respondent as its Chief Executive Officer and

3

President.

12. At all times pertinent to the charges herein, Respondent held the positions of President, Chief Executive Officer, and director at the Bank until his resignation on April 2, 2012, as President and until his June 19, 2012 resignation as Chief Executive Officer.

13. Respondent remains a current director on the Bank's Board and an officer for HBL.

*Respondent's Unsafe or Unsound Expense Reimbursement Practice*
*and Breaches of Fiduciary Duty*

14. Between November 2009 through April 2012 (the "Relevant Period"), Respondent repeatedly engaged in unsafe or unsound practices and breached his fiduciary duty to the Bank by causing the Bank to pay his personal expenses, including the expenses of his girlfriend Susan Taylor ("Taylor"), who was not a Bank employee, without full and truthful disclosure to, or informed approval from the Board.

15. During the Relevant Period, Respondent repeatedly used multiple Bank-owned credit and debit cards issued in his name, Taylor's name, and in the name of other Bank employees (collectively "Bank-Owned Cards") to pay for his and Taylor's personal expenses, which were charged to the Bank without adequate or truthful support for the business nature of the expenses.

16. Until at least July 28, 2011 Respondent routinely did not retain sales receipts for the charges he made on his Bank-Owned Cards, retaining receipts for only about 10 percent of his charges (by dollar volume).

17. More often than not, Respondent failed altogether to document or otherwise

4

evidence the propriety of his charges; and what documentation he did provide was false, misleading, vague or incomplete, and as such, unreliable and effectively useless in allowing the Bank, its auditors, or examiners, to ascertain whether Respondent's charges were for legitimate business purposes, or for personal purposes.

18.    The Bank paid for all of Respondent's expenses that were charged on the Bank-Owned Cards issued to him, non-employee Taylor, and other Bank employees, including those incurred for his personal benefit.

19.    During the Relevant Period, Respondent routinely used the Bank's cash-out tickets, at his discretion, to withdraw Bank cash without maintaining any receipts or providing adequate or truthful support for the business nature of the expenses.

20.    To cause the Bank pay for his personal expenses, Respondent self-approved, and instructed employees to reimburse, his expenses or pay his Bank-Owned Card charges without sufficient support for the business nature of the expenses or prior approval from the Bank.

21.    By way of example only and without any limitation, in email exchanges dated February 19 and 20, 2008, between Bank employees Althea White and Angela Davis, Ms. Davis noted that "I have the stub part of bill but I have no clue what was bought."

22.    In response, Ms. White explained, "I am not allowed to give you the top part."

23.    Ms. White went on to explain, "Campbell said that he and [Senior Vice President of Operations] Scarlette [Blair] worked it out where you just pay the bill. He doesn't want that information to leave the floor."

24.    The email went on to state that "[h]e said to get with Scarlette [Blair] and see how

5

to pay them."

25.    During the Relevant Period, Respondent also made false or misleading entries in records provided to the Bank in order to portray legitimate business purposes for his personal charges.

26.    During the Relevant Period, Respondent misled the FDIC, Texas Department of Banking ("TDOB"), and the Bank's Board about his misuse of Bank-Owned Cards, the number of Bank-Owned Cards in his name, and Taylor's expenses and her Bank-Owned Card.

27.    Respondent's consistent use of Bank-Owned Cards and cash withdrawals during the Relevant Period to fund personal expenses, and his deliberate failure to maintain meaningful documentation of his expenses both were unsafe or unsound banking practices and breaches of his fiduciary duty to the Bank.

28.    To the extent that the Bank's payment of these personal charges and subsequent reimbursement by Respondent could be characterized as loans, Respondent violated Regulation O.

29.    Following are examples of some, but not all of Respondent and Taylor's personal charges on Bank-Owned Cards.

30.    On December 24, 2009, Christmas Eve, Respondent charged $1,600 to a Bank-Owned Card for a purchase at Diamond Creations in New York City.

31.    Diamond Creations is a New York jeweler.

32.    The Bank paid the Diamond Creations charge in December 2009.

33.    The January 2010 Bank-Owned Card statement claims the business purpose of the

6

purchase to be "business development."

34. Respondent did not reimburse the Bank for the Diamond Creation expense until over two years after the Bank paid the charge.

35. On February 11, 2011, Respondent charged $420 to a Bank-Owned Card for 12 "buddy training" sessions at Amarillo Athlete.

36. The Bank paid the Amarillo Athlete charge.

37. A notation on the credit card statement states that the charge was "for Susan Taylor."

38. The February charge is one of ten Amarillo Athlete charges on Bank-Owned Cards issued to Respondent or Taylor incurred in 2011. Many of the receipts carry the notation for "CCB" - Respondent Cornelius Campbell Burgess – and "Susan Taylor".

39. The Bank paid Amarillo Athlete charges totaling $3,570.

40. On August 12, 2010, Respondent charged $169 on one of his Bank-Owned Cards for textbooks shipped to Taylor Burgess, Respondent's son.

41. The September 2010 Visa Statement notates "supplies," but the invoice states "Biology... Geometry... [and] World History... Textbooks."

42. The Bank paid the charge in September 2010.

43. On November 18, 2010, Respondent charged $800 to one of his Bank-Owned Cards for "Google *Ross Koplin."

44. The Visa statement provided by Respondent reflects a notation for the charge of "Business development."

7

45. The Bank paid the charge.

46. Ross Koplin is a Colorado criminal defense attorney who specializes in motor vehicle offenses.

47. After the Bank paid Koplin, the Bank also paid $175.28 for a Colorado traffic ticket. Thus, it appears that the payment to Koplin was for legal services relating to the Colorado traffic ticket and not a business development expense.

48. On at least five occasions before July 28, 2011, Taylor accompanied Respondent on Bank travel at Bank expense. On those five occasions, Taylor's travel expenses were charged on a Bank-Owned Card, and the notation on the Visa statement falsely noted that travel was for "CCB" – Respondent Cornelius Campbell Burgess.

49. On each occasion, there were two identical charges on Bank-Owned Cards for airfare.

50. On each occasion, one ticket was for Respondent and one ticket was for Taylor.

51. The travel charges occurred during 2010 and were dated June 14, 23, and 24 and July 7, and 9.

52. The Bank paid those travel charges.

53. On many other occasions, Taylor accompanied Respondent on Bank-related travel and Respondent or another Bank employee charged Taylor's travel expenses to a Bank-Owned Card.

54. Respondent made numerous charges on Bank-Owned Cards from late 2009 (that the Bank paid in January 2010) through 2011 to Raffkinds, an Amarillo clothing store, totaling

8

over $1,600.

55. On the Visa statements most of the Raffkinds charges were unannotated, but a few had the notation "stationery supplies."

56. The Bank paid the Raffkinds charges.

57. Other examples of expenses with notations containing the questionable nature of a Bank expense include, but are not limited to: $733 at TJ Maxx; $1,130 and $1,641, respectively, to World Market and United Supermarkets (including charges for items such as toothpaste, uncooked meat, eggs, produce, and wine); over $6,600 for expenses relating to 12 trips to Chattanooga, Tennessee, where Respondent's son, Taylor Campbell, attended boarding school; over $11,000 in charges to Tranzon Auction Resolutions; in 2010 and 2011, 17 purchases from Worley Auction and Appraiser totaling over $57,191; over $426 in animal care products and services (including veterinary services and a dog leash); a $1,650 charge from what appears to be Scholastic Tours; and products and services relating to Respondent's home.

58. Although there are only a few receipts from Tranzon and Worley, receipts that do exist describe a variety of expenses that do not appear to be legitimate business expenses, such as a stereo receiver, outdoor furniture, and outdoor fireplaces.

59. The Bank paid all of the charges described above.

*The 2010 Bank Examination*

60. On December 13, 2010, the FDIC began an examination of the Bank ("2010 Examination"). The 2010 Examination resulted in a downgrade in the Management component from 2 to 3 due to, among other things, a lack of control over Respondent's expenses and an

9

inadequate Conflicts of Interest Policy.

61. Specifically, the 2010 Examination found the Bank's ratio of noninterest expense to average assets was 4.13 percent, which placed the Bank in the 92rd percentile of its peer group. The Bank's high noninterest expenses are attributable, at least in part, to the Bank's uncontrolled expense spending, including expenses the Respondent incurred or were incurred on his behalf.

62. On February 24, 2011, the FDIC and the TDOB met with the Board to discuss the findings of the 2010 Examination ("February 24, 2011 Meeting").

63. During the February 24, 2011 meeting, the FDIC and the TDOB informed the Bank's Board that Respondent obtained $38,800 for unsubstantiated expenses using cash-out tickets in 2010 while using seven Bank-Owned Cards for various purchases.

64. The FDIC and the TDOB also informed the Board that they should immediately place controls on Respondent's expenses, order a forensic audit on expenses from 2008 through 2010, promptly obtain reimbursement for all 2010 cash-out tickets without receipts to support the business purpose of such expenses, and obtain reimbursement for any employee expenses incurred for the employee's personal benefit.

65. On March 8, 2011, Respondent met with the FDIC.

66. Respondent stated during the March 8, 2011 meeting that because he could not locate receipts for the cash-out tickets, the $38,800 in cash-out tickets would be added to his 2010 W-2 as income for that year.

67. Also, during the meeting on March 8, 2011, Respondent promised to implement all 2010 examination recommendations, including controls on Respondent's expenses.

10

*Taylor's Bank-Owned Card*

68. On March 21, 2011, Respondent arranged for the issuance of a Bank-Owned Card to Taylor, a non-Bank employee.

69. Taylor's application for her Bank-owned credit card includes the notation that she was the "Senior V P of Assistants" for the Bank.

70. The Bank's Human Resources Department subsequently confirmed to FDIC examiners that Taylor was never a Bank employee.

71. At all times pertinent to this proceeding, Bank policy limited the issuance of Bank-Owned Cards to full time Bank employees with a business need for a credit card.

72. Initially, Taylor's Bank-Owned Card had a credit limit of $5,000.

73. In consecutive months, Taylor's Bank-Owned Card's credit limit was raised to $7,500 and then to $15,000, with no apparent Board or Bank supervisor approval or oversight.

74. On March 22, 2011, Bank Senior Vice President Scarlett Blair ("Blair") informed the Board in writing that Respondent planned to cancel four of his Bank-Owned Cards.

75. Blair's letter regarding the planned cancellations did not inform the Board of issuance of Taylor's Bank-Owned Card or her application with the false information regarding her employment by the Bank as a Senior Vice President of Assistants.

76. Expenses charged on Taylor's Bank-Owned Card totaled approximately $48,000 during 2011 and $9,000 in 2012 before it was deactivated in April 2012.

*The June 2011 Memorandum of Understanding*

77. On June 14, 2011, a Memorandum of Understanding ("MOU") between the Bank,

11

the FDIC, and the TDOB became effective.

78. MOU Provision #3 required a forensic audit for the period 2008 through 2010 that identified and totaled non-Bank related expenses incurred by the Bank on behalf of any employee and required the Board to submit to the FDIC and the TDOB a record of full reimbursement by the employee for any non-Bank expenses.

79. During a Board meeting held on July 28, 2011, the Board conducted its first review of Respondent's expenses.

80. During a related July 28, 2011 Executive Board session and in response to a question whether a Bank-Owned credit card had been issued to Taylor, Respondent answered "No".

81. Respondent knew or should have known that Taylor obtained and was using a Bank-Owned Card.

82. At the meeting, Blair explained to the Board outside of Respondent's presence that Respondent made personal charges on Bank-Owned Cards "to test the Bank's payment card system[,]" but "reimburses the bank for all personal charges."

83. Respondent made minimal reimbursement of personal charges (approximately $4,000) before the FDIC and the TDOB demanded repayment of all non-Bank expenses.

84. Repayments that Respondent made prior to the FDIC and the TDOB's demand for full reimbursement represented a small fraction of non-Bank expenses Respondent charged on Bank-Owned Cards.

85. During the July 28, 2011 Board Executive Session, Blair discussed several credit

12

card charges made by Respondent that appeared to be personal in nature.

86.    One such charge involved one of Respondent's many trips to Chattanooga, Tennessee, purportedly for a student credit card program.

87.    Respondent's trips to Chattanooga, Tennessee corresponded to times when Respondent's son attended school in Chattanooga, Tennessee.

88.    Respondent and/or a subsidiary of HBI controlled by the Burgess family, Financial Payments, reimbursed the Bank for a fraction of the charges incurred on trips to Chattanooga.

89.    Blair explained that the "health and fitness" entries on Respondent's credit card statements were Bank expenses because "CEO Burgess [has] tremendous pain in his neck and back" and the expenditures were for "a masseuse and trainer."

90.    Blair did not explain that the "health and fitness" expenses paid by the Bank were, at least in part, for the benefit of Taylor.

91.    The Executive Board also discussed, outside of Respondent's presence, authorizing payment of Respondent's Executive MBA program ("EMBA"), although by this time Respondent had been charging the expenses to the Bank (totaling more than $100,000), including Taylor's expenses in accompanying Respondent, for over 13 months:

92.    After Respondent returned to the Board meeting, the Board asked why he had travelled to Singapore in July 2011 for his EMBA.

93.    Respondent explained that the travel to the school's Singapore campus was a requirement of his EMBA. Respondent did not explain a side trip from the EMBA required

13

Singapore trip that he and Taylor took in July 2011 to Hanoi, Vietnam, that cost the Bank at least $1,672.

94. Likewise, Respondent never told the Board that in August 2011, after an EMBA-required trip to the school's London campus, he and Taylor were planning a side trip to Paris that ultimately cost the Bank at least $1,278.

95. At the July 28, 2011 meeting, the Board also raised the issue of having an assistant accompany Respondent on travel at Bank's expense.

96. Respondent explained that he needed an assistant (i) to organize the roughly 150 emails he received daily (thereby exposing a non-Bank employee to Bank business); (ii) to bring to his "attention matters that [sic] needing his immediate attention"; and (iii) to be able to discuss Bank matters in real time with someone who knew what was going on because of the time lag with Amarillo and his demanding school day.

97. Respondent did not disclose that his "assistant" was his girlfriend Taylor.

98. Contrary to his statement to the Bank's Board claiming that Taylor's expenses were justified as necessary business expenses, Respondent subsequently explained to the FDIC and the TDOB in February 2012 that the Bank had a policy of paying travel expenses for a significant other who accompanied a Bank employee on legitimate business travel.

99. Respondent did not produce this purported policy in response to FDIC and TDOB requests, and later retracted his statement that the Bank had such a policy.

100. During the July 28, 2011 meeting, Respondent told the Board that the University of Chicago paid for EMBA lodging.

14

101. Respondent and/or Taylor repeatedly used Bank-Owned Cards to pay for lodging while attending EMBA courses.

102. The Bank routinely paid these EMBA lodging charges.

103. At the conclusion of the July 28, 2011 meeting, without reviewing or evaluating any of Respondent's actual expenses based on the business or personal nature of each expense, the Board: (1) approved a 2011 expense budget of $127,000 for Respondent by annualizing his year-to-date expenses; (2) retroactively approved all of Respondent's 2011 Bank-Owned Card expenses; (3) retroactively approved EMBA-related expenses that the Bank paid over the prior 13 months; (4) retroactively approved Taylor's travel expenses as the Bank-related expenses of an assistant; and (5) directed Respondent to abstain from making personal purchases on Bank-Owned Cards.

104. There is no indication in the Board minutes that Respondent's father, Chairman of the Board, recused from the vote.

105. Despite the Board's directive, Respondent continued to make personal charges on Bank-Owned Cards.

*The Padgett, Stratemann & Co. Forensic Audit*

106. On August 8, 2011, the Board retained Padgett, Stratemann & Co. ("PSC") to conduct the forensic audit required by MOU Provision #3.

107. At a September 20, 2011 Executive Board Meeting, the minutes state "certain business related expenses relating to Mr. Campbell Burgess were not adequately documented and in some cases the Bank's files did contain appropriate records and receipts supporting the

15

business related use of such expense advances. The Board acknowledges that such expense advances were made exclusively for business-related purpose, however, because certain of these business-related expenses were not adequately documented, Mr. Campbell Burgess has agreed to remit $73,900 to the Bank."

108.    The Board never approved the addition of $38,800 to Respondent's 2010 income in lieu of his repayment of his 2010 cash advances.

109.    At a November 1, 2011 Board meeting with the FDIC and the TDOB, Respondent stated that he repaid all cash advances for 2008 and 2009 obtained through cash-out tickets totaling $73,900 and that he claimed the $38,800 of 2010 cash advances as income on his 2010 W-2.

110.    During a December 19, 2011 conference call with the FDIC and the TDOB, the Bank's MOU Compliance Committee noted that the PSC forensic audit had been delayed by a lack of adequate documentation for 2008 through 2010 expenses.

111.    On January 25, 2012, the Bank received a draft forensic audit from PSC ("Draft PSC Audit") which found, among other things, Respondent directly charged a total of $476,814 to the Bank, including $330,855 on 12 Bank-Owned credit cards, $33,259 on Bank-Owned debit cards, and $112,700 using cash-out tickets from 2008 through 2010.

112.    The Draft PSC Audit further found that Respondent produced receipts for only $33,388 of the $476,814 of expenses to support such expenses as legitimate Bank expenses.

113.    The Draft PSC Audit determined that $18,866 of credit card charges, which were made by or on behalf of Respondent, had an available receipt to support non-bank expenses; that

16

$327,273 of Respondent's debit and credit card charges lacked receipts; and listed $149,598 of direct credit and debit charges of Respondent without receipts as "questionable."

114. The Draft PSC Audit found that an additional $467,268 was charged on Bank-Owned Cards of other employees, including Respondent's Bank assistants, and that many of these charges relate to Respondent.

115. Unlike Respondent's direct charges on Bank-Owned Cards issued to Respondent, the majority of the charges on Bank-Owned Cards issued to other Bank employees included receipts.

116. Many of these receipts for charges on Bank-Owned Cards issued to other Bank employees show that the expenses benefited Respondent and not the Bank.

117. On February 1, 2012, the Board ratified Respondent's charges from 2008 through 2010 as "business expenses" based on: (i) two letters from Doug Conder ("Conder"), a certified public accountant who also served as CPA for Respondent and HBI, and who was a tenant of HBI, opining that the absence of receipts supporting a business purpose had survived IRS scrutiny and recommending that the Board retroactively approve Respondent's expenses "unless [the Board] had reason to believe otherwise"; and (ii) a memorandum from Blair acknowledging a small number of personal charges ($4,695.22) on Respondent's Bank-Owned Cards that were within the "normal range of error" and stating that all remaining charges were business in nature, and complied with the expense policy in effect when they were made.

118. On February 1, 2012, the Board also passed a resolution that in the future no expense will be reimbursed if it is not accompanied by a receipt.

17

119.    There is no indication in the Board minutes that Respondent's father, Chairman of the Board, recused from the vote.

120.    On February 1, 2012, in accordance with Blair's memorandum, Respondent reimbursed $4,695.22 to the Bank.

*The 2012 Bank Examination*

121.    At the February 13, 2012 joint examination of the Bank ("2012 Examination"), the Bank's management component was downgraded from a 3 to a 4 because of, among other things, the Board's continued lack of controls over Respondent's expenses, including the issuance of a Bank-Owned Card to non-employee Taylor, and continued failure to conduct a line item analysis of Respondent's expenses and obtain full reimbursement for non-Bank expenses, as required by MOU Provisions #3.

122.    The 2012 Examination also noted that Taylor's credit card charges were shown under Respondent's expenses – rather than identifying Taylor's Bank-Owned Card charges separately – in monthly expense reports that the Board reviewed.

123.    On April 2, 2012, without reviewing the nature of Respondent's individual expenses as required by MOU Provision #3, the Board once again retroactively approved all expenses of Respondent from 2008 through 2010 shown in the draft forensic audit after reviewing new IRS analyses by Conder and tax attorney Bill Hoy ("Hoy"), plus the prior recommendations of Conder and Blair.

124.    Hoy opined regarding the sufficiency of the Bank's expense reimbursement "system" for IRS purposes, concluding that the "system" was sufficient for IRS purposes.

18

125. Conder opined that the Bank's reimbursement of expenses without receipts was not a GAAP violation.

126. There is no indication in the Board minutes that Respondent's father, Chairman of the Board, recused from the vote.

127. On April 2, 2012, based on a management study that recommended the position of Chief Executive Officer and President be split into two positions, Respondent resigned as Bank President.

128. On April 12, 2012, PSC issued its final forensic audit report.

129. The final PSC report concluded that approximately $235,000 out of approximately $330,000 of Respondent's charges on Bank-Owned Cards were supported by "Other Documentation Per Bank Policy." PSC based its conclusion on the Board's February 1 and April 2, 2012 retroactive approvals of Respondent's 2008-2010 expenses. "However, because receipts were not available for these disbursements and because such expenses can be considered bank expenses, [PSC was] unable to concretely identify that these expenses were either bank or non-bank expenses."

130. On May 7, 2012, the Board met at the TDOB office with the FDIC and TDOB to discuss the findings of the Joint TDOB-FDIC 2012 Examination.

131. During this meeting, the FDIC noted that the 2012 Examination uncovered Taylor's Bank-Owned Card, her credit card application, and several overseas air fare charges.

132. Also during the May 7, 2012 meeting, Respondent told regulators and the Board that he thought Taylor had a personal credit card instead of a Bank-Owned Card.

19

133. The TDOB and the FDIC recommended that the Board review Respondent's expenses prior to 2008 and through 2012, and that Respondent promptly reimburse the Bank for all non-Bank related expenses.

134. On June 19, 2012, Respondent resigned as Chief Executive Officer of the Bank but remained on the Board. He also resigned from all Board committees.

135. On July 20, 2012, the TDOB and the FDIC jointly notified the Board, in writing, that all non-Bank expenses paid on behalf of Respondent during his tenure at the Bank should be promptly reimbursed.

### The Bank's Settlement with Respondent

136. On October 30, 2012, the Board authorized new directors Robert Templeton ("Templeton") and William McKinney ("McKinney") to resolve Respondent's expense issues and negotiate with Respondent regarding any required payment.

137. After reviewing Respondent's expenses, including the $149,598 identified by PSC as "questionable," directors Templeton and McKinney determined that approximately $180,000 in expenses warranted reimbursement to the Bank.

138. On December 7, 2012, directors Templeton and McKinney reached a signed settlement agreement with Respondent to reimburse the Bank an additional $238,650 for expenses that Respondent charged and the Bank paid from 2005 through 2012.

139. On December 7, 2012, Respondent paid the Bank $238,650, bringing his total reimbursement to the Bank to $319,505 between October 2011 and December 7, 2012.

### CONCLUSIONS OF LAW

140. Paragraphs 1 through 139 are re-alleged and incorporated herein by reference.

20

141. By reason of Respondent's foregoing acts, omissions and practices, Respondent has recklessly engaged in unsafe or unsound practices.

142. As a result of the foregoing acts, omissions, or practices, Respondent has breached his fiduciary duty as an officer and director of the Bank.

143. To the extent that the Bank's payment of Respondent's personal charges and subsequent reimbursement by Respondent could be characterized as loans, Respondent violated Regulation O.

144. Regulation O requires that loans to Bank insiders be extended "on substantially the same terms (including interest rates and collateral) as, and following credit underwriting procedures that are not less stringent than, those prevailing at the time for comparable transactions by the bank with other persons that are not covered by [Regulation O] and who are not employed by the bank." 12 C.F.R. § 215.4(a).

145. Because the Bank did not make comparable loans to non-Bank employees at that time, Respondent's personal charges and cash withdrawals were extensions of credit by the Bank made on preferential terms and therefore violated Regulation O.

146. As a result of Respondent's foregoing acts, omissions, or practices and breaches of fiduciary duties, the Bank suffered losses.

147. As a result of his foregoing acts, omissions, or practices and breaches of fiduciary duties, Respondent received financial gain or other benefit.

148. Respondent's foregoing acts, omissions, or practices demonstrate a willful or continuing disregard for the safety or soundness of the Bank and personal dishonesty.

21

## NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTY, FINDINGS OF FACT AND CONCLUSIONS OF LAW

149.    Paragraphs 1 through 148 are restated and incorporated herein by reference and constitute FINDINGS OF FACT AND CONCLUSIONS OF LAW for the purposes of this NOTICE OF ASSESSMENT.

150.    By reason of the allegations contained herein, Respondent has recklessly engaged in unsafe or unsound practices in conducting the affairs of the Bank within the meaning of 12 U.S.C. § 1818(i)(2)(B)(i)(II).

151.    By reason of the allegations contained herein, Respondent has breached his fiduciary duties to the Bank within the meaning of 12 U.S.C. § 1818(i)(2)(B)(i)(III).

152.    To the extent that the Bank's payment of Respondent's personal charges and subsequent reimbursement by Respondent could be characterized as loans, Respondent violated Regulation O. Therefore, Respondent has violated law or regulation within the meaning of section 8(i)(2)(A)(i) of the Act, 12 U.S.C. § 1818(i)(2)(A)(i).

153.    By reason of the allegations contained herein, Respondent's practices and breaches are part of a pattern of misconduct within the meaning of 12 U.S.C. § 1818(i)(2)(B)(ii)(I).

154.    By reason of the allegations contained herein, Respondent's practices and breaches resulted in pecuniary gain or other benefit within the meaning of 12 U.S.C. § 1818(i)(2)(B)(ii)(III).

155.    By reason of the allegations contained herein, Respondent's practices and breaches resulted in more than a minimal loss to the Bank within the meaning of 12 U.S.C. §

22

1818(i)(2)(B)(ii)(II).

156. By reason of the allegations contained herein, Respondent made or caused to be made false entries in the Bank's books and records within the meaning of 12 U.S.C. § 1818(i)(2)(B)(ii)(II).

157. By reason of the allegations contained herein, Respondent concealed material facts from bank regulatory authorities within the meaning of 12 U.S.C. § 1818(i)(2)(B)(ii)(II).

### ORDER TO PAY

158. By reason of Respondent's reckless engagement in unsafe or unsound practices, breaches of fiduciary duties, and/or violations of law or regulation, which were part of a pattern of misconduct that resulted in pecuniary gain or other benefit to him and more than a minimal loss to the Bank, as set forth in the NOTICE OF ASSESSMENT, the FDIC has concluded that a civil money penalty should be assessed against Respondent pursuant to 12 U.S.C. §§ 1818(i)(2). After taking into account the appropriateness of the penalty with respect to the size of Respondent's financial resources and good faith, the gravity of the practices and breaches, the history of previous unsafe or unsound practices or breaches of fiduciary duties, and other matters as justice may require, it is:

ORDERED, that by reason of the reckless unsafe or unsound practices, breaches of fiduciary duties, and/or violations of law or regulation which were part of a pattern of misconduct that resulted in pecuniary gain or other benefit to Respondent, a penalty be and hereby is assessed against Respondent pursuant to 12 U.S.C. § 1818(i)(2) in the amount of $200,000, and

FURTHER ORDERED, that the effective date of this ORDER TO PAY be, and hereby

23

is, stayed until 20 days after the date of receipt of the NOTICE OF ASSESSMENT by Respondent, during which time Respondent may file an answer and request a hearing pursuant to 12 U.S.C. § 1818(i)(2)(H) and 12 C.F.R. § 308.19.

## OPPORTUNITY FOR HEARING

159.    Notice is hereby given that a hearing shall commence at Amarillo, Texas, sixty (60) days from the date of service of this NOTICE OF INTENT TO REMOVE AND PROHIBIT upon Respondent, or at such place or on such date as the parties to this action and the Administrative Law Judge appointed to hear this matter may agree, for the purpose of taking evidence on the charges herein specified, in order to determine whether a permanent order should be issued to prohibit Respondent from further participation in the conduct of the affairs of any insured depository institution or organization enumerated in 12 U.S.C. § 1818(e)(7)(A) without the prior permission of the FDIC and the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D).

WITH RESPECT TO THE NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES, RESPONDENT MUST SPECIFICALLY REQUEST A HEARING WITHIN 20 DAYS PURSUANT TO 12 U.S.C. § 1818(i)(2)(H) AND 12 C.F.R. § 308.19. IF RESPONDENT FAILS TO FILE A REQUEST FOR A HEARING WITHIN 20 DAYS OF THE SERVICE OF THE NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTY ON HIM, THE PENALTY ASSESSED AGAINST HIM PURSUANT TO THE ORDER TO PAY WILL BE FINAL AND SHALL BE PAID WITHIN 60 DAYS AFTER THE NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTY IS SERVED ON HIM.

24

160.   The hearing will be public and in all respects conducted in accordance with the provisions of the Act, the Administrative Procedure Act, 5 U.S.C. §§ 551-559, and the FDIC's Rules of Practice and Procedure, 12 C.F.R. Part 308. The hearing will be held before an Administrative Law Judge appointed by the Office of Financial Institution Adjudication pursuant to 5 U.S.C. § 3105.

161.   An original and one copy of all papers filed in this proceeding shall be served upon the Office of Financial Institution Adjudication ("OFIA"), 3501 N. Fairfax Drive, Suite VS-D8116, Arlington, Virginia, 22226-3500 pursuant to 12 C.F.R. § 308.10. Copies of all papers filed in this proceeding shall be served upon the Office of the Executive Secretary, Federal Deposit Insurance Corporation, 550 17th Street, N.W. (F-1058), Washington, D.C. 20429; A. T. Dill, III, Assistant General Counsel, Federal Deposit Insurance Corporation, 550 17th Street, N.W., MB 3020, Washington, D.C. 20429; and upon Stephen C. Zachary, Regional Counsel (Supervision), Federal Deposit Insurance Corporation, 6060 Primacy Parkway, Memphis, Tennessee 38119. Pursuant to 12 C.F.R. § 308.10(b)(4), all documents required to be filed, excluding documents produced in response to a discovery request pursuant to Part 308.25 and Part 308.26, shall be filed electronically with OFIA. Respondent is hereby directed to file any answer electronically with OFIA at ofia@fdic.gov. Failure to answer within the 20-day time period shall constitute a waiver of the right to appear and contest the allegations contained in the NOTICE OF ASSESSMENT and NOTICE OF INTENT TO REMOVE AND PROHIBIT and shall, upon the FDIC's motion, cause the Administrative Law Judge or the FDIC to find the facts in these Notices to be true as alleged and to issue appropriate ORDERS.

25

## PRAYER FOR RELIEF

WHEREFORE, the FDIC prays for issuance of the ORDER TO PAY in the form detailed in paragraph 158 above against Respondent; for issuance of an ORDER OF REMOVAL FROM OFFICE AND PROHIBITION FROM FURTHER PARTICIPATION against Respondent; and for such other relief as justice may require.

Pursuant to delegated authority.

Dated at Washington, D.C., this 21st day of November, 2014.

/s/
_____
Christopher J. Newbury
Associate Director
Division of Risk management Supervision

26